**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND | ) |
| EXCHANGE COMMISSION, | ) |
| | ) |
| Plaintiff, | ) Case No. 09-CV -1775 |
| | ) |
| v. | ) Judge William J. Hibbler |
| | ) |
| THE NUTMEG GROUP, LLC | ) Magistrate Judge Ashman |
| RANDALL GOULDING, | ) |
| DAVID GOULDING, | ) |
| | ) |
| Defendants, | ) |
| | ) |
| DAVID GOULDING, INC., DAVID | ) |
| SAMUEL, LLC, FINANCIAL | ) |
| ALCHEMY LLC, PHILLY FINANCIAL, | ) |
| LLC, SAM WAYNE, and ERIC | ) |
| IRRGANG, | ) |
| | ) |
| Relief Defendants. | ) |

### DECLARATION OF RANDALL GOULDING

Upon first being duly sworn on oath and under penalty of perjury, the undersigned states the following:

1.    I have authority to make this Affidavit, and am personally familiar with all matters contained in the affidavit. I am above the age of 21 years old and under no disability. I am a Defendant in this matter. I currently reside and office at 1333 Sprucewood, Deerfield, Illinois.

2.    This affidavit is pursuant to the Receiver's April 9, 2010 motion to hold me in contempt of Court for allegedly not complying with her requests and allegedly not cooperating with her. If called to a hearing before the Court, I am capable of competently testifying to the facts stated herein based upon personal knowledge.

3.      I did not violate the Court's August 6, 2009 Order appointing the Receiver, or any other order of this Court. Additionally, I acted in good faith at all times. I consistently cooperated with the Receiver and assisted her with her requests. In such pursuit, my counsel and/or I sent the Receiver and/or counsel, more than 500 e-mails since she became the Receiver, in my efforts to assist her in the performance of her duties. I spent nearly 400 hours and spent approximately $10,000 in out-of-pocket expenses (which the Receiver will not reimburse), in aiding her efforts. Her allegation that I have "repeatedly refused to cooperate with Receiver in her administration of the Nutmeg estate", is simply not true; I cooperated to the best of my ability. I responded to every single one of her requests to the best of my ability. I truly do not know what more I could possibly do you have not already done or offered to do. See Exhibit, Accounting Records 11-12.[1]

4.      I fulfilled my obligations in assisting "the Receiver in fulfilling her duties and obligations. [I responded] promptly and truthfully to all requests for information and documents from the Receiver".

5.      On September 2, 2009, at the Receiver's request, I relinquished control of all "assets, collateral, books, records, papers or other property of Nutmeg and the Funds" in his "custody, possession or control" to the Receiver. Yet, the Receiver claims to have no such records, repeatedly requesting such records from me.

6.      The Receiver has repeatedly claimed that without making a copy of the files, she gave the Nutmeg external hard drive to the SEC and the SEC converted it to a format which she cannot access. While not questioning the prudence of this action, I repeatedly offered to copy for the Receiver, all documents on my personal hard drive, to a hard drive of the Receiver, so that

---

[1] Leslie Weiss was my attorney in an SEC matter, and also represented the firm of which he was a principal.

the Receiver would have yet another electronic version of all such records. However, the

Receiver has repeatedly ignored and refused this offer. See Real American Brands Exhibit 2;

Accounting Records Exhibit 6. Since September 2, 2009, however, I have no "assets, collateral,

books, records, papers or other property of Nutmeg and the Funds". In order to be able to assist

the Receiver in her duties, before the electronic records were turned over to the Receiver on

September 2, 2009, I purchased, at my own expense, an external hard drive and copied the

electronic files. Since September 2, 2009, I have had no physical records of Nutmeg and the

Funds. I have no records physical or electronic, pertaining to Nutmeg and the Funds, which the

Receiver does not also have.

7.      I have not withheld any documents. Moreover, given her limited familiarity with

Excel spreadsheets, I repeatedly volunteered to walk the Receiver through the organization of

Nutmeg's electronic records on the server. Indeed, immediately prior to the filing this motion, I

renewed the offers. Even when she threatened to file instant motion, I wrote to her explaining his

desire to rectify any item she felt had not been satisfied or resolved. See Exhibits Accounting

Records 11-12.

8.      Additionally, following the filing of this motion, I purchased, at my own expense,

another new external hard drive and physically reloaded the Nutmeg electronic files to this new

drive, which was then personally delivered to Ms. Weiss by Jim Kopecky, after his review of the

external hard drive.

