# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>THE NUTMEG GROUP, LLC, RANDALL )<br>GOULDING, and DAVID GOULDING,  )<br><br>Defendants,  )<br><br>DAVID GOULDING, INC., DAVID )<br>SAMUEL, LLC, FINANCIAL ALCHEMY, )<br>LLC, PHILLY FINANCIAL, LLC, and )<br>ERIC IRRGANG,  )<br><br>Relief Defendants.  ) | No. 09-cv-1775<br><br>Jeffrey T. Gilbert<br>Magistrate Judge |

## MEMORANDUM OPINION AND ORDER

Plaintiff Securities and Exchange Commission (the "SEC") sued three defendants – The Nutmeg Group, LLC ("Nutmeg"); Randall Goulding ("Randall"); and David Goulding ("David") – alleging violations of the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. §§ 80a-1, *et seq.*, and the rules promulgated thereunder. The SEC also sued five other related defendants – David Goulding, Inc.; David Samuel, LLC; Financial Alchemy, LLC; Philly Financial, LLC; and Eric Irrgang (collectively, "Relief Defendants") – asserting an equitable claim for unjust enrichment. The Amended Complaint contains nine counts. Amended Complaint, ECF No. 314. Counts I, II, III, and VII allege primary violations of the Advisers Act and its rules, while Counts IV, V, VI, and VIII allege aiding and abetting violations. Counts I and II are against Nutmeg and Randall, but Counts III and VII are against Nutmeg only. All of

the aiding and abetting counts are against both Randall and David. Count IX is against Relief Defendants.

The SEC has moved pursuant to Federal Rule of Civil Procedure 56 for partial summary judgment. Plaintiff's Revised Motion for Summary Judgment ("SEC Motion"), ECF No. 719. The SEC is not seeking summary judgment on Count IX against Relief Defendants or on portions of Counts I and IV against Nutmeg, Randall, and David. With respect to the latter two counts, the SEC is not seeking summary judgment for alleged misvaluation and misappropriation in violation of Section 206(1). *Id.* at 1-2; Plaintiff's Revised Memorandum in Support of Its Motion for Summary Judgment ("SEC Opening Brief"), ECF No. 721, at 1. The SEC is seeking summary judgment on all other counts (including the other portions of Counts I and IV). Defendants do not argue that the SEC's motion for partial summary judgment is improper as a procedural matter. They do object that the SEC has spent much of this litigation prosecuting claims for misappropriation and seeking disgorgement of allegedly ill-gotten gains but now moves for summary judgment only on non-scienter based claims such as books and records violations. The Court assumes without deciding that it is procedurally appropriate for the SEC to move for summary judgment on the claims as to which it has moved because, among other reasons, the issue has not been briefed by the parties. The Court leaves for another time what impact, if any, that has on the SEC's other claims.

Randall, who is *pro se*, has moved for summary judgment on all counts. Randall Goulding's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendants Opening Brief"), ECF No. 726. David, who also is *pro se*, has joined his motion. David Goulding's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment ("David Brief"), ECF No. 728. Nutmeg's Receiver filed an initial response to the

SEC's motion in which the Receiver said she wanted to review Randall's and David's filings before responding substantively. Receiver's Response to Plaintiff's Motion for Summary Judgment, ECF No. 722. The docket does not reflect any other relevant filings on Nutmeg's behalf opposing summary judgment. The SEC, though, has not argued that the Receiver's response was deficient in such a manner as to entitle the SEC to summary judgment against Nutmeg based solely on a failure to respond. Further, as a practical matter, the individual defendants' briefs effectively respond on behalf of Nutmeg as well. Therefore, the Court has not relied on Nutmeg's failure to respond substantively to the SEC's motion in resolving the motion.

For the reasons explained below, the SEC's motion for summary judgment is granted in part and denied in part. Randall and David's motion for summary judgment is denied.

## I. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 951 (7th Cir. 2013). In deciding a motion for summary judgment, the court "review[s] the evidence in the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in its favor." *NES Rental Holdings, Inc. v. Steine Cold Storage, Inc.*, 714 F.3d 449, 452 (7th Cir. 2013); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The party opposing the motion for summary judgment "gets the benefit of all facts that a reasonable jury might find." *Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 314 (7th Cir. 2011). However, the opposing party cannot rely on mere conclusions and allegations to create factual issues. *Balderston v. Fairbanks Morse Engine Div. of Coltec Indus.*, 328 F.3d 309, 320 (7th Cir. 2003).

Nor can speculation be used "to manufacture a genuine issue of fact." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) (citing *Amadio v. Ford Motor Co.*, 238 F.3d 919, 927 (7th Cir. 2001)). A court will grant summary judgment "if no reasonable trier of fact could find in favor of the non-moving party." *Hoppe v. Lewis Univ.*, 692 F.3d 833, 838 (7th Cir. 2012) (internal quotation marks omitted); *see also Northbound Group, Inc. v. Norvax, Inc.*, 5 F. Supp. 3d 956, 966-67 (N.D. Ill. 2013).

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts with "specific references to the affidavits, parts of the record, and other supporting materials relied upon to support the facts. . . ." N.D. Ill. R. 56.1(a). Then, "the party opposing the motion for summary judgment is required to file and serve 'a concise response to the movant's statement that shall contain . . . a response to each numbered paragraph in the moving party's statement, including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon.'" *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) (quoting N.D. Ill. R. 56.1(b)(3)(B)). "When a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by the rule, those facts are deemed admitted for purposes of the motion." *Id.* Specifically, the responding party's failure "to cite to any admissible evidence to support facts presented in response" renders "the facts presented by the moving party as undisputed." *Id.* Because Local Rule 56.1 serves an important function by organizing evidence and identifying disputed facts, the district court has the discretion to require strict compliance. *Flint v. City of Belvidere*, 791 F.3d 764, 767 (7th Cir. 2015); *F.T.C. v. Bay Area Bus. Council, Inc.*, 423 F.3d 627, 633 (7th Cir. 2005). That is true even when a litigant is *pro se*. *Coleman v. Goodwill Indus. of Se. Wisconsin, Inc.*, 423 F. App'x 642, 643 (7th Cir. 2011).

At various points in their Local Rule 56.1 filings, all parties run afoul of one or more of these prohibitions. The SEC, for example, has a tendency to provide responses that are not concise, but, rather, stretch to near or over a page. Plaintiff's Response to Defendant Randall Goulding's Separate Statement of Material Facts ("SEC Response to Randall SOF"), ECF No. 741, ¶¶ 32, 40, 41, 59, 60, 75, 76; Plaintiff's Response to Defendant David Goulding's Separate Statement of Material Facts ("SEC Response to David SOF"), ECF No. 742, ¶¶ 28, 35, 36. Randall's and David's responses also suffer from technical deficiencies. Often they fail to cite directly to supporting evidence when denying a factual statement, instead citing to an earlier response which then cites to evidence, some of which may be germane to the fact statement in question and some not. *See, e.g.,* Defendant Randall Goulding's Response to Plaintiff's Revised Statement of Undisputed Material Facts ("Randall Response to SEC SOF"), ECF No. 726-1, ¶¶ 78, 79, 80, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 99; Defendant David Goulding's Response to Plaintiff's Revised Statement of Undisputed Material Facts ("David Response to SEC SOF"), ECF No. 729, ¶¶ 78, 79, 80, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93, 99. And, on one occasion, Randall and David cite an earlier response without ever admitting or denying the statement in question. Randall Response to SEC SOF, ¶ 53; David Response to SEC SOF, ¶ 53.

Both parties also provide "responses" that are nonresponsive and/or are not supported by evidence. For instance, in denying paragraph 69 of the SEC's Local Rule 56.1 Statement, neither Randall nor David cites any supporting evidence. Randall Response to SEC SOF, ¶ 69; David Response to SEC SOF, ¶ 69. They only offer meritless argumentative objections followed by a flat denial. While this is the clearest example of Randall's and David's failure to support responses with evidence, it is far from the only such instance.

5

Randall and David provide identical responses to paragraph 75 of the SEC's Local Rule 56.1 Statement, which asserts that Defendants transferred assets to Relief Defendants. Randall Response to SEC SOF, ¶ 75; David Response to SEC SOF, ¶ 75. Randall's and David's responses begin with meritless objections based on relevance and vagueness. Then both assert that Defendants did not transfer the assets to Relief Defendants. The cited evidence – two declarations, one from each individual defendant – does not support this broad denial. Instead, the declarations only assert that Defendants did not transfer assets following Nutmeg's 2007 registration as an investment adviser. Randall Goulding's Declaration ("Randall Dec."), ECF No. 726-3, ¶¶ 60-63; David Goulding's Declaration ("David Dec."), ECF No. 728-1, ¶ 40. Randall's and David's responses spend a few sentences elaborating on the fact that transfers did not occur after Nutmeg's registration. And they close by asserting that no law prohibits investing through third parties (which is a legal conclusion not supported by evidence). These responses to the SEC's Local Rule 56.1 Statement go beyond what the cited evidence will bear. Because the evidence only supports a denial for a limited time period, Randall's and David's responses do not fully meet the SEC's proffered fact concerning asset transfers to Relief Defendants.

Randall and David offer similarly deficient responses to paragraph 58 of the SEC's Local Rule 56.1 Statement, which asserts that assets were commingled. Randall and David again start with meritless objections. Then, they deny that there was commingling after Nutmeg's registration and "at the time the suit was filed." Randall Response to SEC SOF, ¶ 58; David Response to SEC SOF, ¶ 58. These responses do not address whether commingling occurred before those points in time. Randall's and David's responses close with an unrelated additional assertion that certain investors were aware of and accepted the commingling. Thus, these

responses are not actually responsive to a crucial portion of the SEC's statement, namely that commingling occurred before Nutmeg's registration.

Again, Defendants are not alone in failing to comply with Local Rule 56.1. Randall and David include identical paragraphs in their Local Rule 56.1 Statements explaining that Nutmeg covered certain expenses involved in the asset transfers. The SEC provides the same response to each statement. SEC Response to Randall SOF, ¶ 46; SEC Response to David SOF, ¶ 40. The SEC starts with meritless objections. Then the SEC says that it does not dispute what Nutmeg's internal records reveal about commingling. This is nonresponsive. The SEC closes by "presum[ing]" where the money to cover the expenses came from. The SEC cites no evidence to support this presumption. Moreover, even if it did, that would be a nonresponsive additional fact.