9.      On May 20, 2010, at considerable expense, my attorney and I traveled to Ms.

Weiss's office to meet with her to answer any further questions she might have had. In addition,

on the same date, David Goulding, at considerable time and expense, traveled from Madison

Wisconsin, joined by his attorney, to meet with her to answer any further questions she might

3

have had and specifically explain to her the organization of the Nutmeg electronic files. Ms.

Weiss refused to learn the organization of the Nutmeg electronic files.

10.     Soon after Jim Kopecky delivered the new hard drive to Ms. Weiss, on April 26,

2010, she became very confused as she tried to figure out what was on the hard drive, once again

alleging that something was wrong with Nutmeg's files, stating that "I am finding all kinds of

garbage on the drive." After I responded that "There is no 'garbage on the drive,'" she replied

that "I am thinking I have gotten the wrong drive hooked up. I am finding lots of emails dealing

with Hannahs Cylinders, which I have never heard of before and which I do not think has

anything to do with Nutmeg. Please confirm." Accounting records Exhibit 13.

11.     I fully cooperated and did everything I could to placate the Receiver. Yet, she

claims to still be unsatisfied at least as to two points. However, these two points have evolved to

the point of being unrecognizable in comparison to both the original request and the point in the

motion. Finally, it is totally inappropriate if not a perversion for the Receiver's inability to

understand what she has to be transformed into a motion for rule to show cause.

12.     In my April 7, 2010 letter, I offered her the following additional assistance:

"As far as I can determine, I believe that I have already provided you with the assistance
you requested. If you feel otherwise, please let me know what it is that I have, that you do
not have, or how I may otherwise be of assistance to you.
You asked me to direct you to the portion of the drive containing the "accounting
materials". I did that. Additionally, I have repeatedly offered to walk you through the
organization of the records on the server. … I once again repeat this offer. I have no other
accounting records other than what you have on the server….
You also refer to a list of apparent grievances. If your desire is truly to gain information
to enable you to perform your duties, please provide me with the list so that we can work
together toward answering any questions you may still have with regard to any such
item…. I had made numerous computations for you and prepared conversion notices for
you, since you are not conversant with Excel spreadsheets. I even offered to teach you,
once again, how to use Excel spreadsheets…. Please provide me with this list so that we
can complete any task which you feel still requires my attention. As always, if there is
anything else I can do, I am happy to do so."

4

Exhibit Accounting Records 11.

13.     In addition, my April 8, 2010 letter, offered the following additional assistance:

"I do not understand what I could possibly have that you do not have…. I certainly want to resolve any unfinished business [and] any unresolved disputes between us. I believe that I have complied with every request you made for documents or other assistance. If this is not true, please identify what it is that you still need and I will … do the best I can to get it to you. I do not know what [is on] this list to which you refer, but I would prefer to resolve these matters without Court involvement.… Once again I strongly urge you to provide me with any items that you still need that you feel I have not provided…. Please furnish me with this list of your apparent grievances for which you intend to file a motion for rule to show cause, so that we can work together toward answering any questions you may still have with regard to any such item. Only in this way can we hope to address any such issues and thus complete any task which you feel still requires my attention. Finally, rather than going back and forth with these e-mail communications, please telephone me so we could discuss it. ... As always, if there is anything else I can do, I am happy to do so."

Exhibit Accounting Records 12.

A.  Real American Brands

14.     I have never "[withheld] a spreadsheet listing the amount of the RAB investments [yet refusing] to turn over to the Receiver." Nor did I ever "refuse to cooperate with the Receiver [in any regard, including supplying] a spreadsheet". The Receiver has all spreadsheets and other materials. I have no records belonging to Nutmeg. I only have copies of Nutmeg's hard drive as it existed on September 2, 2009, when I delivered the hard drive to the Receiver. I have no Nutmeg materials which the Receiver does not also have. Additionally, on March 8, 2010, prior to the filing of this motion, I again offered to the Receiver, in the e-mail attached hereto as Exhibit Real American Brands 1, "I will once again download the files for you [on a blank external hard drive and], consistent with Jim Kopecky's suggestion to which you never responded." However, the Receiver again refused my offer to once again download the files for her.