There are many other instances where the parties' responses are deficient. The Court need not catalog all of them here. Instead, where the Court cites to only one party's Local Rule 56.1 Statement in this Memorandum Opinion and Order, that means the relevant fact either was admitted by the responding party or was deemed admitted by the Court because the responding party failed to comply with Local Rule 56.1. When the Court has determined a material factual dispute exists, it will be obvious from the Court's discussion in the body of this Memorandum Opinion and Order.

## II. FACTUAL BACKGROUND

### A. Nutmeg

Nutmeg, founded in 2003 by Michael Montaigne and Randall Goulding, was an investment advisory firm that worked with unregistered investment pools. Plaintiff's Revised Statement of Undisputed Material Facts ("SEC SOF"), ECF No. 720, ¶ 1; Declaration of Todd P.

Bielskis ("Bielskis Dec."), ECF No. 699-21, ¶ 7; Transcript of Randall Goulding's April 9, 2012

Deposition ("Randall Dep."), ECF No. 699-5, at 84:19-22. Initially, Nutmeg was not required to

register as an investment adviser because it was too small. *See* Defendant Randall Goulding's

Separate Controverting Statement of Undisputed Material Facts ("Randall SOF"), ECF No. 726-

3, ¶ 2. But Nutmeg's business grew, and it eventually registered as an investment adviser on

June 7, 2007. *Id.* ¶ 1; SEC SOF, ¶ 7. By December of that year, the firm had fifteen advisory

clients – which will be referred to collectively as "the Funds" – and claimed to have about $32

million under management. SEC SOF, ¶¶ 12, 35-36.

      The Funds, created over several years, all were limited partnerships organized in Illinois

or Minnesota. *Id.* ¶ 12. The Funds' clients (the "Investors") invested money with the Funds,

which would then purchase securities in small companies (meaning those with market

capitalizations below $50 million). *Id.* ¶¶ 31, 33. The Funds would acquire these securities

through private investments in public equity ("PIPE") transactions. *Id.* ¶ 12. In a PIPE

transaction, a public company sells a security directly to a private investor rather than through a

public offering. *See Pipe Offerings*, SEC, http://www.sec.gov/answers/pipeofferings.htm (last

modified May 19, 2005). The issuing company then files a registration statement with the SEC,

allowing the private investor to sell the shares to the public. *Id.* In this case, the Funds mostly

used the PIPE investments to acquire rights to convertible equity, convertible debt, and warrants.

SEC SOF, ¶ 13. And, in most of the Funds, the Investors were locked in – they could not receive

a distribution or withdraw capital – until these underlying securities were sold. *Id.* ¶¶ 32, 33, 34.

      In its work with the Funds, Nutmeg wore two hats. Nutmeg was an investment adviser

for all fifteen funds. *Id.* ¶ 1. It also was a general partner in thirteen funds. *Id.* ¶ 15. In

fulfilling its duties as an investment adviser, Nutmeg directed the Funds' strategy and monitored

their investments. *Id.* ¶ 17. As a general partner, Nutmeg provided offering documents and quarterly account statements, maintained the books and records, and executed investment transactions. *Id.* ¶ 16.

### B. Randall Goulding

Randall was one of Nutmeg's two founders. Bielskis Dec., ¶ 7; Randall Dep., at 84:19-22. In 2006, a few years after the firm's formation, he became the sole owner and managing member. SEC SOF, ¶ 2. He remained so until 2009. *Id.* In these roles, Randall oversaw Nutmeg's operations. *Id.* ¶¶ 18, 19. He decided whom to hire. *Id.* ¶ 19. He oversaw the employees. *Id.* He was responsible for the preparation of the Funds' offering documents. *Id.* He opened the brokerage and bank accounts. *Id.* He identified investment opportunities, negotiated investment terms, and made investment decisions for the Funds. *Id.*; Randall Dep., at 104:6-11. He approved the transfer of funds and payment of expenses for both Nutmeg and the Funds. SEC SOF, ¶ 19. He valued the Funds. *Id.* And he was responsible for the books and records of both Nutmeg and the Funds. *Id.*

### C. David Goulding

David, Randall's son, became involved with Nutmeg later and had a smaller role than his father. In 2007, David began working with Nutmeg as a consultant. *Id.* ¶ 21. In this capacity, he helped prepare account statements and track investments. *Id.* Then, in January of 2008, David became a full-time Nutmeg employee, accruing additional responsibilities. *Id.* ¶ 9. Within a few months, David became Nutmeg's Chief Compliance Officer. *Id.* ¶ 10.

### D. The Conduct at Issue

In May, 2008, the SEC began a five-month-long compliance examination of Nutmeg. *Id.* ¶ 44. The SEC claims this review revealed extensive illegal conduct. Specifically, the SEC alleges that Defendants:

(1) transferred assets owned by the Funds to Relief Defendants;

(2) paid Relief Defendants for their role in the asset transfers;

(3) commingled assets owned by the Funds with Nutmeg's assets and Randall's personal assets;

(4) failed to conduct a required annual audit or surprise examination;

(5) did not keep appropriate books and records;

(6) decided not to disclose these misdeeds; and,

(7) made false or misleading statements to cover-up their wrongdoing.

### 1. The Asset Transfers

Relief Defendants are Randall's family and friends, and companies owned by them. *Id.* ¶ 72. They all have little or no investment experience outside of their relationships with Nutmeg and the Funds. *Id.* ¶ 73. Randall sought out Relief Defendants because he wanted to obtain freely tradeable shares from public companies through Regulation D offerings, and he believed that could be accomplished only by an investor domiciled in the state where the shares were registered. *Id.* ¶¶ 75-76. Of course, the Funds were not always domiciled in the state where the shares that they wanted to buy were registered. *Id.* ¶ 77. So Randall chose to work with Relief Defendants based at least in significant part on two factors: personal relationship and state of residence. *Id.* ¶ 78; Randall Response to SEC SOF, ¶ 77.

When Randall decided to work with a relief defendant, one or more of the Funds would transfer assets to the relief defendant, and then the relief defendant would invest those assets. SEC SOF, ¶¶ 74, 88. It is undisputed that the asset transfers, which totaled more than $4 million, resulted in Relief Defendants gaining legal title to the Funds' assets. *Id.*; Randall SOF, ¶¶ 44, 56.

Although Relief Defendants received legal title, Randall continued to play a significant role in determining what happened to the assets. *See* SEC SOF, ¶ 79. He instructed Relief Defendants when to receive the Funds' asset transfers and how to invest them. *Id.* He decided which companies to invest in, determined how much to invest, negotiated the terms of the investments, and prepared the documentation for the investments. *Id.* ¶ 80. In fact, Relief Defendants never picked investments. *Id.* ¶ 81. There is some dispute as to how much control Relief Defendants exercised once the investments were made.[1]

What is clear, though, is that the Funds did not retain legal ownership of the assets after the transfer. Randall SOF, ¶¶ 44, 56; SEC SOF, ¶¶ 74, 88. Moreover, neither Nutmeg nor the Funds were parties to the investment agreements made by Relief Defendants. SEC SOF, ¶ 87. In fact, the investment documents often did not specify which fund's assets were being used. *Id.* ¶ 86. And the securities and cash that Relief Defendants received through these transfers were held in bank and brokerage accounts in Relief Defendants' own names. *Id.* ¶ 91. The only interest that the Funds retained was a contractual right to the proceeds from the eventual sale of the securities that Relief Defendants purchased with the transferred assets. Randall SOF, ¶¶ 53, 53-59.

---

[1] Specifically, there is conflicting evidence as to whether Relief Defendants had discretion to decide (1) whether to sell, (2) when to do so, and (3) at what price to do so. SEC Response to Randall SOF, ¶ 60.

Eventually the asset transfers, which took place over a number of years, stopped. While the parties have not identified the last asset transfer, it appears that no fund transferred additional assets to Relief Defendants after Nutmeg's registration in June of 2007. SEC Response to Randall SOF, ¶ 63.[2] However, at the time of registration, Relief Defendants had not transferred back to the respective funds all of the assets that Relief Defendants had received. While a specific end date cannot be determined based on this record, it is clear that the retitling of transferred assets was not completed until sometime after the SEC's 2008 examination. Transcript of David Goulding's March 2, 2012 Deposition ("David Dep."), ECF No. 743-1, at 257:16-258:23, 259:21-260:24; Randall Goulding's December 28, 2012 Deposition, ECF No. 743-6, at 140:15-143:13, 148:12-149:6.

## 2. The Payments to Relief Defendants

Nutmeg compensated Relief Defendants for their involvement in the asset transfers. Specifically, Nutmeg promised each Relief Defendant between one and three percent of gross proceeds from sales involving securities purchased with transferred assets. SEC SOF, ¶ 95. That means the payments were made regardless of whether the securities were sold at a profit. *Id.* ¶ 94. Some Relief Defendants also were guaranteed minimum monthly payments, even if no assets were sold in a given month. *Id.* ¶ 96.

The Funds never bore the cost of these payments. Randall SOF, ¶ 45; Defendant David Goulding's Separate Controverting Statement of Undisputed Material Facts ("David SOF"), ECF No. 730, ¶ 39. Instead, both the Funds and the Investors were credited with all sale proceeds.

---

[2] The SEC concedes this fact in its response to paragraph 63 of Randall's Local Rule 56.1 Statement. SEC Response to Randall SOF, ¶ 63. Then, in its very next response, the SEC asserts that a relief defendant made an investment on behalf of a fund in December, 2007. *Id.* ¶ 64. However, the citation in support of this assertion is to the first page of a deposition transcript which includes only the caption of the case, the name of the court reporter, appearances of counsel, and other precatory information. Considering both the response to paragraph 63 and the inaccurate citation, it remains undisputed that no new transfers occurred after June, 2007.

Randall SOF, ¶ 46; David SOF, ¶¶ 40, 41. Nutmeg alone bore the costs associated with these payments. Randall SOF, ¶¶ 45-48.