5

15.     While Exhibit A to her motion, her March 3, 2010 e-mail to me, falsely suggests that I never replied thereto, I did respond on March 4, 2010, on March 8, 2010, and had previously furnished the information to her on September 10, 2009. See Exhibits Real American Brands 1-3. The spreadsheet was not "unintelligible" as she claimed; it was simply not understood by her. This spreadsheet, attached to Exhibits Real American Brands 1 and 3 (and also on the hard drive collected by receiver on September 2, 2009, and again delivered to the Receiver immediately after she filed this motion), was an amortization schedule. It reflects all the information, which I thought would help her on this controversy. It calculates and reflects which Nutmeg fund made the investment (the Nutmeg Lightning Fund); it reflects the amount of the investment ($182,500) and the amount and date of each installment (see the first two columns of Exhibits Real American Brands 1 and 3, Attachment tab six), the dates and amounts of all sales (Exhibits Real American Brands 1 and 3, Attachment tab three); the balance of the amount due from time to time, including all increases (see the second and fourth columns reflecting advances and interest charges) and decreases (see the sixth column reflecting constructive payments or 75% of sales, conforming to the terms of the convertible note, and consistent with the sales reflected in Exhibits Real American Brands 1 and 3, Attachment tab three). Moreover, the motion was my first notice that the Receiver was unable to understand this schedule.

16.     Also withheld from the motion is the series of e-mails in which I was to have a telephone conference with Ms. Weiss to discuss Real American Brands, the 2008 tax returns, Sanswire, MIKP and other items. However, Ms. Weiss broke appointment after appointment with me. She never telephoned me, despite her repeated promises to do so, requiring that I set aside time for telephone calls which she never made. Exhibits Real American Brands 4-5.

17.     Exhibit Real American Brands 6, is an excerpt of transactional entries in the Internal Rate of Return spreadsheet which reflects all payments to Real American Brands, by fund. Exhibit Real American Brands 7, is a spreadsheet prepared by Ryan Goulding and Brandon Goulding, further simplifying the information for the Receiver. They secured this information from the master spreadsheets, which are maintained by fund. All such information has been readily available to Ms. Weiss. By way of illustration, these spreadsheets are attached as Exhibits Real American Brands 8-9, from which they derived the data to prepare Exhibit Real American Brands 7 for the Receiver.

18.     Further illustrating additional ways for the Receiver to access the information, attached as Exhibit Real American Brands 10, is the spreadsheet reflecting the investments, sales etc., relating to the Fortuna fund investment in Billy Martin, the predecessor to Real American Brands.

19.     By way of example, to aid in the Receiver's understanding, the way that information was input is as follows:  When sales were made they were entered into the spreadsheet for the specific security as well as the QuickBooks file for the fund that benefited from the transaction.  I will illustrate this by way of an example.  On October 20, 2008, Nutmeg/Fortuna Fund sold 620,000 shares of Sanswire (SNSR), previously Globetel (GTEL).  In the file labeled "GTEL- FORT" an entry was made in the sales tab to reflect both the shares and the $28,420.83 received.  Linked to this file was the Fortuna Fund master file, named "FORTUNA FUND", and located in the same subfolder.  There are three tabs in this excel file (FORTUNA FUND).  The first tracked all investments in that fund.  Linked to that was a tab listing all investors and their interests in the fund.  Linked to FORTUNA FUND were investor statements.  Additionally, an entry was simultaneously made in QuickBooks to reflect this sale

(and all other sales) as well. The purpose of linking all of these excel files together was to ensure that each fund, and ultimately each investor got credit for all proceeds earned from sales. This was among the many things that David Goulding and I wanted to explain to the Receiver so that she could work with the electronic files and understand how they fit together and how she could ultimately feel comfortable in the fact that all investments are accounted for by fund and that all investor funds are appropriately credited. See Exhibit Real American Brands 1-13.

B.      Morgan Wilbur/Howard Salamon

21.     As evidenced in the attached Exhibits Wilbur and Salamon 1-3, not identified in the motion, the claim that I "refus[ed] to cooperate with the Receiver in providing information on his dealings with Wilbur and Salamon" and "refused to provide any detail on the amounts paid to Wilbur or Salamon, nor has he provided any detail as to the deals that either brought to Goulding", is not true. I specifically disclosed all information that I believed the Receiver was seeking. I was unaware that the Receiver desired more information than what was provided. Contrary to the Receiver's representations to the Court, I sent three separate communications to the Receiver (one of which is transmitted by Stephen Nagler, Esquire), attached as Exhibits Wilbur and Salamon 1-3. As indicia of good faith, since it was not clear what the Receiver sought, I even sent her an additional e-mail to make sure everything was covered. Exhibit Wilbur and Salamon 4. These communications responded to her inquiry and then some. The Defendants provided details concerning payments to Wilbur and Salamon and more. The Receiver never requested any information beyond what is set forth in the responses constituting Exhibits Wilbur and Salamon 1-3. Since it does not appear that the Receiver ever responded to Exhibits Wilbur and Salamon 1-3, I could only assume that the Receiver was not interested in any further information. Moreover, this was one of the reasons, for my letters of April 7 and April 8, 2010