### 3. The Commingling

The Funds' and Nutmeg's money and investments were commingled at some point in time. Randall SOF, ¶ 31; David SOF, ¶ 27; SEC SOF, ¶ 54. Money from fourteen of the Funds was deposited along with Nutmeg's own money in a Nutmeg bank account. SEC SOF, ¶¶ 55, 56. Some of the Funds' investments were made in Nutmeg's name, rather than the relevant fund's name. *Id.* ¶¶ 61, 63-64. Likewise, securities owned by the Funds were deposited in brokerage accounts belonging to Nutmeg or Relief Defendants. *Id.* ¶ 57. This commingling even involved Randall's personal assets, which were held in Nutmeg's bank and brokerage accounts. *Id.* ¶ 58. According to Randall, he believed that this commingling would help the Funds' investors by reducing procedural and administrative burdens. *Id.* ¶ 59. In reality, though, the commingling made it more difficult to track the Funds' money, redemptions, and expenses. *Id.* ¶ 60.

The exact date when commingling started is not clear from this record. The commingling must have begun before 2006, though, because Ryan Goulding found out about it in 2004 or 2005. Transcript of Ryan Goulding's Deposition ("Ryan Dep."), ECF No. 743-4, at 241:15-19. According to Randall, the commingling was "more of a process" that took place as Nutmeg did more deals. Randall Dep., at 201:10-202:10.

Whether the commingling ever ended and, if so, when it did are disputed. *See* Plaintiff's Reply Memorandum in Support of Its Motion for Summary Judgment ("SEC Reply"), ECF No. 744, at 6. It appears that no *additional* assets were commingled after Nutmeg registered in June of 2007. Randall SOF, ¶¶ 31-32, 35; David SOF, ¶¶ 28, 30-31. As with the asset transfers,

13

though, the commingling was not unwound by the time of registration. In fact, some of the already commingled assets remained commingled through David's tenure at Nutmeg. Randall SOF, ¶ 33; David SOF, ¶ 29. Only in the six months following the SEC's examination did Defendants finally create separate bank and brokerage accounts for each fund. Randall SOF, ¶ 23; David SOF, ¶ 19.

### 4. The Audits and Surprise Examinations

The Funds were never audited or subjected to surprise examinations. SEC SOF, ¶¶ 48, 49. Nutmeg never took steps to conduct an audit or surprise examinations for the period from June 7, 2007, to December 31, 2007. Instead, it only sought an audit for the 2008 calendar year. Randall SOF, ¶ 28; David SOF, ¶ 24. But that audit never happened either. SEC SOF, ¶ 48. Nutmeg began interviewing potential auditors in the second half of 2008 and had an auditing firm come to Nutmeg's office in January, 2009. Randall SOF, ¶¶ 17, 27-28; David SOF, ¶¶ 14, 23-24. According to Defendants, Nutmeg was assured that the auditor would send an engagement letter. Randall SOF, ¶ 29; David SOF, ¶ 25. But none was ever sent. Transcript of David Goulding's April 9, 2012 Deposition, ECF No. 743-3, at 127:6-17.

### 5. The Books and Records

The SEC asserts that Nutmeg failed to maintain for the Funds required books and records, including general or auxiliary ledgers, trial balances, income and expense statements, and supporting financial documentation. SEC Opening Brief, at 11; SEC SOF, ¶¶ 66, 67.[3]

There is evidence to support this contention. Todd Bielskis, an SEC staff accountant, explained that, during the SEC's examination of Nutmeg in 2008, the SEC asked for "accounting

---

[3] In its briefs, the SEC periodically mentions that Nutmeg did not have a compliance manual, code of ethics, or certain written policies until after the SEC's examination. SEC Opening Brief, at 2, 11. However, the SEC is not arguing that this violates the Advisers Act. SEC Response to Randall SOF, at 11-12. In fact, the SEC does not mention these failures in the relevant discussion portion of its briefs. SEC Opening Brief, at 21; SEC Reply, at 7.

records, financial statements, receipts, and ledgers . . . for each Fund." Bielskis Dec., ¶ 17. According to Bielskis, Nutmeg "could not comply with many of these requests." *Id.* Bielskis said the only financial records Nutmeg maintained for the Funds consisted of "some account statements," "a handful of balance sheets," and "internal Excel spreadsheets." *Id.* In fact, Bielskis stated that Randall and David "admitted that Nutmeg had no general or auxiliary ledgers, trial balances, or income and expense statements." *Id.* On November 25, 2008, Randall sent a letter to Bielskis in which he said that "Nutmeg was previously unaware of the requirements set forth in Rule 204-2(a)." Letter from Randall Goulding to Todd Bielskis, Staff Accountant, SEC (Nov. 25, 2008) ("Randall Letter"), ECF. No. 699-10, at 5.

Defendants' response to the SEC's evidence requires careful reading. This lesson is best illustrated by Ryan Goulding's declaration. In this document, Ryan asserted that "Nutmeg maintained records that included general ledgers, auxiliary ledgers, trial balances, and financial statements . . . for each fund." Ryan Goulding's Declaration ("Ryan Dec."), ECF No. 727-11, ¶ 5. This might seem to create a factual dispute because of the SEC's evidence that Nutmeg did not maintain these records. But, in the very next paragraph, Ryan explained that, "For the funds, these took the form of Excel spreadsheets, attached as Exhibit A hereto. I personally provided these attachments (Exhibit A) to the SEC examiners, in May 2008." *Id.* ¶ 6. Thus, according to Ryan, the Excel spreadsheets he provided to the SEC in 2008 were the "general ledgers, auxiliary ledgers, trial balances, and financial statements" that the Advisers Act and its regulations required for each fund.

Other than the spreadsheets, the only documentation attached to Ryan's declaration is a tax return for one of Nutmeg's funds. [ECF No. 733-11.] In his declaration, Ryan asserts that "there is . . . an income statement on the first page of the tax return which is reconciled with any

non-taxable activity on Schedule M-1 [of the return]" and that Schedule L of the tax return is a balance sheet. Ryan Dec., ¶ 8. Defendants thus contend that Nutmeg maintained an income statement and a balance sheet for each fund in the tax returns for the Funds.

Two paragraphs of each individual defendant's Local Rule 56.1 Statement relate to the books and records issue. Although the paragraphs are numbered differently in the respective Statements, they are identical. In the first set of paragraphs, Randall and David state that Nutmeg maintained "a general ledger, trial balances, and income and expense statements for the Funds, long before the SEC's examination." Randall SOF, ¶ 40; David SOF, ¶ 35. It is clear that Randall and David are referring to the Excel spreadsheets referenced by Ryan because the next sentence in the paragraph states, "These records were necessary for Ryan Goulding to prepare the income tax returns, which he did." Randall SOF, ¶ 40; David SOF, ¶ 35. As Ryan's declaration makes clear, the records he claimed that he needed to prepare tax returns were the Excel spreadsheets. *See* Ryan Dec., ¶¶ 5-8 (explaining that Ryan needed trial balances to prepare the tax returns and that the trial balances "took the form of Excel spreadsheets").

In the second pair of relevant paragraphs, Randall and David contend that "Nutmeg always maintained supporting financial documentation . . . for the Funds." Randall SOF, ¶ 41; David SOF, ¶ 36. In the immediately following sentence, they further detail that, "The Funds separately had their own master spreadsheet reflecting each investor and their equity account, as well as subsidiary spreadsheets pertaining to each transaction which reflected terms of the transaction, sales activities, conversions, interest accumulation, and other control and reporting facets." Randall SOF, ¶ 41; David SOF, ¶ 36. Again, as with Ryan's declaration, these two paragraphs amount to an assertion that the Excel spreadsheets constituted Nutmeg's required books and records.

Further confirmation of this understanding comes in the form of each individual defendant's response to the SEC's Local Rule 56.1 Statement. In responding to the SEC's assertion that Nutmeg lacked general or auxiliary ledgers, trial balances, and income and expense statements for the Funds, Randall and David contend that Nutmeg had these documents and cite to Ryan's declaration and the attached exhibits. Randall Response to SEC SOF, ¶ 66; David Response to SEC SOF, ¶ 66. Then, they describe how these books and records were necessary for Ryan to prepare the tax returns and cite to their own Statements of Material Fact and declarations, and to Ryan's declaration. Randall Response to SEC SOF, ¶ 66; David Response to SEC SOF, ¶ 66. As detailed above, Excel spreadsheets and a tax return were attached to Ryan's declaration as exhibits. Ryan characterized the spreadsheets as necessary to prepare the tax returns. In responding to the SEC's Statement that Nutmeg lacked supporting financial documentation for the Funds, Randall and David simply deny the statement and then cite the same sources. Randall Response to SEC SOF, ¶ 67; David Response to SEC SOF, ¶ 67.

There is one final source that further demonstrates Defendants reliance on the Excel spreadsheets and tax returns: their briefs. The individual defendants filed three briefs opposing summary judgment. Randall filed the first one. David then filed a separate one in which he states that he is joining Randall's brief in full and makes some additional arguments not related to the books and records issue. Then both individual defendants filed a joint final brief. In the first brief, there is a section on page five that begins, "The Defendants maintained all necessary books and records . . . ." Defendants Opening Brief, at 5. The spreadsheets are the only documentation identified in this section as constituting those books and records: "The intricate Fund spreadsheets, including a master spreadsheet for each fund and the subsidiary spreadsheets . . . clearly tracks (sic) all requisite investment information investor by investor, Fund by Fund,

quarter by quarter." *Id.* Thirteen pages later, Randall discusses the books and records issue. *Id.* at 18. He repeats the same language from page five and does not mention any documentation other than the spreadsheets. *Id.* This time, though, there is some additional language that further drives the point home. Randall states, "The declaration of Ryan Goulding and the exhibits attached thereto clearly belie the SEC's assertion that Nutmeg's records were inadequate. Moreover, the SEC has had these records, and all of Nutmeg's records, in its possession since shortly after the suit was filed." *Id.* As already noted, the only documents attached as exhibits to Ryan's declaration were Excel spreadsheets and a tax return. Moreover, the spreadsheets are the only documents that Ryan claimed in his declaration to have turned over to the SEC.