(Exhibits Accounting Records 11-12), to clear up such misunderstandings and to provide the

Receiver with information that she may have felt she still needed. In particular, in my April 7,

2010 letter, I specifically made an open and unlimited offer of additional assistance. However,

once again, the Receiver refused my attempts to furnish any further information or assistance.

Clearly, the assertion that I did not cooperate when I did, repeatedly, is not supportable. See

Exhibits Wilbur and Salamon 1-4; Exhibits Accounting Records 11-12. Additionally, for the

Receiver's further convenience, the Defendants prepared additional spreadsheets reflecting

payments to Wilbur and Salamon. Exhibits Wilbur and Salamon 5-6. I also provided all the

evidence I had concerning the Receiver's requests for information on this and other topics. See

Exhibits Wilbur and Salamon 7-17. I also provided the Receiver with a detailed analysis

illustrating why certain investments could not have been fund investments. Exhibits Wilbur and

Salamon 8. See also supporting documents. Exhibits Wilbur and Salamon 10-13. While the

Receiver may not have agreed with my conclusions, there is nothing more that I have. The rest of

the evidence was abandoned by the Receiver at the Nutmeg office. I could not have taken the

records without being in violation of the Court's August 6, 2009 Order.

C.     Sanswire

22.     Attached is a copy of the original note (Exhibit Sanswire 1) and the original

Convertible Note Assignment Agreement (Exhibit Sanswire 2) assigning the note to

Nutmeg/Fortuna Fund, L.L.L.P.  The Assignment Agreement specifically recites that on

September 8, 2006, for and on behalf of the Assignee, the Assignor invested $100,000 into

Sanswire. On September 2, 2009, I met with the Receiver to furnish her with all Nutmeg records

that she desired to take and gave her a key to the premises. On September 10, 2009, September

16, 2009, September 22, 2009, and thereafter on May 20, 2010, I went to the Receiver's office, at

her request to answer questions. On September 8, 2009, among other things, the Receiver and I reviewed the Sanswire Note and the Assignment Agreement (which were in her possession), and I discussed why he felt the Receiver should sue. Paragraph 16 of my list of discussion points with the Receiver (Exhibit Sanswire 5) states "We should file suit, for default on the note. We have prepared the complaint and identified local counsel for Fortuna Fund. Liability is clear-cut. Suit needs to be filed in New York in accordance with the jurisdiction selection clause. There is a summary procedure in New York on promissory notes." (Exhibit Sanswire 3)

23. As evidenced in the attached Exhibits Sanswire 1-11, which were not revealed in the motion, it is falsely claimed that "Goulding refus[ed] to provide any books or records on the Sanswire investments" and "refused to cooperate with the Receiver in providing information on the Sanswire investment". I specifically disclosed all information that he believed the Receiver was seeking. He was unaware that the Receiver desired more information than what was provided. I sent four separate communications to the Receiver, attached as Exhibits Sanswire 6-9. As indicia of good faith, on Monday, March 08, 2010 12:14 PM I sent her an e-mail inquiring "why don't you send me a blank external hard drive and I will once again download the files for you, consistent with Jim Kopecky's suggestion to which you never responded." However, she never responded. These communications and attachments (which attachments the Receiver already had) responded to her inquiry and then some. She already had all books and records on the Sanswire investments, and all other nutmeg and fund related books and records. I was not "holding a spreadsheet listing the amount of the Sanswire investment which [he] refused to turn over to the Receiver." All books and records were turned over to the Receiver on September 2, 2009. Nutmeg's electronic records clearly provided this information, had she bothered to look. I provided details concerning the Sanswire investments and more. The Receiver never requested

any information beyond what is set forth in the responses, attached as Exhibits Sanswire 6-9.

Since it does not appear that she ever responded to Exhibits Sanswire 6-9, I could only assume

that the Receiver was not interested in any further information, and had no interest in me again

downloading the files for her on a blank external hard drive. Moreover, this was one of the

reasons for my letters of April 7 and April 8, 2010 (Exhibits Accounting Records 11-12), to clear

up such misunderstandings and to provide the Receiver with information that you feel you still

need. In particular, in my April 7, 2010 letter, I specifically offered additional assistance to her.