Randall and David's final brief devotes just four sentences to the books and records issue. Defendants' Surreply in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defendants Sur-Reply"), ECF No. 749, at 8-9. Again, Randall and David assert that Nutmeg maintained general or auxiliary ledgers, trial balances, and income and expense statements for the Funds. *Id.* at 9. Then they state, "These have been furnished to the SEC repeatedly. They were maintained by Ryan Goulding CPA." *Id.* They also again describe them as the documents "from which the tax returns were prepared for Nutmeg and each Fund." *Id.* For the reasons already discussed, this description can refer to only two sets of documents – the Excel spreadsheets and the tax return.

In summary, therefore, the SEC claims that Nutmeg failed to maintain required books and records. Defendants respond by broadly asserting that Nutmeg maintained those books and records. But then they specifically identify only the Excel spreadsheets and the tax returns attached to Ryan's declaration as the documents Nutmeg maintained that, in Defendants' minds, constituted the required books and records. That means there only can be a genuine issue of

material fact about whether Nutmeg maintained the required books and records if there is a genuine issue of material fact about whether the Excel spreadsheets and the tax return constitute those books and records. This matter will be addressed further in the Discussion section of this Memorandum Opinion and Order.

### 6. Non-disclosures

The SEC has identified evidence that Nutmeg and Randall did not disclose the above discussed asset transfers, payments to Relief Defendants, and commingling. *See* SEC SOF, ¶¶ 97, 101, 102.

Defendants counter with a handful of factual assertions. They say the Investors were aware of what was occurring. *See, e.g.,* Randall SOF, ¶¶ 68, 70, 72; David SOF, ¶¶ 47, 49, 51. They say Nutmeg personnel were available to explain what was happening if the Investors called. Randall SOF, ¶ 73; David SOF, ¶ 52. They say some of the Investors actually were told about the asset transfers when they inquired. Randall SOF, ¶ 49. They say the offering materials for the investments made with transferred assets stated that the investment type was Regulation D, Rule 504. *Id.* ¶ 51. Finally, they say the Investors made checks out to Nutmeg and received distributions from Nutmeg. Randall SOF, ¶ 68; David SOF, ¶ 47.

### 7. False or Misleading Statements

The SEC also claims that Nutmeg and Randall made several false or misleading statements. SEC Opening Brief, at 19. First, Nutmeg and Randall stated that the Funds owned certain assets even though those assets had been transferred to Relief Defendants, who then became the legal owners. This assertion was made in two ways. SEC SOF, ¶¶ 98-102. Account statements reported securities as though the Funds owned on the Investors' behalf the listed securities (rather than some contract right derivative of them). Nutmeg and Randall also filed

Form ADVs in which they certified that "no related persons" had custody of client assets. Second, the account statements listed assets which the Funds owned on the Investors' behalf without revealing that commingling was occurring. *Id.* ¶¶ 100-102. Third, Nutmeg and Randall said that certain amounts of cash were held on the Investors' behalf when some of that amount was actually in securities. They made this final statement in the account statements, which listed "cash available," "current cash position," and "held monies" totals. *Id.* ¶ 104.

## III. DISCUSSION

The Advisers Act "was the last in a series of Acts designed to eliminate certain abuses in the securities industry, abuses which were found to have contributed to the stock market crash of 1929 and the depression of the 1930's." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963). "The Act is the linchpin of the federal regulation of financial advisers and money managers." *New York Republican State Comm. v. SEC*, 799 F.3d 1126, 1128 (D.C. Cir. 2015). It "reflects a congressional intent to eliminate, or at least to expose, all conflicts of interest which might incline an investment adviser – consciously or unconsciously – to render advice which was not disinterested." *SEC v. DiBella*, 587 F.3d 553, 567 (2d Cir. 2009). The SEC alleges several primary violations and several aiding and abetting violations of the Advisers Act.

### A. The Primary Violations

Four of the Counts in the Amended Complaint assert primary violations of the Advisers Act and its rules. Counts I and II, which are against both Nutmeg and Randall, collectively allege violations of Sections 206(1), 206(2), and 206(4), and Rule 206(4)-8. Counts III and VII, which are against Nutmeg only, collectively allege violations of Sections 204 and 206(4), and Rules 204-2 and 206(4)-2.

The sections of the Advisers Act under which the SEC seeks primary liability only apply to an "investment adviser" as defined in the Act. Under the statute, an investment adviser is "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ." 15 U.S.C. § 80b-2(a)(11). This definition encompasses anyone who manages the funds of others for compensation or controls an investment advisory firm. *SEC v. ABS Manager, LLC*, 2014 WL 7272385, at *4 (S.D. Cal. Dec. 18, 2014); *SEC v. Bolla*, 401 F. Supp. 2d 43, 59 (D.D.C. 2005) *aff'd in part and remanded sub nom. SEC v. Washington Inv. Network*, 475 F.3d 392 (D.C. Cir. 2007); *SEC v. Berger*, 244 F. Supp. 2d 180, 192 (S.D.N.Y. 2001). In the instant case, it is undisputed that Nutmeg and Randall were investment advisers who could commit primary violations. However, the SEC has not alleged that David was an investment adviser, and none of the counts alleging primary violations are against him.

### 1. Section 204 and Rule 204-2 (Count VII against Nutmeg)[4]

Section 204 and Rule 204-2 are the Adviser Act's recordkeeping provisions. *SEC v. Young*, 2011 WL 1376045, at *8 (E.D. Pa. Apr. 12, 2011). Together, they specify certain books and records that investment advisers must maintain and keep. 15 U.S.C. § 80b-4; 17 C.F.R. § 275.204-2. *See also SEC v. Nutmeg Grp., LLC*, 2011 WL 5042094, at *3 (N.D. Ill. Oct. 19, 2011). Specifically, Rule 204-2(a)(1) requires the maintenance and keeping of records of cash receipts and disbursements. 17 C.F.R. § 275.204-2(a)(1). Subsection (a)(2) of the Rule imposes the same obligation with respect to general and auxiliary ledgers or other comparable records,

---

[4] The SEC states in its opening brief that "Nutmeg and Randall Goulding may be held liable for violating" Section 204 and Rule 204-2. SEC Opening Brief, at 21. The inclusion of Randall appears to be the result of sloppy drafting. Both the SEC's amended complaint and its motion reference only Nutmeg in connection with Count VII. Amended Complaint, at ¶¶ 116-118; SEC Motion, at 2.

reflecting asset, liability, reserve, capital, income and expense statements. 17 C.F.R. § 275.204-2(a)(2). And, finally, 204-2(a)(6) mandates that investment advisers maintain and keep all trial balances, financial statements, and internal audit working papers. 17 C.F.R. § 275.204-2(a)(6).

It is worth noting that Rule 204-2 only applies to investment advisers that are "registered or required to be registered." 17 C.F.R. § 275.204-2(a). *See also Nutmeg*, 2011 WL 5042094, at *3. That means that, in this case, only Nutmeg's post-registration conduct could violate this Rule. The SEC concedes as much. SEC Reply, at 4 n.4. This point of law, however, has no effect on the disposition of the motions currently under consideration.

One of Defendants' arguments should be dealt with up front. Defendants essentially assert that Nutmeg should not have been required to maintain these books and records for the Funds because the documentation that Nutmeg did maintain on their behalf was good enough. *See, e.g.,* Defendants Opening Brief, at 5, 18. That is not a winning argument. If the law – that is, the Advisers Act – required Defendants to do something, they cannot escape that obligation merely because they disagree with it. Arguments about the wisdom of the Advisers Act's requirements are best addressed by Congress, not the judiciary.

With that issue aside, the main dispute regarding Count VII may be addressed. The SEC contends that Nutmeg violated Section 204 and Rule 204-2 because it failed to maintain and keep the following books and records for the Funds: general or auxiliary ledgers, trial balances, income and expense statements, and supporting financial documentation. SEC Opening Brief, at 11; Plaintiff's Response to Defendants' Sur-Reply Memorandum, ECF No. 760, at 7. As explained above, whether the SEC is correct turns on whether the Excel spreadsheets and tax return attached to Ryan Goulding's declaration constitute these required books and records.

The Excel spreadsheets attached to Ryan Goulding's declaration relate to one of

Nutmeg's funds, the "Nutmeg/October 2006 Fund LLP," and they provide some information for

the years 2005 and 2006. [ECF Nos. 733-1, 733-2, 733-3, 733-4, 733-5, 733-6, 733-7, 733-8,

733-9, 733-10, 733-11.] Having reviewed the spreadsheets, the Court concludes that no

reasonable jury could find them sufficient to constitute the required books and records. Some of

the information in the spreadsheets could be drawn from or support a general ledger, trial balance

or income and expense statement, but the spreadsheets themselves are not those documents.

Essentially, the spreadsheets contain some financial information for one or two years for one of

Nutmeg's funds. Regardless of whether similar spreadsheets exist for other years or for other

funds, these spreadsheets are not enough to create a genuine factual question as to whether

Nutmeg maintained the books and records required of a registered investment adviser.

The terms "general or auxiliary ledgers," "trial balances," and "financial statements"

mean something. Each requires certain information in a certain form. For example, a general

ledger "contains the accounts that make up the entity's financial statements. Separate accounts

exist for individual assets, liabilities, stockholders' equity, revenue, and expenses." J.K. SHIM,

PH.D, DICTIONARY OF ACCOUNTING TERM 226 (6th Ed. 2014). An entity's general ledger

typically summarizes its ongoing operations. The general ledger "summarizes the journal entries

by account and includes the accumulated net total of all transactions, by account balance, since

the inception of the company." J. ALIX, ET AL., FINANCIAL HANDBOOK FOR BANKRUPTCY

PROFESSIONALS: A FINANCIAL AND ACCOUNTING GUIDE FOR BANKRUPTCY JUDGES, ATTORNEYS

AND ACCOUNTANTS 740 (2d Ed. (West) 1996). A trial balance is a "listing of the account

balances from the general ledger, prepared at the end of the accounting period . . . . The trial

balance is a work sheet and not a formal financial statement. It serves as a convenient basis for

the preparation of the balance sheet and income statement." *Id.* at 506. The spreadsheets do not contain the information required to constitute these books and records in the manner mandated by the Advisers Act and the regulations promulgated thereunder.