However, once again, she refused my attempts to supply her with any further information or

assistance. Clearly, the assertion claiming that I did not cooperate when he did, repeatedly, is

false. See Exhibits Sanswire 1-11; Exhibits Accounting Records 11-12. As can easily be gleaned

from the complaint I prepared and Exhibits (Exhibit Sanswire 4), and as explained to the

Receiver, although withheld from her motion, all pertinent information is set forth therein. The

following portions of the complaint provide the details.

> 16. Thereafter, on April 28, 2008, Nutmeg issued to Defendant a notice of conversion (Exhibit Sanswire 5), offering to Defendant a credit of accumulated penalties (of $36,000) and interest (of $23,164.70), then in the total amount of $59,164.70, in exchange for 2,629,542 shares of Defendant's common stock.
> 17. Defendant accepted, by issuing the 2,629,542 shares of Defendant's common stock on July 25, 2008
> 18. Despite demands and threats of litigation, Defendant refuses to make any further payments.

24. Additionally, the attached conversion notice, Exhibit Sanswire 5, an exhibit to the

complaint, as repeated and set forth above in paragraph 16, reflect the terms pursuant to which

the 2,629,542 shares were issued, that being at $.0225 per share, defraying only interest and

penalties accumulated to that date.

Conversion Price per share:             $.0225
Number of shares to be issued:         2,629,542

11

Amount of Interest and penalties Converted:          $59,164.70

25.     She has had this complaint against Sanswire and the exhibits since September 2, 2009. Also attached are my various responses to the Receiver (Exhibits Sanswire 6-9), and attachments (Exhibits Sanswire 10-11). See Exhibits Sanswire 1-11; Exhibits Accounting Records 11-12.

26.     All this information is in the file labeled "GTEL- FORT" (Exhibit Sanswire 12) and the Fortuna Fund master file, named "FORTUNA FUND".  Additionally, transaction entries were simultaneously made in QuickBooks. the Receiver refused to look at what she had, and refused to permit me to explain to her what she had, refused to permit him to reload the files for her on a blank external hard drive (although he actually did this at his own personal expense), and further refused to discuss this by telephone (breaking appointment after appointment with him. Exhibits Real American Brands 4-5.)  By examining "GTEL- FORT" (Exhibit Sanswire 12)" or the Fortuna Fund master file, "FORTUNA FUND", it is evident that FORTUNA FUND sold 2,680,337 shares[2], the credit for the shares sold, when the sales occurred, the sales proceeds and the amortization.

27.     I did not know what more Nutmeg related information the Receiver could possibly want that she did not already have; I had nothing more than what the Receiver had.

D. The Carried Interest Increase to Investors

28.     First, there was no "Carried Interest Increase to Investors"; the Carried Interest percentage never increased. Once again, the claim that the Receiver "asked Goulding for information" which I "refused to provide" is false.  My March 16, 2010 response to the

---

[2] Note that the difference between the 2,629,542 shares issued upon conversion, and the 2,680,337 shares sold, is the fact that the company issued some shares, without explanation and without consideration, pursuant to the advice of their broker, as a result of their default.

12

Receiver's Exhibit C was sent later on the very same day, March 16, 2010. As clearly stated in my response, Exhibit Carried Interest Increase 1:

> "your representations as to the percentage carried interest are false. You should more carefully read the materials upon which you base your conclusions. The e-mail which you attach has no relevance. That e-mail was pursuant to the original offering, citing why the carried interest should be 25% instead of 20%, for previous (pre-Mercury) investors. The original offering documents called for a varying percentage carried interest. It was 25% for previous investors, 30% for new investors…. As a loyalty bonus, all previous Nutmeg Investors will be grandfathered in at a 25% carried interest. Otherwise, new investors, those who previously have not invested with The Nutmeg Group, LLC, will bear a 30% carried interest."