Likewise, the tax return itself is not Nutmeg's or the fund's financial statement. Ryan contends that Schedule L of the tax return constitutes "a balance sheet." Ryan Dec., ¶ 8. It does not. That schedule is a "Balance Sheet[] *per Books*." [ECF No. 733-11, at 4] (emphasis added). In essence, Schedule L purports to reflect certain information drawn from Nutmeg's books, but the relevant books and records are missing. Ryan also contends that the first page of the tax return includes an "income statement." Ryan Dec., ¶ 8. That cannot be true, though, because not a single box in the income section of the page is filled in. [ECF No. 733-11, at 1.] More fundamentally, the tax return is a tax return. It reports certain information to the Internal Revenue Service. It is not a financial statement. No reasonable jury could conclude otherwise.

Moreover, Defendants cannot create an issue of fact by, for example, averring in a conclusory and unsupported manner that Ryan must have had a trial balance to prepare tax returns without actually producing the trial balance. This argument is akin to a youngster attempting to prove there are bears in the woods behind his house by showing his mother the stick he uses to scare the bears away. The stick simply is not evidence that the bears are in the woods.[5] Abbreviated financial information in a tax return that purports to be drawn from a fund's books and records is not evidence that the fund actually maintained the required books and records.

---

[5] This is a variation on a classic rhetorical device frequently used in closing argument at trial to make the same point:
> Witness: "I was visited by a ghost the other day who gave me a pen."
> Lawyer: "You'll have to prove that to me."
> Witness: "Sure, here's the pen."

The SEC has presented evidence that Nutmeg did not maintain the required books and records. All of Defendants' responsive filings point to financial documents that are clearly insufficient to satisfy that requirement. Defendants have never indicated that they have in their possession, but have chosen not to produce, books and records that are materially different from those they have provided to the Court. Instead, their filings direct the Court only to the Excel spreadsheets and tax return attached to Ryan's declaration. "[A] motion for summary judgment requires the responding party to come forward with the evidence that it has – it is the 'put up or shut up' moment in a lawsuit." *Eberts v. Goderstad*, 569 F.3d 757, 767 (7th Cir. 2009) (internal quotation marks omitted). In this case, Defendants have failed to produce any specific evidence that a reasonable jury could accept as establishing that Nutmeg maintained the required books and records. *See Knight v. Wiseman*, 590 F.3d 458, 463 (7th Cir. 2009) (noting that the non-moving party must "show through specific evidence that a triable issue of fact remains").

The Advisers Act and its rules unambiguously required that Nutmeg maintain certain books and records. Nutmeg did not do so. It failed to fulfill its legal obligations. No reasonable jury could find sufficient the books and records that Nutmeg actually maintained, *i.e.,* the Excel spreadsheets and the tax return. Nutmeg therefore violated Section 204 and Rule 204-2.

### 2. Section 206 Background

The remaining alleged primary violations all involve Section 206(2) and Section 206(4). Section 206 "applies 'to all investment advisers, whether or not such advisers were required to register under Section 203 of the Act.'" *SEC v. Gruss*, 859 F. Supp. 2d 653, 663 (S.D.N.Y. 2012) (quoting *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979)). *See also Goldstein v. SEC*, 451 F.3d 873, 881 (D.C. Cir. 2006) (noting that Section 206 applies to "any investment adviser—registered or not); *SEC v. Ficeto*, 2013 WL 1196356, at \*3 (C.D.

Cal. Feb. 7, 2013). This understanding is strongly supported by the statute's reference to "any

investment adviser" because "there seems every reason to believe that when it uses the term

[investment adviser] unmodified, it means both" registered and unregistered. *Teicher v. SEC*,

177 F.3d 1016, 1018 (D.C. Cir. 1999).

Defendants argue that scienter is required to establish at least some of the primary

violations under Section 206. But neither Section 206(2) nor Section 206(4) require proof of

scienter. *SEC v. Steadman*, 967 F.2d 636, 647 (D.C. Cir. 1992); *Messer v. E.F. Hutton & Co.*,

847 F.2d 673, 679 (11th Cir. 1988); *Steadman v. SEC*, 603 F.2d 1126, 1134 (5th Cir. 1979) *aff'd*,

450 U.S. 91 (1981). Instead, the "Advisers Act holds liable negligent acts." *DiBella*, 587 F.3d at

569. Section 206(2) reaches negligent conduct. *Bolla*, 401 F. Supp. 2d at 67; *see also SEC v.*

*Tambone*, 550 F.3d 106, 146 (1st Cir. 2008) *reh'g en banc granted, opinion withdrawn*, 573 F.3d

54 (1st Cir. 2009) and *opinion reinstated in part on reh'g*, 597 F.3d 436 (1st Cir. 2010);

*Steadman*, 967 F.2d at 643 n.5.[6] And the same is true of 206(4). *In re Reserve Fund Sec. &*

*Derivative Litig.*, 2013 WL 5432334, at *12 (S.D.N.Y. Sept. 30, 2013); *SEC v. Yorkville*

*Advisors, LLC*, 2013 WL 3989054, at *3 (S.D.N.Y. Aug. 2, 2013).

Negligence is the failure to exercise ordinary care. *Bolla*, 401 F. Supp. 2d at 72. Phrased

differently, negligence is the failure to use the "degree of care that a reasonably careful person

would use under like circumstances." *In re Reserve Fund Sec. & Derivative Litig.*, 2013 WL

5432334, at *12 n.7. That means a person may be negligent by doing what no reasonable person

would do, or by not doing what every reasonable person would do. *Id.* Under this standard, a

---

[6] *See also SEC v. EagleEye Asset Mgmt.*, 975 F. Supp. 2d 151, 158 (D. Mass. 2013); *Gruss*, 859 F. Supp.
2d. at 669; *SEC v. Daifotis*, 2011 WL 2183314, at *10 (N.D. Cal. June 6, 2011) *modified on
reconsideration*, 2011 WL 3295139 (N.D. Cal. Aug. 1, 2011); *SEC v. Mannion*, 789 F. Supp. 2d 1321,
1339 (N.D. Ga. 2011); *SEC v. Pimco Advisors Fund Mgmt. LLC*, 341 F. Supp. 2d 454, 470 (S.D.N.Y.
2004); *Morris v. Wachovia Sec., Inc.*, 277 F. Supp. 2d 622, 644-45 (E.D. Va. 2003); *SEC v. Moran*, 922
F. Supp. 867, 895 (S.D.N.Y. 1996).

violation of the Advisers Act may be established by showing that a defendant "should have" acted differently. *Steadman*, 967 F.2d at 643; *see also Moran*, 922 F. Supp. at 897-98.

### 3. Section 206(4) and Rule 206(4)-2 (Count III against Nutmeg)[7]

Section 206(4) prohibits an investment adviser from engaging "in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4); *see also Alonso v. Weiss*, 958 F. Supp. 2d 922, 926 (N.D. Ill. 2013). Rule 206(4)-2, which applies only to an "investment adviser registered or required to be registered," prohibits an investment adviser from having custody of clients' funds or securities unless a qualified custodian maintains the funds or securities in separate accounts for each client. 17 C.F.R. § 275.206(4)-2(a); *see also Lamm v. State St. Bank & Trust*, 749 F.3d 938, 948 (11th Cir. 2014); *Nutmeg*, 2011 WL 5042094, at *3.

In short, commingling of clients' funds or securities creates liability under Section 206(4) and Rule 206(4)-2 for an investment advisor registered or required to be registered under the Act. *SEC v. Sentinel Mgmt. Grp., Inc.*, 2012 WL 1079961, at *13 (N.D. Ill. Mar. 30, 2012); *SEC v. Slocum, Gordon & Co.*, 334 F. Supp. 2d 144, 149, 177 (D.R.I. 2004). Commingling violates this Rule even if it occurs for only "a short period of time." *Sentinel*, 2012 WL 1079961, at *14. Indeed, commingling "in any fashion" is contrary to the Rule. *Slocum,* 334 F. Supp. 2d at 178. For this reason, the Rule is violated not only by the specific transactions that commingle funds or securities but also by continued or unremedied commingling. *See id.* (citing *Steadman*, 967 F.2d at 646). This understanding is consistent with the Rule's unambiguous reference to the duty to "maintain[]" funds and securities in appropriate accounts. 17 C.F.R. § 275.206(4)-2(a)(1).

---

[7] The SEC states in its opening brief that "Nutmeg and Randall Goulding violated" Section 206(4) and Rule 206(4)-2. SEC Opening Brief, at 20. Similarly, the SEC says that "Nutmeg and Randall Goulding may be held liable" for violating that section and that rule. *Id.* at 21. Again, the inclusion of Randall appears to be the result of sloppy drafting. Both the SEC's amended complaint and its motion reference only Nutmeg in connection with Count III. Amended Complaint, ¶¶ 104-106; SEC Motion, at 2.

Here, the undisputed facts are that Nutmeg commingled the Funds' and the Investors' assets with Nutmeg's and Randall's assets. While it appears that no additional assets were commingled after Nutmeg's June 2007 registration, the firm did not segregate the already commingled assets before the SEC's examination, which occurred in May, 2008. Thus, the commingling persisted after Nutmeg's registration. Randall, Nutmeg's managing member, and therefore Nutmeg, knew the assets were commingled; Randall does not argue otherwise. Nutmeg, an investment adviser managing tens of millions of dollars of other people's money, should have known that the Advisers Act and its unambiguous rules prohibited commingling. Yet Nutmeg still maintained assets in accounts where it should have known they would be commingled with other assets. This conduct clearly satisfies the low bar of negligence. That means Nutmeg violated Section 206(4) and Rule 206(4)-2's prohibition on commingling.

The version of Rule 206(4)-2 in effect from February 1, 2006, to March 11, 2010, also imposed another requirement at issue in this lawsuit. Specifically, the Rule required "an adviser that sends quarterly account statements to investors to undergo annually a surprise examination or provide audited financial statements to investors within 120 days after a pooled investment vehicle's fiscal year end." *Nutmeg*, 2011 WL 5042094, at *3; *see also* 17 C.F.R. §§ 275.206(4)-2(a)(3), b(2)(ii), (b)(3). Again, this Rule only applied after Nutmeg registered in June, 2007 – which the SEC concedes. SEC Reply, at 4 n.4. Because Defendants concede that Nutmeg neither underwent a surprise exam nor produced audited financial statements in 2007, the only issue is whether Nutmeg was required to take either of these actions for the post-registration portion of 2007.