29.     The Mercury Fund carried interest percentage was always 25% (in some instances 30%). It never changed. Even the complaint and answer are inapposite. See paragraph 39. There was no vote to increase the carried interest percentage. There was no increase to the Mercury Fund carried interest percentage. Exhibit C to the Motion accompanied the original offering materials. The original offering materials reflect this same carried interest amount, which the Receiver would have known with a minimum of diligence before making this allegation. The purpose of Exhibit C, was a disclosure to investors so that they were fully aware of this increase over that of previous funds. As to the investor vote to change to a perpetual fund, this was documented in the files left at the Nutmeg office when the Receiver abandoned such records to the landlord. However, as explained to Leslie Weiss, evidence of the results of this vote would be on Randy White computer which Ms. Weiss has in her possession. Additionally, on June 3, 2010, I was able to locate the spreadsheet, which Leslie Weiss has had, showing the tally on the vote. See Exhibit 2 Carried Interest Increase.

30.     Clearly, there was no "refusal to cooperate with the Receiver in providing information on the Carried Interest". Nor was there ever any "withholding any books or records

on the Carried Interest Increase". I do not have any documents that the Receiver does not also have.

E. AccessKey/Hot Web

     31.    Once again, the Receiver falsely claims that she asked for information and I refused to respond. My response to the Receiver's Exhibit D was sent later within 24 hours, requesting clarification. I did not understand what she meant by this "Why did How Web want AccessKey shares and what did How Web do with the shares. Also, what were the fact amounts of the notes?" (Exhibit AccessKey/Hot Web 1) The Receiver refused to respond to my request for clarification and did not disclose to the court that that I did respond. Additionally, I spent a considerable amount of time providing her information to clear the shares for trading. Exhibits AccessKey/Hot Web 1-5.

     32.    Clearly, there was no "refusal to cooperate with the Receiver in providing information on the AccessKey and Hot Web investment". Nor is there any "withholding any books or records".

     33.    The claim that I had not responded when I did, repeatedly, is false. See Exhibit AccessKey/Hot Web 1-5.

F. Legal Representation Issues

34.    I did fully disclose "those entities which received [my] legal services". As evidenced in the attached Exhibit, Legal Representation 1, which the Receiver withheld from the Court in her motion, she falsely claimed that I "refus[ed] to cooperate … in providing information on the Legal Representation Issues" and "refused to provide [such] information". However, I specifically disclosed the companies in his November 20, 2009 e-mail (Exhibit, Legal Representation 1):

14

"I am convinced that this is nothing more than retaliation for my discovery of [the Receiver's] malpractice and a diversion from the fact that this is really something desired by the SEC for whom she is acting. No doubt that is why she refused to disclaim that objective and became very evasive and unresponsive. As best as I can determine, the portfolio companies for which the law offices provided legal services are:
> Phyhealth
> Nanologix
> Apple Rush
> American Asia
> Inverso"

The Receiver's definition for this purpose was "payment is not relevant" and "Exclud[ing only] those for which I [had only] a casual conversation regarding legal matters." Moreover, this is another non-issue. The Receiver is wasting investor funds pursuing this. This is clearly not going to get any benefit for the investor. Instead is a vindictive, frolic endeavor, for which should not charge the investors.

35.     What makes this a red hearing is the fact that the purpose of these services was really to benefit the funds. There was probably not a single instance in which my law firm charged portfolio companies for the advice, while a fund was investing. Many of these companies could not afford legal services. My objective was to assure such things as compliance with securities laws so that the funds would benefit. As stated on the website, Nutmeg tried to be a full-service organization, which was for the benefit of the funds. Additionally, by giving such free advice, the funds were more likely to get a deal, and with better terms. In short, there was never a conflict or even the possibility of a conflict. Moreover, the Receiver has had all of the communications. Yet, she cannot cite a single instance of any advice to any portfolio company which was contrary to the interests of any fund. Furthermore, there was no advice furnished that was detrimental to the interests of any fund. Even if there was, as disclosed to receiver and her counsel, with rare exceptions, the law firm only had one client, Nutmeg. It therefore did not carry

15

professional liability insurance. There is simply no conceivable legitimate purpose or benefit for the funds of this inquiry.[3] See Exhibits Legal Representation 1-3.

G. Physicians Healthcare

36.     The Receiver's Exhibit F, states: "I am looking over the Physicians Healthcare investment and need to know exactly how much money each of the funds invested in that company, the dates of the investments and whether or not any securities of that company were sold." The attached Exhibits, Phyhealth 1 and Phyhealth 2, responded to her Exhibit F.  I never "refus[ed] to cooperate with the Receiver." Indeed, I went out of my way to provide the Receiver with this information which she already had, but refused to access herself. She first secured this information, including all electronic information and paper files from Nutmegs office on September 2, 2009. As I repeatedly explained to the Receiver, this information is available in several different places. I also repeatedly attempted to re-supply her with this information. However, she repeatedly refused. As evidenced in the attached Exhibits, Phyhealth 1 and Phyhealth 2, withheld from the Court in her motion, I "never "refus[ed] to cooperate with the Receiver in providing information". Moreover, not only did she have this information in several different places, since September 2, 2009, but I purchased a backup hard drive, recopying all of the files so that she would have this information once again.