Defendants contend that the surprise examination or annual audit requirement only applies to the first *full* year after registration. The SEC disputes this, arguing that the

requirement applies immediately after registration, meaning that it applies during the first year of registration, regardless of whether it is a full or partial year. Neither party cites a case that addresses this issue, and the Court did not find one in its research.

In interpreting this requirement, the place to begin is with the text of the Rule. The surprise examination portion of Rule 206(4)-2 mandates that an examination be arranged "at least once during each calendar year." 17 C.F.R. § 275.206(4)-2(a)(3)(ii)(B). A firm that chooses the alternative option must conduct an audit "at least annually" and the resulting audited financial statements must be distributed within either 120 or 180 days of "the end of its fiscal year." 17 C.F.R. §§ 275.206(4)-2(b)(2)(ii), (b)(3).

"The cardinal rule is that words used in statutes must be given their ordinary and plain meaning." *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000). Each calendar year means each calendar year. The plain meaning is clear. Defendants contend that the word "annual," which is repeatedly used in describing the audit requirement, means once every full year. Defendants Sur-Reply, at 2. But, that is contrary to the plain meaning of the word. According to BLACK'S LAW DICTIONARY, "annual" means "[o]ccuring once every year." *Annual*, BLACK'S LAW DICTIONARY (10th ed. 2014). And, in determining a word's plain meaning, "[w]e frequently look to dictionaries . . . ." *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000). *See also Cler v. Illinois Educ. Ass'n*, 423 F.3d 726, 731 (7th Cir. 2005) (consulting BLACK'S LAW DICTIONARY). Nothing in this definition indicates that annual refers only to every *full* year. The Court cannot read the limiting word "full" into the definition of either "each calendar year" or "annual" when there is no basis in the Rule for doing so.

Moreover, the Court's interpretation is supported by two additional rules of statutory construction. If this Rule were ambiguous, which it is not, the Court would have to interpret it

consistent with the purpose of the Advisers Act. *In re Ryan*, 725 F.3d 623, 626 (7th Cir. 2013) *cert. denied sub nom. Ryan v. United States*, 134 S. Ct. 1540 (2014). Other courts have already noted the importance of the purpose of the Advisers Act in interpreting the statute's provisions. *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 389 (S.D.N.Y. 2004); *SEC v. Wall St. Transcript Corp.*, 454 F. Supp. 559, 565 (S.D.N.Y. 1978); *Sullivan v. Chase Inv. Servs. of Boston, Inc.*, 434 F. Supp. 171, 183 (N.D. Cal. 1977). The purpose of the Advisers Act and its rules is to protect investors, not investment advisers. *DiBella*, 587 F.3d at 567. Indisputably, an interpretation requiring a surprise examination or an audit for a partial year of registration provides more protection for investors than dispensing with such an obligation. *See SEC v. Amerindo Inv. Advisors, Inc.*, 2013 WL 1385013, at *9 (S.D.N.Y. Mar. 11, 2013) *modified on reconsideration sub nom. SEC v. Amerindo Inv. Advisors, Inc.*, 2014 WL 405339 (S.D.N.Y. Feb. 3, 2014) (noting that the audit requirement is "meant to ensure effective safekeeping of clients' funds and securities").

Further, interpretations that result in absurdity must be rejected. *Czerkies v. U.S. Dep't of Labor*, 73 F.3d 1435, 1442 (7th Cir. 1996). Again, this classic rule of construction applies to the Advisers Act and its rules. *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 389 (S.D.N.Y. 2004). If Defendants' interpretation of Rule 206(4)-2 were correct, a firm that registered on January 2 of a given year could operate for roughly 728 days without being required to conduct a surprise examination or audit. It strains belief to imagine that requirements that apply "each calendar year" and "at least annually" could have no effect for over 700 days.

Nutmeg, which registered just half-way through 2007 after about four years of operation, was required to arrange for a surprise examination or conduct an audit for the post-registration portion of 2007. It did not do so. This inaction was at least negligent because a reasonable

investment adviser would have taken steps to arrange for the legally mandated surprise examination or audit. Therefore, this failure also constitutes a violation of Section 206(4) and Rule 206(4)-2.

### 4. Section 206(2) (Count I against Nutmeg and Randall)

Section 206(2) prohibits an investment adviser from engaging "in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2). This Section establishes a statutory fiduciary duty for investment advisers. *Belmont v. MB Inv. Partners, Inc.*, 708 F.3d 470, 501 (3d Cir. 2013). This duty can be violated by what is done, what is said, and what is not said. *See Goldstein*, 451 F.3d at 881; *SEC v. K.W. Brown & Co.*, 555 F. Supp. 2d 1275, 1308 (S.D. Fla. 2007); *DiBella*, 2007 WL 2904211, at *12. Investment advisers must act in their clients' best interest. *Belmont*, 708 F.3d at 503; *Tambone*, 550 F.3d at 146; *Goldstein*, 451 F.3d at 881; *Sterling Asset Mgmt., LLC v. VTL Associates, LLC*, 2011 WL 3652330, at *4 n.2 (E.D. Pa. Aug. 19, 2011); *Mannion*, 789 F. Supp. 2d at 1339; *United States v. Lay*, 568 F. Supp. 2d 791, 815 (N.D. Ohio 2008); *Moran*, 922 F. Supp. at 895. Relatedly, they must employ reasonable care to avoid misleading clients. *Bolla*, 401 F. Supp. 2d at 66. *See also Belmont*, 708 F.3d at 501; *Tambone*, 550 F.3d at 146. And, finally, they must fully and frankly disclose all material facts. *Bolla*, 401 F. Supp. 2d at 66; *Gruss*, 859 F. Supp. 2d at 668 (quoting *Capital gains*, 375 U.S. at 197). *See also Belmont*, 708 F.3d at 501; *Tambone*, 550 F.3d at 146.

"A fact will be considered material . . . if there is a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information available." *DiBella*, 587 F.3d at 565. Under this standard, deciding what is material "necessarily depends on all relevant circumstances." *Id.*

Because the issue of materiality is so fact-intensive, it "is usually a question for the jury." *Silverman v. Motorola, Inc.*, 798 F. Supp. 2d 954, 965 (N.D. Ill. 2011). However, "the ultimate issue of materiality [may be] appropriately resolved as a matter of law" when "the established omissions are so obviously important to an investor that reasonable minds cannot differ on the question of materiality . . . ." *SEC. v. Bauer*, 723 F.3d 758, 772 (7th Cir. 2013) (quoting *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976)).

The SEC argues that the asset transfers, the payments to Relief Defendants, the commingling, and the non-disclosure of the same violated Section 206(2). Each argument will be addressed in turn.

Defendants contend that the asset transfers were not harmful or material because the Funds still retained the contract right to sale proceeds. But this contract right is dramatically different from what the Funds were supposed to own and what Defendants told the Investors that the Funds owned. Nutmeg and Randall said that the Funds held securities in small companies. After the asset transfers, that is not what the Funds owned. Instead, Relief Defendants held legal title to the very securities that the Funds' should have owned for the Investors. The Investors only retained a contractual right to the proceeds received when Relief Defendants sold those securities. These are completely different assets. Perhaps most importantly, this transformation exposed the Investors to a host of new risks. Relief Defendants, who were not skilled in managing investments, could have made any number of well-intentioned mistakes. If they were more nefarious, they could have stolen the securities or their proceeds. And there always is some counterparty risk in a situation such as this. As one court put it, "diverting funds away from the Fund, even for a short period of time, always carries with it the risk that some or all of the money will be lost or at least unavailable for some period of time." *Mannion*, 789 F. Supp. 2d at 1341.

The asset transfers transformed what the Funds owned on behalf of the Investors. This was a material fact that, at the very least, should have been disclosed.[8] *See also SEC v. Constantin*, 939 F. Supp. 2d 288, 307 (S.D.N.Y. 2013); *SEC v. Blavin*, 557 F. Supp. 1304, 1313 (E.D. Mich. 1983) *aff'd sub nom. SEC v. Blavin*, 760 F.2d 706 (6th Cir. 1985).

Defendants next argue that the payments to Relief Defendants were not harmful or material because Nutmeg, not the Investors, paid all of the associated costs. But this argument does not account for the fact that the monetary arrangement created a potential conflict of interest. Some Relief Defendants received monthly fees of a fixed amount. Others were not paid unless and until the underlying securities were sold because they only received a percentage of the gross sale proceeds. Essentially, Relief Defendants, as the legal owners, could generate cash for themselves by selling the assets. Therefore, their decisions could be driven by self-interest rather than the Investors' best interests. Moreover, Randall may have had an incentive to transfer assets to Relief Defendants. The more assets Randall transferred to Relief Defendants the more assets they could sell, meaning the more fees Relief Defendants (who were Randall's family and friends) would collect. Because the payments created potential conflicts of interest, they were not in the Investors' best interests. For the same reason, they were material facts that should have been disclosed. *See Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 955 (7th Cir. 2004); *Vernazza v. SEC*, 327 F.3d 851, 859 (9th Cir.) *amended*, 335 F.3d 1096 (9th Cir. 2003).

That leaves the commingling. Defendants do not mount a defense of this practice. Instead, Randall admits that the failure to segregate the Funds' assets made it more difficult to

---

[8] Randall argues that the asset transfers were beneficial because they allowed the Funds "to get more immediate liquidity than would otherwise be the case." Defendants Opening Brief, at 10. Even if this were true, an issue the Court need not resolve, the change in the character of the assets the Funds owned and the change in who had custody of the assets meant that the Funds owned something that was materially different from what the Investors were told the Funds owned. The Investors were entitled to know about this material change so that they could make fully informed investment decisions.

track the Funds' money, redemptions, and expenses. SEC SOF, ¶ 60. That means it was not in the Investors' best interests. For the same reason, the commingling was material and should have been disclosed. *See Sentinel*, 2012 WL 1079961, at *6; *SEC v. Levine*, 671 F. Supp. 2d 14, 30 (D.D.C. 2009); *Slocum*, 334 F. Supp. 2d at 183-84.