37.     Nonetheless, I spent a considerable amount of time and effort preparing an Excel spreadsheet which reflects all of the investments into Phyhealth, by payment, and all of the sales. See Exhibit Phyhealth 3. In creating this Excel spreadsheet for the Receiver, I personally copied

---

[3] As set forth in this letter which Ms. Weiss withheld from the Court, exhibit, Legal Representation 1: "Finally, we also find her joint venture type agreement with the SEC, violative of Ms. Weiss's fiduciary obligations to me as her former client. Effectively, she has altered her role from that of receiver, to become a government agent prosecuting her former client."

and pasted it from internal rate of return spreadsheet. As previously explained to the Receiver repeatedly, this information is also available, by fund, on each fund's master spreadsheet. I also repeatedly offered to once again teach her how to use Excel spreadsheets so that she could effectively perform her duties. This offer was also refused each time.

H. Dave Rivers

38.     Again, the Receiver falsely claims that I "refused to provide any detail on the amounts paid to Rivers" and "refus[ed] to cooperate with the Receiver in providing information". Contrary to her representations to the court, David Goulding and Randall Goulding sent at least 6 separate communications to her office, and several attachments, most of which are attached as Exhibits Rivers 1-7. These communications responded to her inquiry and then some. I am not aware of any other information she may be seeking.

39.     Hopefully clarifying her confusion, in my November 3, 2009 letter to the Receiver, among other things I pointed out that:

> Most if not all finders were investors first. When you go through the records, you need to look at the complete description in the records. Payments to them … were undoubtedly for more than just finder's fees. No doubt, some of those payments were distributions.
Exhibit Real American Brands 11.

40.     She also states that "1099-MISC Forms (Miscellaneous Income) for Rivers in Receivers possession do not match the amounts that Nutmeg's ledgers show that Rivers received." As I repeatedly indicated to her, it would not match. Only a portion of what was paid was subject to the IRS's 1099 reporting requirements; the distributions he received as an investor would not be included in the 1099's. Without disclosing the source of the payments which she was attempting to compare to the 1099's, there was nothing further I could provide.

---

Significantly, she did not deny that this inquiry was "really something desired by the SEC for whom [she was] acting". As such, this is a tacit admission.

41.     Finally my sons and I prepared an additional schedule for her breaking down David Rivers' earnings, by investor referred. Exhibit Rivers 8.

42.     Moreover, this was one of the reasons for my letters of April 7 and April 8, 2010 (Exhibits Accounting Records 11-12), to clear up such misunderstandings and to provide her with information that she may have felt was still needed. While I once again specifically offered additional assistance, she refused to supply me with any further information to enable me to assist.  Clearly, her claim that I did not cooperate when I did, repeatedly, was false.

I. Artfield Investments, Inc.

43.     As evidenced in the attached Exhibit, Artfield 1, which the Receiver failed to include in her motion, the claim that I "refus[ed] to cooperate with the Receiver in providing information on Artfield" and "refused to provide any detail on the Artfield investment", is false. I did respond, saying: "It sounds familiar; I do not recall…. If you have more information or could be more specific perhaps I could understand what you are seeking…. Do you know when and in what amounts?" Exhibit, Artfield 1. Dave Goulding also responded to her, saying: "I have never heard of Artfield investments." The truth is, the Defendants tried to provide her with information, but she thwarted her own efforts by refusing to respond to my requests for information. I simply could not recall what is "Artfield Investments". See Exhibit, Artfield 1. Again, the Receiver's claim of non-cooperation was false.

J. Offering Documents/Partnership Agreements

44.     Again, the Receiver's claim that "Goulding refused to provide the Offering Documents/Partnership Agreements" is false. Her claim that "Goulding refus[ed] to cooperate with [her] in providing the Offering Documents/Partnership Agreements" is equally false. First, there is no evidence that she ever requested the Offering Documents and Partnership Agreements. Certainly, I never refused to provide her with that documentation, or for that matter,

18

any other documentation. Moreover, she already had it. I do not have it. I do not have any original Nutmeg or fund documents; the Receiver took the Nutmeg fund documents from Nutmeg's offices on September 2, 2009. All other Nutmeg documents were abandoned by the Receiver, to the landlord.