Finally, Defendants argue that they disclosed (or effectively disclosed) the asset transfers, payments to Relief Defendants, and commingling. Two of their factual contentions in support of this argument are easily dismissed. Defendants note that some of the Investors were told about the conduct at issue. But that does not ameliorate the breach of fiduciary duty owed to the other Investors. *Bolla*, 401 F. Supp. 2d at 68. They also assert that Nutmeg personnel were willing to answer questions when asked. But a willingness to disclose is a poor substitute for actual disclosure. Put another way, the law does not put the onus on investors to seek out disclosures; it puts the obligation to provide disclosure on the people who solicit and manage investors' money.

As discussed previously, Defendants contend that the Investors knew what was happening. But Randall's and David's own declarations are the only supporting evidence identified by Defendants. In those declarations, Randall and David simply assert that the Investors knew. This is inadmissible evidence because neither Randall nor David has personal knowledge of what the Investors knew. *Gray v. Monical Pizza Corp.*, 2014 WL 1308343, at *3 (C.D. Ill. Apr. 1, 2014). It should also be noted that Defendants' Local Rule 56.1 Statements are full of conclusory, speculative assertions that amount to: "Because of this fact, the Investors must have known what was going on." Even when the underlying fact is supported by admissible evidence, the conclusions and speculations are not themselves evidence and cannot be considered in resolving this motion. *Thomas v. Christ Hosp. and Medical Center,* 328 F.3d 890, 893-94 (7th Cir. 2003); *Cleveland v. Porco Co.,* 38 F.3d 289, 295 (7th Cir. 1994).

Defendants' last two factual contentions reflect a basic misunderstanding of what constitutes meaningful disclosure to investors. Defendants explain that the Investors wrote checks to Nutmeg and received distributions from Nutmeg. In Defendants' minds, this practice put the Investors on notice that assets were commingled. But routing money transfers through Nutmeg is not the same as disclosing that the assets were commingled while in Nutmeg's hands. Moreover, even if the routing through Nutmeg somehow hinted that assets were commingled while in Nutmeg's hands, that practice could not possibly disclose that the assets remained commingled even after they were supposedly transferred to the Funds. Defendants' final claimed disclosure occurred in its offering materials for the assets that were eventually transferred. There, Defendants stated that the assets would be used for Regulation D, Rule 504 investments. Rule 504 exempts certain securities from the registration requirements of federal securities law. *Rule 504 of Regulation D*, SEC, http://www.sec.gov/answers/rule504.htm (last modified Oct. 27, 2014). The Rule says nothing about transferring legal title of assets to third parties.

Nutmeg and Randall had the ability to stop all of this misconduct because they were the ones transferring assets, paying Relief Defendants, commingling assets, and deciding not to make disclosures. A reasonable investment adviser would have known that this conduct was improper. That means Nutmeg and Randall were at least negligent in allowing each of these to occur. Therefore, Nutmeg and Randall violated Section 206(2).

### 5. Section 206(4) and Rule 206(4)-8 (Count II against Nutmeg and Randall)

As discussed above, Section 206(4) makes it unlawful for an investment adviser "to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative." 15 U.S.C. § 80b-6(4). "Rule 206(4)–8 thereunder prohibits investment advisers

from making false statements of material fact to any investor or prospective investor in a pooled investment vehicle, or failing to state material facts necessary to make statements made to such investors not misleading." *SEC v. Rabinovich & Associates, LP*, 2008 WL 4937360, at *4 (S.D.N.Y. Nov. 18, 2008) (citing 17 C.F.R. § 275.206(4)-8). Section 206 applies to registered and unregistered investment advisers. The same is true of Rule 206(4)-8. *Id.* The Rule, however, only became effective on September 10, 2007. *Id.* This timing issue is not relevant to the present motions because neither party contends that certain statements were only made before the Rule's effective date.

The SEC has identified three types of false or misleading statements. First, Nutmeg and Randall asserted, in the account statements and Nutmeg' Form ADVs, that the Funds owned certain assets that actually were transferred to Relief Defendants. These statements were materially false or misleading. Nutmeg and Randall transferred legal title of the Funds' assets to Relief Defendants. Whatever securities Relief Defendants bought with those assets were not owned by the Funds. Instead, the Funds owned a meaningfully different asset – a contract right to the proceeds to be realized from selling the securities.

Moreover, the "custody" statement did not account for this crucial fact. Custody is defined as having "care and control" of the assets. *Custody*, BLACK'S LAW DICTIONARY (10th ed. 2014). After the assets were transferred, Relief Defendants had legal title to those assets. That means they had the ability to control them. There is no indication that the contract right to sale proceeds gave Defendants the legal right to control the assets that were now legally owned by Relief Defendants. The account statements fell prey to the same type of error. An investor reading the statements reasonably would have believed, and reasonably was entitled to believe,

36

that securities listed on his or her account statement were owned by the respective fund on her behalf. Here, though, the listed securities were not owned by the Funds.

The next category of misleading statements includes the listing of assets on individualized account statements without disclosing that they were commingled in accounts belonging to Nutmeg or Relief Defendants. An investor who received such an individualized account statement would not presume that assets were commingled or were held in accounts belonging to others. To the contrary, she would assume that her assets were separately held so as to be readily identifiable and protected from potential confusion with others' assets. In this case, though, Nutmeg and Randall commingled those assets and that commingling created problems with tracking the Funds' money, redemptions, and expenses. The account statements hid the practice of commingling and the resulting damage. Therefore, they would have misled a reasonable investor.

The final set of false or misleading statements involves the assertion in the account statements that certain amounts were listed as "cash available," "current cash position," and "held monies" totals. It is undisputed that these amounts actually were not held in cash because of the commingling. SEC SOF, ¶¶ 106-107; Randall Letter, at 3-4. Instead, they represented a mix of cash and securities. SEC SOF, ¶ 106. Defendants proffer an explanation for this seeming disjunction; the totals represented two portions of the proceeds from asset sales. Defendants Opening Brief, at 13-14; Defendants Sur-Reply, at 9-10. They included both (1) the portion still held in cash and (2) the portion which was to be, but had not yet been, designated to a new or subsequent fund, even if that portion had already been used to buy new securities. This explanation may be true; that is, Nutmeg and Randall may have used the terms to refer to what they claim the terms represented. But even if so, that would not change the basic inquiry:

37

whether an investor would understand those phrases to refer to cash, not a mix of cash and investments.

The meaning of the words "current," "position," "available," and "held," as used in these phrases, has no relevance to this issue. Neither party has argued to the contrary. Thus, this matter boils down to the reasonable interpretation of the words "cash" and "monies." Of course, cash means cash. It is defined as "money or its equivalent." *Cash*, BLACK'S LAW DICTIONARY (10th ed. 2014). There is no reasonable interpretation of the word as it was used in the account statements that would include securities. The meaning of "monies" is similarly straight-forward. A search for "monies" in BLACK'S LAW DICTIONARY directs one to "money." *Monies*, BLACK'S LAW DICTIONARY (10th ed. 2014). And money is defined as "the medium of exchange authorized or adopted by a government as part of its currency." *Money*, BLACK'S LAW DICTIONARY (10th ed. 2014). A reasonable reading of this definition cannot stretch it to cover securities. Therefore, an investor would not understand either "cash" or "monies" to include securities.

Each of these false or misleading statements relates directly to what assets the Funds actually owned or held on behalf of the Investors and whether those assets were commingled. As already discussed, these facts are material.

Defendants contend that the context surrounding each of these three types of statements would make them either not false or misleading, or not material. This argument relies on the same factual assertions dealt with in the non-disclosure portion of this Memorandum Order and Opinion: the Investors were aware, there was a partial disclosure, and so on. For the reasons already provided, none of these arguments is meritorious.

Nutmeg and Randall made all of the statements at issue in Count II. Because a reasonable investor would have found them to be false or misleading, Nutmeg and Randall should have known that they were so. Therefore, they were at least negligent in making the statements. Their conduct violated Section 206(4) and Rule 206(4)-8.

## B. The Aiding and Abetting Violations

Four of the counts in the Amended Complaint – Count IV, Count V, Count VI, and Count VII – assert that Randall and David aided and abetting the above discussed primary violations.

Under Section 9(d) of the Advisers Act, "the SEC may seek an enforcement action against aiders and abettors of 'a violation of any provision' of the statute." *DiBella*, 587 F.3d at 568-69 (quoting 15 U.S.C. § 80b–9(d)). To succeed in such an action, the SEC must establish three elements. *Monetta*, 390 F.3d at 956. First, there must have been a primary violation of the Advisers Act. *Id.* Second, the aider and abettor must have been "generally aware" or known that "his or her actions were part of an overall course of conduct that was improper or illegal . . . ." *Id.* Third, the aider and abettor must have "substantially assisted the primary violation." *Id.*

The SEC has satisfied the first element of aiding and abetting liability by establishing the above discussed primary violations.

At the motion to dismiss stage in this case, the court observed that, "Neither the SEC nor Goulding adequately sets forth the confusion concerning the awareness requirement" of aiding and abetting liability. *Nutmeg*, 2011 WL 5042094, at *2. This description is no less accurate at the summary judgment stage. Randall and David have not provided any legal argument as to what the awareness element demands. The SEC asserted in one sentence that, in its view, the second element includes reckless conduct. SEC Opening Brief, at 14. But the case law from this circuit provided by the SEC is far from clear on this matter.

The first case the SEC cites is the ruling on the motion to dismiss referenced above. In that opinion, however, the court did not hold that recklessness was enough; instead, the court explicitly stated that it did not need to decide the issue. *Nutmeg*, 2011 WL 5042094, at *2. The only other case from this circuit cited by the SEC is *SEC v. Koenig*, 2007 WL 1074901 (N.D. Ill. Apr. 5, 2007). In that case, the court noted that it was "most persuaded" by the courts that found recklessness sufficient for aiding and abetting liability. *Id.* at *8. The court did not explain why this was the case. Regardless, the court did not hold that recklessness was enough because it determined that "the SEC established by a preponderance of the evidence that Koenig acted with actual knowledge of the fraudulent statements . . . . " *Id.* at *9. Moreover, in a 2012 case that the SEC has not cited, the court characterized the "general awareness" element as requiring scienter. *Sentinel*, 2012 WL 1079961, at *12. Taking these cases together, it remains an open question whether recklessness is enough under the law of this circuit for aiding and abetting liability.[9]

What is indisputable is that the second element requires that the aider and abettor was "generally aware" or knew that "his or her actions were part of an overall course of conduct that was improper or illegal . . . ." *Id.* Of course, knowledge or awareness of *the conduct* that turns out to be improper or illegal is not the same as knowledge or awareness of the conduct's *impropriety or illegality*. *See Howard v. SEC*, 376 F.3d 1136, 1142 (D.C. Cir. 2004). The latter is what the law requires. *See Monetta*, 390 F.3d at 956; *Howard*, 376 F.3d at 1142; *Sentinel*, 2012 WL 1079961, at *14.