45. Every fund had its own file. Within the file are sub-files containing documents for each investment. Additionally, at the front of each fund's file is a permanent file, which contains the partnership agreement. In addition, the electronic files contain these documents, by fund, which electronic files the Receiver has had since September 2009. I repeatedly offered to furnish her with a second set of electronic files. Jim Kopecky also made this offer. For some reason, however, she refused. Nonetheless, I provided her with a second set of electronic files, on an external hard drive which I purchased and personally loaded for her.

46. Additionally, upon review of all e-mails to and from the Receiver and/or her partners and associates, the only e-mails or other communications that I could locate in which there was a request for offering materials or partnership agreements was her September 11 and September 12, 2009 request for such documents pertaining to MicroPipe PPM and Operating Agreement. As evidenced by the attached, Exhibits Offering Documents/Partnership Agreements 1 & 2, such documents were immediately provided to her. I do not believe she made any other such requests. Finally, on May 20, 2010, when he met with her at her office, contrary to her assertions, she had the offering materials and partnership agreements at the meeting. Accordingly, she clearly has such documents. See Exhibits Offering Documents/Partnership Agreements 1-10.

K. Accounting Issues

47.     Again, the claim that I did not provide the Accounting Records is false. The claim

that I "refus[ed] to cooperate with the Receiver in providing the Accounting Records" is equally

false. The claim that "All the Receiver has in her possession are balance sheets as of March 31,

2009" is also false. I never refused to provide the Receiver with that documentation, or for that

matter, any other documentation. Attached are Exhibits of e-mails and e-mail strings (Exhibits

Accounting Records 1-9), evidencing that I was the one encouraging the Receiver to either

permit me to have the returns filed, or to start the process, to assure compliance with the Internal

Revenue Code. Indeed, it does not appear that she even commenced this process with regard to

2009 returns until after my January 8, 2010 letter and January 28, 2010 e-mail (Exhibits

Accounting Records 1-2). Forwarded to her in my January 28, 2010 e-mail was Ryan Goulding's

e-mail stating, among other matters: "I fear that Leslie just doesn't care and will again ignore the

filing responsibilities.  I urge you to contact Leslie one more time and see if you can quickly

come to some agreement on how this gets done before it is [again] too late." (Exhibit Accounting

Records 2, which attaches Exhibit Accounting Records 1). This would not have been the first

time she failed to timely act with regard to filing income tax returns.  (Docket No. 80)  Moreover,

she already had it. I do not have any original Nutmeg or fund documents. The Receiver took

them from Nutmeg's offices on September 2, 2009. Every fund had its own file. Within the file

are sub-files containing documents for each investment. Additionally, at the front of each fund's

file is a permanent file, which contains the partnership agreement. In addition, the electronic files

contain these documents, by fund, which electronic files she had since September 2009.

48.     Moreover, far from "refus[ing] to cooperate with the Receiver in providing the

Accounting Records", while she has equivocated as to the condition of these files, I repeatedly

offered to furnish her with a second set of electronic files. Jim Kopecky also made this offer. For

some reason, however, she refused. Additionally, I have now provided her with a second set of electronic files, on an external hard drive which I purchased and personally loaded for her. Finally, far from only having "balance sheets as of March 31, 2009"," she has had all of Nutmeg's records, both electronic and physical records, since September 2, 2009; she has had all of Ryan Goulding's records pertaining to Nutmeg, both electronic and physical records, since October 30, 2009; I personally e-mailed her Nutmeg's tax return for 2008 and Michael Fund's tax return for 2008 (Exhibits Accounting Records 4-5). See also Ryan Goulding's April 22, 2010 letter, Exhibit Accounting Records 10. She now has yet another copy of all such documents, which she previously had refused to get from me. See Exhibit, Accounting Records 1-13.

49.     Based on the above, I verily believe that the Receiver's objection is untenable and that the Receiver is obligated under the rules to respond to discovery and comply with the Federal Rules of Civil Procedure concerning discovery and that compliance with the discovery request will advance the resolution of this case.

50.     I verily believe that all of the allegations set forth in the Response to which this is attached, are true.

**RANDALL GOULDING,** being first duly sworn states that he is a Defendant in the foregoing matter, that he has read the foregoing, and that he knows the contents thereof, and that the same is true.

Further the affiant sayeth not.

/s/ Randall S. Goulding

21