Even in circuits where recklessness suffices to establish the second element, that bar remains high. In a case out of the Tenth Circuit upon which the SEC relies, the defendant had

---

[9] In another recent case from this district, the court determined that it need not decide whether recklessness sufficed. *SEC v. Benger*, 697 F. Supp. 2d 932, 939 (N.D. Ill. 2010).

such an extensive background and significant experience that the Court determined he "surely knew" the primary violator's recordkeeping was deficient. *Geman v. SEC*, 334 F.3d 1183, 1195 (10th Cir. 2003). In another cased cited by the SEC, *Graham v. SEC*, 222 F.3d 994 (D.C. Cir. 2000), the D.C. Circuit Court of Appeals held that "extreme recklessness" is enough for aiding and abetting liability. *Howard*, 376 F.3d at 1143. But, as the Court later explained, such a standard does not allow a finding of liability based on "the proposition that a person 'should have known' he was assisting violations of the securities laws." *Id.* That is true even if the defendant engaged in "inexcusabl[y]" negligent conduct. *Id.*

Perhaps the record now before this Court could have been developed in such a way as to be sufficient to show that Randall acted at least recklessly. But, "[a]s a general matter, if the moving party does not raise an issue in support of its motion for summary judgment, the nonmoving party is not required to present evidence on that point, and the district court should not rely on that ground in its decision." *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006); *see also Pourghoraishi v. Flying J, Inc.*, 449 F.3d 751, 765 (7th Cir. 2006), *as amended on denial of reh'g* (May 25, 2006). That means it is not the court's role to construct the case that a party could have made but failed to make. Therefore, the Court will only consider the arguments actually presented by the SEC in support of its aiding and abetting claims.

For every count but one, the SEC has identified just two facts as satisfying the second element. SEC Opening Brief, at 17, 18, 19, 20, 21-22. The first is that Randall and David did not stop the primary violations. The second is that they did not disclose the primary violations. Perhaps a reasonable jury could infer that these failures were indicative of general awareness. It should be obvious, however, that a reasonable jury could find otherwise. As a matter of simple logic, these facts are just as consistent with knowledge or awareness that the conduct constituting

the primary violations was not illegal or improper. That is, a reasonable jury could conclude that Randall and David did not stop the primary violations or disclose them because Randall and David did not think Nutmeg and Randall were doing anything illegal or improper.

The evidence related to commingling with respect to Randall illustrates this point. When responding to the SEC's Local Rule 56.1 Statement, Randall admitted that the commingling created problems for the Funds. Randall Response to SEC SOF, ¶ 60. But the evidence cited by the SEC indicates that, while commingling was occurring, Randall thought that commingling was legal and proper. In a portion of Randall's deposition cited by the SEC, Randall stated, "I never dreamed that [commingling] was a violation of the Investment Advisors Act." Randall Dep., 205:8-11. In another partially cited portion, Randall explained that he thought commingling would help the Funds by allowing for more timely trades and by minimizing brokerage, bank, and accounting costs. *Id.* at 206:24-208:23. Randall admitted in a final cited portion that, "I *decided later after I separated everything* that [the] efficiencies [from commingling] were relatively small." *Id.* at 187:16-18 (emphasis added). As Randall clarified, he thought at the time the commingling was occurring that having separate accounts "would be more difficult procedurally [and] administratively . . . [and] would inure to the disadvantage of investors." *Id.* at 202:4-10. If the jury were to accept Randall's testimony – that he had no knowledge or awareness that commingling was illegal or harmful to investors (*i.e.* improper) when the commingling was happening – then Randall's decision not to stop or disclose the commingling may not support the inference drawn by the SEC. At a minimum, the SEC's inference would not be the only reasonable one. *See Sentinel*, 2012 WL 1079961, at *13-14.

The SEC's undeveloped arguments about failure to stop and nondisclosure therefore would not compel a reasonable jury to find that Randall and David acted with knowledge or

general awareness (even if the latter included recklessness). The SEC has not identified any other facts or presented any additional legal arguments that support summary judgment on Counts V, VI, and VIII.

The SEC provides an additional argument with respect to just one count, Count IV. In fact, the SEC's argument only applies to one part of the conduct covered by that count, the asset transfers. The SEC contends that Randall and David must have been aware of the impropriety or illegality of the asset transfers because they knew that (1) Relief Defendants had no qualifications, (2) Randall continued to make all investment decisions, (3) Relief Defendants were all friends or family members, and (4) Relief Defendants did almost no work but were still paid. SEC Opening Brief, at 17. Of course, none of this evidences Randall's and David's subjective awareness that what they were doing was improper or illegal. Essentially, the SEC's argument is that the asset transfers were so bad that Randall and David should have known they were illegal or improper. But, as the court detailed in *Howard*, even under a recklessness standard, this type of "should have known" argument is not sufficient to establish aiding and abetting liability. *Howard*, 376 F.3d at 1143.

Moreover, these facts would not necessarily have raised red flags for Randall and David. The SEC notes that Relief Defendants had no qualifications, but this might not have alerted Randall and David to any problem if, as the SEC contends, Randall continued to direct what happened with the assets even after the transfers. Randall's continued involvement might have seemed appropriate to Randall and David considering that Relief Defendants did not have qualifications. And, the mere fact that Randall and David did business with their family and friends would not *necessarily* raise red flags to them. Finally, the SEC's evidence shows that Randall believed Relief Defendants were rendering a service that allowed the Funds to purchase

43

securities that they could not otherwise acquire, so some compensation may have seemed appropriate (*i.e.* not illegal or improper) to Randall and David. Moreover, they say they thought the payments did not harm the Investors because Nutmeg covered the entire cost. Even though Randall was negligent in proceeding as he did, that does not satisfy the higher state of mind required for aiding and abetting liability.

At a more general level, the SEC's own factual allegations militate against its weak argument on the second element. According to the SEC, Randall did not know about all of the rules and regulations governing investment advisers when he formed Nutmeg, and David had no experience working for an investment adviser or as a compliance officer when he joined Nutmeg. SEC SOF, ¶ 8, 11. Randall and David told the SEC that, prior to the SEC's examination of Nutmeg, they were unfamiliar with the Advisers Act. *Id.* ¶ 68. The SEC claims that both "first learned" about the surprise examination or audit requirement and the segregation requirement because of the examination. *Id.* ¶ 69. Taking these statements together, it appears that Randall and David may have known almost nothing about the Advisers Act, meaning they cannot have known that the conduct at issue was illegal.[10] This evidence of utter legal ignorance creates at least a triable question as to whether Randall and David knew or were generally aware that their conduct was illegal.

Likewise, there is at least some evidence (beyond that discussed above) that Randall's and David's "fault was in *not* being aware" that Nutmeg's and Randall's misconduct was improper. *Howard*, 376 F.3d 1143. According to the SEC, Randall thought the asset transfers were necessary so that the Funds' could purchase freely tradeable shares from public companies through Regulation D offering. SEC SOF, ¶¶ 75-76. The SEC also claims that Randall thought

---

[10] The SEC has not argued this lack of knowledge about the provisions of the Advisers Act constitutes recklessness.

the commingling would help the Investors by reducing administrative burdens. *Id.* ¶ 59. Finally, Randall and David repeatedly claimed in their declarations that the Investors were aware of what was happening. While this is not evidence of what the Investors actually knew, it is evidence of Randall's and David's state of mind.

Simply put, the SEC has failed to demonstrate an entitlement to summary judgment on the aiding and abetting counts. The SEC has identified a thin factual basis from which it wants the Court to conclude that any reasonable jury would find Defendants had a general awareness of illegality and impropriety. It has failed to develop that factual argument. And it has not cited any case that found such facts sufficient. Again, even if the Court could conceive of arguments that better support the SEC's case, the Court cannot raise them where the SEC failed to do so.

Defendants still argue that David is entitled to summary judgment on all counts against him because he did not substantially assist the primary violations. The substantial assistance element "requires a showing that 'the aider and abettor proximately caused the harm to [the victim] on which the primary liability is predicated.'" *DiBella*, 587 F.3d at 566 (quoting *Bloor v. Carro, Spanbock, Londin, Rodman & Fass*, 754 F.2d 57, 62 (2d Cir. 1980)). Mere awareness does not satisfy this standard. *SEC v. Treadway*, 430 F. Supp. 2d 293, 339 (S.D.N.Y. 2006). Silence and inaction may constitute substantial assistance, though, if the aider and abettor had "actual knowledge of the primary fraud, or should have known of the fraud but for a breach of a duty to inquire." *Bianco v. Texas Instruments, Inc.*, 627 F. Supp. 154, 162 (N.D. Ill. 1985); *see also Armstrong v. McAlpin*, 699 F.2d 79, 92 (2d Cir. 1983).

Here, the SEC has presented at least some evidence of affirmative assistance provided by David. For instance, David received asset transfers. SEC SOF, ¶¶ 72, 83, 92. He certified Form ADVs with false or misleading statements. *Id.* ¶ 98. And he prepared and distributed account

statements with false or misleading statements. *Id.* ¶¶ 21, 23. Moreover, the SEC has shown that the primary violations persisted through at least some of David's tenure at Nutmeg, including his time as Chief Compliance Officer. It is unclear on this record exactly what David did to try to remedy the problems and what alternative measures he could have taken. Thus, whether David failed to take appropriate steps to remedy the problems cannot possibly be determined on this record. If David were inactive, that also could satisfy the third element if he intended the inaction to aid the primary violations, or consciously or recklessly disregard the fact that it did aid them. Therefore, the undisputed facts do not establish that David is entitled to summary judgment as a matter of law on the aiding and abetting counts.

## IV. CONCLUSION

For all of the reasons stated above, the SEC's motion for summary judgment [ECF No. 719] is granted in part and denied in part, and Randall and David's motion for summary judgment [ECF No. 726] is denied.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated: February 18, 2016