**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | No. 09-cv-1775 |
| v. | ) ) | Jeffrey T. Gilbert |
| THE NUTMEG GROUP, LLC; RANDALL GOULDING; and DAVID GOULDING, | ) ) ) | Magistrate Judge |
| Defendants, | ) ) | |
| DAVID GOULDING, INC.; DAVID SAMUEL, LLC; FINANCIAL ALCHEMY, LLC; PHILLY FINANCIAL, LLC; and ERIC IRRGANG, | ) ) ) ) ) | |
| Relief Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff's Motion to Exclude Proposed Testimony by Anthony Garvy ("SEC's Motion") [ECF No. 847] and Defendants' and Relief Defendants' Motion *in Limine* to Bar the Testimony of Mari Reidy and Peter Hickey and the Admission of Their Respective Reports ("Defendants' Motion") [ECF No. 852]. For the reasons stated below, the SEC's Motion [ECF No. 847] is granted in part and denied in part, and Defendants' Motion [ECF No. 852] is granted in part and denied in part.

## I. BACKGROUND

Plaintiff Securities and Exchange Commission (the "SEC") sued three defendants and five relief defendants. In a nine-count complaint, the SEC alleged that the defendants—The Nutmeg Group, LLC ("Nutmeg"); Randall Goulding ("Randall"); and David Goulding ("David")—violated the Investment Advisers Act of 1940 (the "Advisers Act"), 15 U.S.C. § 80a-

1 *et seq.*, and the rules promulgated thereunder. Amended Complaint, [ECF No. 314]. The SEC also asserted an equitable claim for unjust enrichment against the relief defendants—David Goulding, Inc.; David Samuel, LLC; Financial Alchemy, LLC; Philly Financial, LLC; and Eric Irrgang. *Id.* Throughout this Memorandum Opinion and Order, the Court will refer collectively to the defendants and the relief defendants as the "Defendants."

Several of the claims in this case where resolved in the Court's ruling on the parties' cross-motions for summary judgment. *SEC v. Nutmeg Grp., LLC*, 162 F. Supp. 3d 754 (N.D. Ill. 2016), *reconsideration denied*, 2016 WL 3023291 (N.D. Ill. May 24, 2016). Specifically, the Court granted summary judgment in favor of the SEC on all of the alleged primary violations except for the portions of Count I that alleged misvaluation and misappropriation, on which the SEC did not seek summary judgment. *Id.* at 761–62, 777–78, 780, 782. But the Court also denied summary judgment to any party on all of the aiding and abetting counts. *Id.* at 784. No party sought summary judgment on Count IX, which is the only count against the relief defendants. *Id.* at 761–62.

The parties are now preparing to try the remaining claims in this case. Toward that end, both parties have filed *Daubert* motions asking the Court to limit expert testimony that can be admitted during trial. The SEC has moved to exclude the testimony of Defendants' expert Anthony Garvy. SEC's Motion, [ECF No. 847]. Defendants have returned the favor by moving to exclude two of the SEC's witnesses, Mari Reidy and Peter Hickey. Defendants' Motion, [ECF No. 852].

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) govern the admissibility of expert testimony. *Hall v. Flannery*, 840 F.3d 922, 926

(7th Cir. 2016). Expert testimony is admissible only "if the testimony is relevant to a fact in issue, is based on sufficient facts or data, and is the product of reliable scientific or other expert methods that are properly applied." *Stuhlmacher v. Home Depot U.S.A., Inc.*, 774 F.3d 405, 409 (7th Cir. 2014). It is the role of the district court to serve as "the gatekeeper of expert testimony" by admitting only testimony that is reliable and relevant. *Id.* The court will admit expert testimony only where the expert "(i) is qualified to offer opinion testimony under Rule 702, (ii) has employed a reliable methodology, (iii) proposes to offer opinions that follow rationally from the application of his knowledge, skill, experience, training, or education, and (iv) presents testimony on a matter that is relevant to the case at hand, and thus helpful to the trier of fact." *Mintel Int'l Grp., Ltd. v. Neergheen*, 636 F. Supp. 2d 677, 684–85 (N.D. Ill. 2009) (internal quotation marks omitted). The proponent of expert testimony bears the burden of proving the testimony is admissible. *Fail-Safe, L.L.C. v. A.O. Smith Corp.*, 744 F. Supp. 2d 870, 887 (E.D. Wis. 2010).

An expert may be qualified "by knowledge, skill, experience, training or education." FED. R. EVID. 702. An expert need not have any "particular credentials" to be qualified. *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). The court must consider "'a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area.'" *Trustees of Chicago Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Royal Int'l Drywall & Decorating, Inc.*, 493 F.3d 782, 788 (7th Cir. 2007) (quoting *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000)). When assessing whether an expert is qualified, the court is "not concerned with [her] general qualifications." *Hall*, 840 F.3d at 926. Instead, the court examines whether the expert has the

necessary qualifications to support "'each of the conclusions [she] draws.'" *Id.* (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)). In other words, the expert must be "qualified to offer opinions in the specific area of his or her proposed testimony." *Bone Care Int'l LLC v. Pentech Pharm., Inc.*, 2010 WL 3928598, at *1 (N.D. Ill. Oct. 1, 2010).

To be reliable, an expert's testimony must be "based on sufficient facts or data" and be "the product of reliable principles and methods" that the expert has "reliably applied . . . to the facts of the case." FED. R. EVID. 702(b), (c). Put more succinctly, the expert's testimony must demonstrate "'the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 153 (1999)). This standard is not satisfied when an expert "simply assert[s] a 'bottom line'" or bases her opinion on "subjective belief or speculation." *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010). The court has broad latitude when deciding whether an expert's testimony is reliable. *Higgins v. Koch Dev. Corp.*, 794 F.3d 697, 704 (7th Cir. 2015).

To be relevant, an expert's testimony must "assist[] the jury in determining any fact at issue in the case." *Stuhlmacher*, 774 F.3d at 409. Expert testimony must be "pertinent to an issue in the case." *Id.* at 410. If "the jury is able to evaluate the same evidence and is capable of drawing its own conclusions," then the expert's testimony is not helpful. *Sanders v. City of Chicago Heights*, 2016 WL 4398011, at *4 (N.D. Ill. Aug. 18, 2016). The relevance standard for expert testimony is a liberal one. *Hale v. State Farm Mut. Auto. Ins. Co.*, 2016 WL 6947065, at *2 (S.D. Ill. June 2, 2016).

The court's application of these admissibility standards for expert testimony "is not intended to supplant the adversarial process." *Ortiz v. City of Chicago*, 656 F.3d 523, 536 (7th

Cir. 2011). Even "shaky" testimony may satisfy Rule 702 and *Daubert*. *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011). It remains for the jury to determine the accuracy of admissible expert evidence that has been "tested" through "'vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.'" *Lapsley*, 689 F.3d at 805 (quoting *Daubert*, 509 U.S. at 596).

### III. DISCUSSION

The Court will discuss the SEC's *Daubert* motion first and then turn to Defendants' motion.

### A. The SEC's *Daubert* Motion

The SEC has moved to exclude the testimony of Anthony Garvy. The SEC argues Garvy is unqualified, and that his opinions are unreliable and irrelevant.[1] The Court will address each of these arguments in turn after providing some background information.

#### 1. Background

Garvy prepared an expert report in this case, which the Court will refer to as "Garvy's Report." Garvy's Report, [ECF No. 849-1]. Various opinions are scattered throughout the report, but they largely can be sorted into three categories. First, Garvy opines as to the fair value of the Mercury Fund on December 31, 2008. Most of the report is devoted to calculating this number, which Garvy determines is $7,051,642. *Id.* at 13. Second, Garvy opines on the adequacy of how Nutmeg calculated the value of the Mercury Fund. He concludes Nutmeg engaged in "unacceptable discounting," and thus ended up with a value that was too low. *Id.* at 15. But Garvy also says Nutmeg's valuation was "in good-faith" and "reasonably objective and approximate to the *Fair Value* of the assets." *Id.* 13, 15. Third, Garvy opines on the adequacy of

---

[1] The SEC states Defendants did not turn over all of Garvy's work papers and supporting documents. SEC's Motion, [ECF No. 847], at 10. The SEC does not argue that this supposed failure justifies barring Garvy's testimony.

Crowe Horwath's calculations of the value of the Mercury Fund.[2]  He asserts Crowe Horwath "aggressively discounted" assets "with no understandable basis per their limited discussion of their discounting of these fair value assets" and improperly determined the value of certain securities by extrapolating from the value of others.  *Id.* at 13 n.7, 18–19.  Garvy further claims Crowe Horwath did not comply with the Appraisal Foundation's Uniform Standards of Professional Appraisal Practice, the American Institute of Certified Public Accountants' Statement of Standards of Valuation Services, or the Fair Value Standards.  *Id.* at 16–17.  Garvy even contends one of Crowe Horwath's reports does not conform with the Federal Rules of Civil Procedure.  *Id.* at 16.  Although this is not a complete summary of every opinion contained in Garvy's report, it is sufficient for background purposes.

## 2. Garvy's Qualifications

The SEC contends Garvy is not qualified to render an opinion in this case because he does not have experience calculating the fair value of securities, particularly the type of illiquid or restricted microcap securities that the Mercury Fund held.  Plaintiff's Reply in Support of the Motion to Exclude Proposed Testimony by Anthony Garvy ("SEC's Reply"), [ECF No. 866], at 2; *see also* SEC's Motion, [ECF No. 847], at 3.  But the SEC also argues Garvy's opinion in this case is unreliable because he did not use the same methodology he used in a previous "similar" engagement.  SEC's Motion, [ECF No. 847], at 8, 13; SEC's Reply, [ECF No. 866], at 1, 4.  So, the SEC's premise is that Garvy's previous engagement is similar enough to this one that he should have used the same methodology in both engagements.  It is odd, then, for the SEC to argue at the same time that Garvy has no experience conducting the type of valuation required in this case.  Regardless, courts impose no requirement that an expert be a specialist in a given

---

[2] Crowe Horwath is an accounting firm that Nutmeg engaged, with the Court's approval, to do forensic accounting and valuation work.  *See* [ECF Nos. 38, 39, 39-2].

field.  *See In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *5 (N.D. Ill. Mar. 31, 2017) (explaining that courts normally do not require an expert to be a specialist and that an expert's lack of specialization typically goes to weight, not admissibility); *Taylor v. Union Pac. R. Co.*, 2010 WL 3724287, at *2 (S.D. Ill. Sept. 16, 2010) ("However, an expert need not have credentials narrowly tailored to the subject matter of a case in order to pass muster under Rule 702, so long as the expert is testifying to matters within the area of his or her expertise.").

Moreover, the Court is not convinced Garvy actually lacks the knowledge, experience, training, or education required to satisfy Rule 702.  *See Smith*, 215 F.3d at 718 ("[A] court should consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area.").  Garvy received a Master of Business Administration from Northwestern University's Kellogg School of Management and completed some graduate level course work at the University of Chicago's Booth Graduate School of Business.  Garvy's Report, [ECF No. 849-1], at 26.  Garvy also has various accreditations, including Certified Public Accountant, Certified Valuation Analyst, and Accredited in Business Valuation.  *Id.* at 26.  Garvy was a Managing Partner for valuation and litigation support services at Chadwick & Garvy LLC until he became President of Corporate Valuation Services Inc., which is the position he currently holds.  *Id.* at 23.  Garvy says that, through his work, he "has appraised billions of dollars of equity interests" and that he has appraised assets using fair value standards.  *Id.*  This includes a fair market valuation of a hedge fund that owned public securities.  Deposition of Anthony Garvy ("Garvy's Dep."), [ECF No. 849-2], at 20–22.  Therefore, the Court rejects the SEC's challenge to Garvy's qualifications to value the Mercury Fund.

The SEC does raise one meritorious objection to Garvy's qualifications. The SEC notes Garvy opined in his report about whether reports prepared by Crowe Horwath comply with the Federal Rules of Civil Procedure. SEC's Motion, [ECF No. 847], at 6 n.5; *see also* Garvy's Report, [ECF No. 849-1], at 17. Garvy does not appear to be qualified to render such an opinion and Defendants have not explained why he is qualified to do so. Therefore, Garvy cannot testify about that opinion.

### 3. Garvy's Reliability

The SEC takes somewhat of a scattershot approach to challenging Garvy's opinions as unreliable. Apparently attempting to inflict death by a thousand cuts, the SEC identifies many potential weak spots in Garvy's opinions. While this method of attack may be sufficient to kill off some experts, the Court finds that most of the SEC's arguments leave only scratches on Garvy for the purpose of its *Daubert* motion, not mortal wounds, and are the stuff of cross-examination rather than disqualification. They do not render Garvy's testimony entirely inadmissible.[3]

The SEC first advances several reasons why Garvy's opinions are "untrustworthy" and argues he took shortcuts in preparing his report. The Court notes, as an initial matter, that "untrustworthiness" is not a recognized basis for excluding an expert's opinion. The question of

_____

[3] This brings to mind the exchange between King Arthur and The Black Knight in the movie *Monty Python and the Holy Grail*:

> **King Arthur**: [*after King Arthur has cut off both of the Black Knight's arms*] Look, you stupid bastard, you've got no arms left!
> **Black Knight**: Yes I have.
> **King Arthur**: Look!
> **Black Knight**: It's just a flesh wound.

Monty Python and the Holy Grail (Python (Monty) Pictures et al. 1975). As discussed below, the SEC's attack on Garvy is less damaging—at least in the context of the SEC's *Daubert* motion—than King Arthur's attack on the Black Knight.

an expert's credibility is left to the jury. *Smith*, 215 F.3d at 719. The SEC never ties many of the supposed "untrustworthy" aspects of Garvy's report to a recognized legal principle that renders expert testimony inadmissible. As noted above, most of what the SEC has to say about Garvy is more appropriately addressed to the jury.

The SEC contends Garvy spent so little time preparing his report that he could not have developed a reliable opinion. SEC's Motion, [ECF No. 847], at 3–4; SEC's Reply, [ECF No. 866], at 2. According to the SEC, Garvy spent only 26.5 hours working on his report. The SEC seems to have calculated this number by dividing the amount Garvy charged for his services ($10,000) by his hourly rate ($375.00). At his deposition, Garvy testified that he did not recall how many hours he spent working on the report. Garvy's Dep., [ECF No. 849-2], at 44. But Garvy also testified that, by the time he sent Randall a $6,000 bill in June, 2011, he had stopped billing by the hour. *Id.* at 45. That means the SEC's method of calculation is not necessarily reflective of the amount of time Garvy actually worked on his report. More fundamentally, the SEC has not shown that a competent report could not be prepared in 26.5 hours. Although the SEC can cross-examination Garvy about the amount of time he devoted to developing his opinions, his testimony should not be barred solely because of the number of hours he spent preparing his report. *See Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717, 724 (N.D. Ill. 2001) ("Defendant's main objections to [the expert's] testimony center around the short amount of time he spent studying the facts and documents in the case and the fact that he never personally examined the sump pump at issue. Although these are valid objections this Court believes that they are better explored on cross-examination.").

Next, the SEC contends Garvy's opinion is not trustworthy because he allowed Randall to file his report with exhibits that were not a part of the report. SEC's Motion, [ECF No. 847],

at 2, 6; SEC's Reply, [ECF No. 866], at 5. Garvy's report has only one exhibit, which is just one page. *See* [ECF No. 297], at 23. The report includes a Table of Exhibits that lists only that one exhibit. *Id.* at 3. Randall filed the report, including its one exhibit, as ECF No. 297. He filed hundreds of pages of additional documents as ECF Nos. 297-1 through 297-9 and ECF Nos. 298 through 305. It is uncertain whether Garvy reviewed these additional documents when preparing his report. *See* Garvy's Dep., [ECF No. 849-2], at 219–21. The record also does not clearly reflect what Garvy knew about what Randall did, when he knew it, and what control, if any, Garvy had over Randall's decision. At his deposition, Garvy testified only that he "must have said[] that is fine" when Randall said he would file the report "with some of the debentures and documents." *Id.* at 221, 232.[4]

The Court does not believe that Randall's conduct justifies excluding Garvy's testimony. It should go without saying that the filing of the additional exhibits in no way bears on the actual soundness of the opinions in Garvy's report. Further, there is no indication that Randall's filings prejudiced the SEC or misled the Court. The version of the report filed by Randall specified that there was only one exhibit to the report and was docketed as a separate filing with attachments. To the extent the SEC thought this was improper, it easily could have moved to strike the filing and asked the Court to require Randall to file the report without the additional exhibits. The SEC did not do so. The SEC has not cited any case law barring an expert's report under similar circumstances or explained why such a severe result is justified in this case.

Third, the SEC claims Garvy took a shortcut by pulling the "National Economic Outlook" section of his report for this case from a report that he prepared for another engagement. SEC's Motion, [ECF No. 847], at 2, 6–7; SEC's Reply, [ECF No. 866], at 5. The

---

[4] When laying out its argument on this issue, the SEC cites pages 222 and 223 of Garvy's deposition. SEC's Motion, [ECF No. 849], at 6. But the SEC did not file these two pages of Garvy's deposition transcript with its motion.

SEC concedes copying from a prior report is not prohibited. SEC's Motion, [ECF No. 847], at 7. The SEC says, though, that lifting the section undermines the reliability of Garvy's report. That may be so but, again, that is more of an issue for cross-examination than for wholesale disqualification.

In addition, the record does not clearly support the SEC's theory that Garvy copied-and-pasted text from one report into another. Garvy did not deny that portions of the two reports could be similar. *See* Garvy's Dep., [ECF No. 849-2], at 96–97. But he said he "didn't rely anything on" or "derive anything" from the previous report. *Id.* at 91–92, 95. Garvy claimed he maintained an "[a]bsolute Chinese wall" between his previous engagement and his work for this case. *Id.* at 98. Garvy explained that he generally included an economic outlook section in his appraisal reports and that those sections tended to follow a "fairly similar" template with similar boilerplate language or data. *Id.* at 95, 97. He also noted that, in the case of the two reports at issue, he "probably was using the same service" to get the information in the outlooks. *Id.* at 96–97. Again, this may be fodder for cross-examination but not flat disqualification The Court is not making a factual finding as to what actually happened because doing so is unnecessary to resolve the SEC's *Daubert* challenge.

The SEC identifies two specific problems supposedly resulting from the inclusion of the "lifted" National Economic Outlook section. The first is that Garvy's opinion is untrustworthy because he could not explain why it was relevant. At his deposition, the SEC questioned Garvy about why he included this section in his report. The SEC specifically focused on agriculture and housing. Garvy explained that neither of those are directly related to the value of the assets held by the Mercury Fund. *Id.* at 116–17. But he also noted how "agriculture drives commodity

prices and it also drives inflation" and housing is a factor "in the overall macro sense that could drive the market." *Id.*

The SEC also contends Garvy's opinion is untrustworthy because the National Economic Outlook section includes a statement contradicted by Defendants. The SEC focuses on Garvy's statement that "the downward volatility" in the national economy would be "magnified in the [Mercury] Fund's assets which comprise mostly of (sic) lower capitalized equities." Garvy's Report, [ECF No. 849], at 10. The SEC contends that, to the contrary, Randall and David revalued the Mercury Fund in early 2009, leading to an increase in the Fund's value. What the SEC decided not to mention, however, is that the memorandum describing the revaluation, which the SEC cites in its briefs, shows that the revaluation occurred because Defendants supposedly discovered "two small errors" made in their initial valuation. [ECF No. 849-8], at 1. One error purportedly involved the incorrect entering of the terms of a note and the other was the overlooking of one certificate. *Id.* at 5–6. In other words, the revaluation may have no bearing on Garvy's statement regarding downward volatility.

Fourth, as noted above, the SEC argues Garvy's opinion must be untrustworthy because he used a different approach in this case than in a previous engagement. SEC's Motion, [ECF No. 847], at 2, 8, 13; SEC's Reply, [ECF No. 866], at 1, 4. According to the SEC, in another case, Garvy used a fair market value approach instead of a fair value approach. The SEC says Garvy did not explain at his deposition why he used different approaches in these two engagements. It is undisputed, however, that the previous engagement did not involve the Advisers Act, which imposes specific requirements with respect to valuation. Moreover, the SEC itself identifies, tellingly, the proper vehicle for addressing this issue: cross-examination. *See* SEC's Reply, [ECF No. 866], at 4 ("If Garvy testifies at trial, he will be required to explain

why, in a previous valuation engagement, he disregarded the standard he now claims apply . . . ."). A conflict between an expert's prior work and his work in a specific case is "prime territory for 'vigorous cross-examination.'" *Ernst v. City of Chicago*, 39 F. Supp. 3d 1005, 1011 (N.D. Ill. 2014) (quoting *Daubert*, 509 U.S. 596).

The SEC's next set of arguments all drive towards the notion that Garvy blindly followed Defendants' lead without checking whether information they gave him was accurate. The SEC's first complaint in this area is that Garvy did not independently verify the Mercury Fund's holdings. SEC's Motion, [ECF No. 847], at 2, 5, 13–14; SEC's Reply, [ECF No. 866], at 1, 5. But "[a]nalyzing data assembled by others is neither illicit nor unusual, even if the data were prepared for litigation by an interested party." *Southwire Co. v. J.P. Morgan Chase & Co.*, 528 F. Supp. 2d 908, 934 (W.D. Wis. 2007); *see also Fluidmaster*, 2017 WL 1196990, at *20 (rejecting a challenge to an expert's testimony based on his reliance on information provided by a party); *City of Gary v. Shafer*, 2009 WL 1605136, at *6 (N.D. Ind. June 2, 2009). Defendants, as the people and entities responsible for running the Mercury Fund, were well-suited to know of its holdings. Importantly, the SEC has not asserted or argued (much less shown) that, as of the valuation date, the Mercury Fund did not actually own any of the assets that Garvy included in his report.[5] Instead, the SEC merely notes the Mercury Fund was not a party to certain agreements that predate the December 31, 2008 date valuation date.[6] With no indication that Garvy lacked sufficient facts or data with respect to the Mercury Fund's holdings, "[f]actual inaccuracies are to be explored through cross-examination and go toward the weight and

---

[5] The SEC concedes that the issue of whether the Mercury Fund owned these assets on the valuation date (December 31, 2008) is independent of the Court's ruling on the parties' motions for summary judgment. SEC's Motion, [ECF No. 847], at 5 n.4; *see also Nutmeg*, 162 F. Supp. 3d at 767.

[6] This distinction is important because Defendants undertook some process to transfer assets back to the appropriate fund and neither party has provided the Court with a clear description of the state of affairs as of late 2008. *See Nutmeg*, 162 F. Supp. 3d at 767.

credibility of the evidence not admissibility." *Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717, 723 (N.D. Ill. 2001); *see also Sys. Dev. Integration, LLC v. Computer Scis. Corp.*, 886 F. Supp. 2d 873, 882 (N.D. Ill. 2012) ("The Court must be mindful, however, not to usurp the jury's role of determining the 'soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis.'") (quoting *Bielskis*, 663 F.3d at 896); *Traharne v. Wayne Scott Fetzer Co.*, 156 F. Supp. 2d 717, 724 (N.D. Ill. 2001) ("Also, 'shaky' expert testimony and testimony with a weak factual basis is better revealed through cross-examination and it is not an abuse of discretion to admit such testimony.").

The SEC also asserts Garvy relied on unreliable price information supplied by Defendants. SEC's Motion, [ECF No. 847], at 2, 4–5, 12–13; SEC's Reply, [ECF No. 866], at 1, 4. As pointed out above, even if Garvy accepted such information from Defendants, this alone would not necessarily justify the exclusion of his opinion. The SEC contends the price information from Defendants that Garvy supposedly relied upon was inaccurate with respect to one security. The SEC notes Garvy listed in his report the price of USA Technologies, Inc. ("USAT") as $2.16, but E*Trade reported a closing price of $2.11 on December 31, 2008. [ECF No. 849-13]. What the SEC does not say, however, is that the pricing information provided by Aegis Capital ("Aegis") reported $2.16 as the price of USAT on December 31, 2008. [ECF No. 849-7], at 4. The SEC has not argued the data provided by Aegis is unreliable. That means the SEC has not shown conclusively that Garvy used inaccurate pricing information to value the Mercury Fund's holdings in USAT. Again, while this may be fodder for cross-examination, it does not justify disqualification.

The SEC also says Garvy's pricing information was internally inconsistent. The SEC notes Garvy used a price of $0.16 for one security in Andover Medical, Inc. ("ADOV") and

$0.35 for another security in that same company. Garvy's Report, [ECF No. 849-1], at 27. Defendants say in response that the two securities are different, the former is a debenture and the latter is a warrant. *Id.* As such, Defendants say, Garvy used the market price for the debenture and the warrant exercise price for the warrant. The SEC does not respond in its reply brief to this explanation. The other supposed inconsistency identified by the SEC has to do with securities in Long E, Inc. ("LOGE"). Again, though, Garvy used different prices for two different types of securities in LOGE, a debenture and a warrant. Defendants offer the same explanation and the SEC again does not respond. Therefore, the Court is not convinced Garvy relied on inconsistent pricing data. Once again, fertile areas for cross-examination do not disqualify Garvy at the courthouse door.

The SEC's last argument related to prices is that Garvy lied about the source of the data he relied upon by claiming he got it from Aegis. Garvy said during his deposition that he received some pricing information from Defendants but that he got most of it from Aegis. Garvy's Dep., [ECF No. 849-2], at 59–61. The SEC seizes on the fact that Garvy signed his report on May 26, 2011, but did not receive one specific email that contained pricing information from an employee at Aegis until the next day. Garvy's Report, [ECF No. 849-1], at 21; [ECF No. 849-7]. At his deposition, Garvy testified that he usually does not do work on a report after signing and dating it. Garvy's Dep., [ECF No. 849-2], at 65–67. He said he was not sure if the May 27, 2011 email contained all of the pricing information that he received from Aegis. *Id.* at 145. But, he said that, if it did, then he would have incorporated the information into his spreadsheet after he received the email. *Id.* Garvy testified that he told Defendants he needed a third party, such as Aegis, to provide confirmation of the pricing data contained in Defendants' memorandum. *Id.* at 289–91. In other words, it is possible that Defendants provided Garvy with

pricing information that he used while preparing his report and that he confirmed the prices with the Aegis information that he received on May 27. So, while this may be ripe area for cross-examination, the Court does not find that it shows Garvy relied on pricing data that is so unreliable as to justify excluding his opinion.[7] *See Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 809 (7th Cir. 2013) ("Assuming a rational connection between the data and the opinion—as there was here—an expert's reliance on faulty information is a matter to be explored on cross-examination; it does not go to admissibility.").

The SEC next argues that Garvy's methodology was fundamentally flawed because he did not incorporate certain liabilities in his fair value calculation. SEC's Motion, [ECF No. 847], at 7–8; SEC's Reply, [ECF No. 866], at 1. The SEC identifies as the supposedly ignored liabilities "money owed to certain Mercury Fund investors, administrative fees, and early disbursements." SEC's Motion, [ECF No. 847], at 7. In support of this argument, the SEC cites Garvy's deposition testimony and a memorandum prepared by Defendants. Both Garvy's testimony and the memorandum indicate that the $266,168.23 due to Mercury Fund investors was owed by Nutmeg, not the Mercury Fund. Garvy's Dep., [ECF No. 849-2], at 292–95; [ECF No. 849-8], at 7–8. In other words, that amount was not a liability of the Mercury Fund. Moreover, the record does not clearly show that the amount was still due as of December 31, 2008. The memorandum says only that the entry reflecting payment of that amount "was placed on the books in January 2009" without stating whether the payment was made in that month or prior to it. [ECF No. 849-8], at 8. At his deposition, Garvy seemed to indicate that he thought the payment occurred before the date of his valuation, although his testimony is not entirely clear on the matter. Garvy's Dep., [ECF No. 849-2], at 292–93. Likewise, it is not clear that the

---

[7] Again, it is important to note that the SEC does not dispute the actual reliability of the Aegis data and has not shown the prices used by Garvy differed from the Aegis data, other than as noted above with respect to the warrants.

$15,056.38 in early disbursements was a liability of the Mercury Fund.  [ECF No. 849-8], at 7–8.

The only other liability identified by the SEC is $39,444.35 in accrued by unexpensed

administrative fees.

The SEC's case for why these liabilities (real and supposed) should have been included in

Garvy's fair value calculation rests solely on his testimony.  The SEC characterizes Garvy as

having admitted they should have been deducted from his fair value.  This simply is not an

accurate description of Garvy's testimony.  He repeatedly said he should have looked into the

Mercury Fund's liabilities more, but he never testified he should have reduced his fair value

calculation because of them.  Garvy's Dep., [ECF No. 849-2], at 292–96, 300.  In fact, he clearly

said the largest number—the amount due from Nutmeg to investors—might, if anything, push

his fair value calculation higher.  *Id.* at 294–95.  Moreover, the more fundamental point is that

Garvy calculated the fair value of the Mercury Fund.  He did not calculate the Fund's net fair

value.  Therefore, the SEC's liability argument misses the mark.

There is another issue that the Court must address before turning to the SEC's lone

meritorious objection.  As stated above, in its opening brief, the SEC argued Garvy's opinion is

untrustworthy because he used a different methodology in this case than he employed in a

previous engagement.  SEC's Motion, [ECF No. 847], at 2 ("But, most troubling of all, Garvy

was unable to explain why his approach to valuation in this matter differs dramatically from his

approach in a previous case."); *id.* at 8 ("But by far the most troubling aspect of Garvy's Report

is that he used a 'fair value' approach in valuing the Mercury Fund, without explaining why he

rejected that same approach in a previous engagement."); *id.* at 13 ("Garvy's opinions are also

improper because he did not (or could not) explain why he rejected the valuation methodology

he used during a previous expert engagement."); *id.* ("As each approach benefited the needs of

his client, Garvy's inability to explain this change in methodology is an independent ground for excluding the Report."). The SEC changed emphasis in an important respect in its reply brief. It continued to argue that Garvy used different approaches in two engagements. SEC's Reply, [ECF No. 866], at 1. But the SEC went on to affirmatively argue with slightly more gusto that Garvy's approach in this case is flawed because he did not adhere to the appropriate standards, particularly for discounting assets. *Id.* at 4, 6–7. This argument was referenced vaguely in the SEC's opening brief, and it was only minimally more developed in its reply.

There are two problems with this argument. The SEC never explains why what Garvy did was wrong although it asserts as much, repeatedly. For instance, the SEC says in one stray sentence that "nothing about Garvy's opinion demonstrates that he adhered to the appropriate standards" but does not explain where or why Garvy's opinion fell short. *Id.* at 6. Other broad assertions include the accusation that Garvy was "ignoring . . . guidance, provisions, and rules . . . which would require discounting for certain of the Mercury Fund securities." *Id.* at 4; *see also* 6. Again, though, the SEC never identifies what guidance, provisions, and rules Garvy overlooked; never summarizes what they say; never explains how they would apply to the Mercury Fund's holdings; and never notes where Garvy's opinion specifically falls short. The closest the SEC comes to offering an explanation as to why what Garvy did was wrong is to cite the report of one of its own experts, Peter Hickey.

This skeletal presentation "impermissibly shift[s] the responsibility to the court to do the lawyer's work and to explicate the arguments that the briefs have left undeveloped." *Kyles v. J.K. Guardian Sec. Servs.*, 236 F.R.D. 400, 402 (N.D. Ill. 2006). Judges are not pigs hunting for truffles buried in the record (or in an expert opinion). *McCloud ex rel. Hall v. Goodyear Dunlop Tires N. Am., Ltd.*, 479 F. Supp. 2d 882, 894 (C.D. Ill. 2007) (critiquing a party for not

discussing an expert's publications in their brief because "[j]udges are not expected to be pigs hunting for truffles buried in the record"). It also is not the Court's job, at this juncture, to try to identify what in Hickey's report rebuts Garvy's opinions, determine whether Hickey has the better of the argument, and then assess whether that failing in Garvy's report justifies exclusion under *Daubert*. *See Goldberg v. 401 N. Wabash Venture LLC*, 2013 WL 212912, at *2 (N.D. Ill. Jan. 18, 2013) (noting that the party seeking to bar an expert must bring "to the Court's attention any specific opinions with deficiencies" and that it is not the court's job to review a lengthy expert report and *sua sponte* determine whether the report passes muster under *Daubert*); *McCloud v. Goodyear Dunlop Tires N. Am., Ltd.*, 2008 WL 2323792, at *9 (C.D. Ill. June 2, 2008) ("Without any citation to the record, this Court is not about to do Defendant's work and search for any oversteps in Kasner's testimony."). The SEC bore the burden to develop its argument in its brief. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("Moreover, 'perfunctory and undeveloped arguments . . . are waived (even where those arguments raise constitutional issues).'") (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)). While there potentially may be problems with Garvy's methodology for determining discounts, the SEC's failure to develop that argument has left the Court unable to assess whether that is so. Although this failure dooms the SEC's *Daubert* challenge, it does not preclude the SEC from challenging Garvy about such matters through cross-examination.

There is another flaw with at least part of the SEC's argument. There is no dispute that Garvy purported to apply the fair value framework provided by Accounting Standards Codification 820 ("ASC 820"), which formerly was known as Statement of Financial Accounting Standards No. 157 ("FAS 157"), and that this is a reliable method of calculating fair value. If Garvy improperly applied that methodology so as to render his opinions unreliable,

then exclusion under *Daubert* would be appropriate. But to the extent the SEC simply thinks Garvy reached the wrong result—*i.e.*, Garvy should have discounted certain assets more than he did—that is not a proper objection to the admission of his testimony. "It is not the trial court's role to decide whether an expert's opinion is correct." *Smith*, 215 F.3d at 719. In the adversarial system, it is for the jury to determine the accuracy of an expert's conclusion. *Lapsley*, 689 F.3d at 805.

The final issue that remains is the SEC's one meritorious objection to the reliability of Garvy's report. The SEC contends Garvy improperly accepted Defendants' valuation of a legal judgment. SEC's Motion, [ECF No. 847], at 2, 5–6, 13–14. In one line of one exhibit to his report, Garvy assigned a value of $80,000 to a legal claim against H3 Enterprises, Inc. Garvy's Report, [ECF No. 849-1], at 27. Garvy did not discuss this claim anywhere else in his report. At his deposition, Garvy was asked what he did to evaluate the value of this claim. Garvy's Dep., [ECF No. 849-2], at 274. He answered, "I believe I had discussions with the Gouldings on the likelihood of recovery on that." *Id.* at 274–75. When asked if he relied on anything besides his conversations with Gouldings, Garvy admitted there was no other basis. *Id.* at 275. Garvy said that the Gouldings picked the number and he put it down without discounting it or assessing its value. *Id.* at 275–76.

Of course, this is entirely indefensible. Defendants have not made any showing that Garvy is qualified to render an opinion as to the value of a legal claim. Regardless, Garvy did not even try to reach an independent conclusion as to the claim's value.[8] An expert cannot be the "mouthpiece" for another expert. *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002). Garvy's reliance on the Gouldings, however, is even worse than that.

---

[8] Defendants' contention that Garvy reached an independent conclusion as to the value of the legal claim that just happened to be the same as Defendants' is contradicted by his deposition testimony. *See* Defendants' Response, [ECF No. 857], at 21.

There is no indication that the Gouldings are experts in valuing legal judgment and Garvy's deposition testimony does indicate that he had any awareness about how the Gouldings arrived at their decision. Therefore, Garvy's opinion about the value of the H3 legal claim is inadmissible.

### 4. Relevance

The SEC argues Garvy's opinions are irrelevant to this case. The SEC says Garvy has opined only about what Defendants could have done, not about what they actually did. SEC's Motion, [ECF No. 847], at 2. The SEC points out that Nutmeg did not value the Mercury Fund using a fair value approach, that the Mercury Fund's disclosure documents discussed a different valuation methodology, and that the "net asset value" reported on Mercury Fund investors' account statements was not based on a fair value approach. *Id.* at 14–15. Instead, Defendants always calculated the value of the Mercury Fund using a fair market value approach. *Id.* Because Garvy did not opine on what Defendants did and did not "endorse Defendants' approach," the SEC claims his opinion is irrelevant. *Id.* at 2.

As specified above, Garvy's report actually does opine on the validity of Defendants' approach to valuation. After laying out his fair value analysis, Garvy concludes that Nutmeg's valuation of the Mercury Fund was too low because of "unacceptable discounting" but also was "reasonably objective and approximate" to his fair value calculation. Garvy's Report, [ECF No. 849-1], at 15. Garvy also devotes about two-and-a-half pages of discussion to the flaws in the approach to the Mercury Fund's value taken in Crowe Horwath's reports. *Id.* at 17–19. It simply is not true that Garvy did not endorse Defendants' approach and only rendered a value about hypothetical valuations of the Mercury Fund.

Moreover, in this case, the SEC alleges Defendants engaged in misvaluation and misappropriation in violation of the Advisers Act. Those claims are still alive in this case. The

SEC has not explained why Garvy's valuation is not relevant to those claims. Moreover, the SEC's own expert, Peter Hickey, concedes the Advisers Act requires investment advisers to calculate the fair value of securities that they own and conducts his analysis under FAS 157, like Garvy did. *See* Hickey's Report, [ECF No. 860-1], at ¶¶ 11–14. At this time, the Court is not convinced that Garvy's opinion should be excluded on the basis of relevance. The SEC may raise this issue at the pretrial conference and attempt to make a stronger showing at that time when it may be able to better explain to the Court exactly why it thinks Garvy's opinions, either individually or collectively, are irrelevant.

### B. Defendants' *Daubert* Motion

Defendants have moved to exclude testimony of Mari Reidy and Peter Hickey.[9]

#### 1. Mari Reidy

In 2009, after the Court granted the SEC's Motion to Appoint Accountant, Nutmeg signed an engagement letter for forensic accounting and valuation work with Crowe Horwath. *See* [ECF Nos. 30, 38, 39, 39-2]. Mari Reidy, a forensic accountant employed by Crowe Horwath, was "the lead engagement partner" for the firm's work with Nutmeg. Plaintiff's Response to Defendants' Motion to Exclude the Testimony of Mari Reidy and Peter Hickey ("SEC's Response"), [ECF No. 859], at 1, 5. During the engagement, Nutmeg's receiver filed three reports prepared by Crowe Horwath and signed by Reidy. *Id.* at 6; September 28, 2010 Report, [ECF No. 860-3]; October 20, 2010 Report, [ECF No. 860-4]; November 16, 2010 Report, [ECF No. 860-5]. The SEC expects Reidy to testify about the Receiver's retention of

---

[9] Defendants argue in their *Daubert* motion that Reidy and Hickey should be barred because the SEC has violated Federal Rule of Civil Procedure 26(a)(1)(A)(iii). This is not a basis for exclusion under *Daubert*, and Defendants have filed a separate motion *in limine* raising the same objection. *See* Defendants' and Relief Defendants' Motion *in Limine* to Bar Any Admission of Evidence of Any Disgorgement Damages or Any Other Form of Damages, to Preserve the Integrity of FRCP 26(a)(1)(A)(iii) and Other Discovery Provisions, [ECF No. 848]. Therefore, the Court will address Defendants' Rule 26(a)(1)(A)(iii) argument when it rules on this non-*Daubert* motion, rather than in this Memorandum Opinion and Order.

Crowe Horwath, the work performed by Crowe Horwath, and the content of these three reports, "including the conclusions which she drew based upon her accounting expertise and work on this matter." Plaintiff's Preliminary Witness List and Anticipated *Motions in Liminie*, [ECF No. 845], at 3.

Defendants attack Reidy at length on *Daubert* grounds. This tack is somewhat off point. The SEC freely admits it never retained or disclosed Reidy as an expert witness under Federal Rule of Evidence 702 and she never prepared a report consistent with Federal Rule of Civil Procedure 26(a)(2). SEC's Response, [ECF No. 859], at 6. The SEC also is not claiming that it now wants to disclose her as a Rule 702 expert or that its failure to disclose her earlier was justified or harmless. That means Reidy cannot give expert testimony under Rule 702. *See Musser v. Gentiva Health Servs.*, 356 F.3d 751, 758 (7th Cir. 2004) ("The exclusion of non-disclosed evidence is automatic and mandatory under [Federal Rule of Civil Procedure] 37(c)(1) unless non-disclosure was justified or harmless."); *see also Tribble v. Evangelides*, 670 F.3d 753, 759–60 (7th Cir. 2012), *as amended* (Feb. 2, 2012).

Nevertheless, the Court understands Defendants' confusion as to the best way to attack Reidy because the SEC, while disclaiming that it is offering Reidy as a retained expert, speaks at length about her as an expert. For example, the SEC argues Reidy is an expert under Federal Rule of Evidence 706. SEC's Response, [ECF No. 859], at 9. Rule 706 "allows the court at its discretion to procure the assistance of an expert of its own choosing." *Daubert*, 509 U.S. at 595. An expert can be appointed under this rule to assist courts with "complex scientific, medical, or technical matters." *Armstrong v. Brown*, 768 F.3d 975, 987 (9th Cir. 2014). A court typically invokes this authority under Rule 706 only "in rare and compelling circumstances." *Monolithic*

*Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 558 F.3d 1341, 1348 (Fed. Cir. 2009); *see also Rachel v. Troutt*, 820 F.3d 390, 397 (10th Cir. 2016).

Reidy does not fall within Rule 706. Rule 706 applies only to court-appointed expert witnesses. *See Ass'n of Mexican-Am. Educators v. State of California*, 231 F.3d 572, 590–91 (9th Cir. 2000) ("The short answer to Plaintiffs' argument is that Rule 706 applies to court-appointed *expert witnesses,* but not to technical advisors like Dr. Klein."). The SEC concedes Reidy was not appointed or hired to testify as a witness in this case. SEC's Response, [ECF No. 859], at 9. That alone means she falls outside of the scope of the Rule. *See Reilly v. United States*, 863 F.2d 149, 155 (1st Cir. 1988) ("[W]e are constrained to conclude that the grasp of Rule 706 is confined to court-appointed expert witnesses; the rule does not embrace expert advisors or consultants.").[10]

Moreover, Crowe Horwath was not appointed by the Court to assist the Court or the jury in understanding the evidence in this case. Instead, Crowe Horwath was hired by Nutmeg to provide valuation and accountant services that Nutmeg was required to obtain under the Temporary Restraining Order and Order for Other Emergency Relief. *See* Minute Entry Dated 4/28/09, [ECF No. 38] (describing the Crowe Horwath's purpose as "provid[ing] valuation and accountant service"); Engagement Agreement between Nutmeg and Crowe Horwath, [ECF No. 39-2]. Indeed, the Court approved the appointment only by granting the SEC's motion to appoint Crowe Horwath, which never cited Rule 706 and cannot reasonably be read to have sought an appointment under that provision. *See* Plaintiff's Motion to Appoint Accountant, [ECF No. 30]. The SEC's brief even concedes the appointment was pursuant to the Temporary

---

[10] The SEC cites one case in support of its argument. In that case, however, the court actually appointed an expert pursuant to Federal Rule of Evidence 706. *Nemir v. Mitsubishi Motors Corp.*, 381 F.3d 540, 546 (6th Cir. 2004).

Restraining Order. SEC's Response, [ECF No. 859], at 5. There is no indication in the record that the Court thought it was exercising its power under Rule 706.[11] The mere fact that the Court approved Nutmeg's hiring of Crowe Horwath does not render Reidy a Rule 706 expert.

Defendants' more meritorious objection to Reidy is that much of her purportedly lay opinion testimony actually constitutes expert opinion testimony which, again, she cannot offer because she was not disclosed as a retained or testifying expert. Federal Rule of Evidence 701 governs the admissibility of lay opinion testimony. That rule permits lay witnesses to provide testimony in the form of opinion only when that testimony is (1) "rationally based on the witness's perception," (2) "helpful to clearly understanding the witness's testimony or to determining a fact in issue," and (3) "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." FED. R. EVID. 701. Rule 701, in its present form, is intended "'to eliminate the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing.'" *United States v. Conn*, 297 F.3d 548, 553 (7th Cir. 2002) (quoting FED. R. EVID. 701 advisory committee's note (2000 amends.)).

Rule 701 allows a lay witness to "'offer an opinion on the basis of relevant historical or narrative facts that the witness has perceived.'" *United States v. Tomkins*, 2012 WL 1357701, at *10 (N.D. Ill. Apr. 19, 2012) (quoting *Certain Underwriters at Lloyd's, London v. Sinkovich*,

---

[11] When a court rules on a Rule 706 motion, the court must "expressly articulate a reasoned explanation for its determination" whether or not to appoint an expert. *Gorton v. Todd*, 793 F. Supp. 2d 1171, 1178 (E.D. Cal. 2011). An appointment is proper under Rule 706 only in rare and compelling circumstances when the neutral expert will assist the Court or the jury in understanding the evidence. There is no indication the Court in this case made the type of findings required to justify appointment under Rule 706(a). There also is no indication that the Court tried either to inform Crowe Horwath as to its duties consistent with Rule 706(b) or set and apportioned its costs consistent with the Rule 706(c). Of course, none of this was in error; the Court was appointing Crowe Horwath under the Temporary Restraining Order, which does not incorporate the same requirements. The Court merely notes these facts now to further illustrate that the Court did not appoint Crowe Horwath under Rule 706.

232 F.3d 200, 203 (4th Cir. 2000)).  This type of opinion testimony "'most often takes the form of a summary of firsthand sensory observations.'"  *Tribble*, 670 F.3d at 758 (quoting *Conn*, 297 F.3d at 555).  "'The prototypical example'" of lay opinion "'relates to the appearance of persons or things, identity, the manner of conduct, competency of a person, degrees of light or darkness, sound, size, weight, distance, and an endless number of items that cannot be described factually in words apart from inferences.'"  *Chen v. Mayflower Transit, Inc.*, 224 F.R.D. 415, 417–18 (N.D. Ill. 2004) (quoting *Asplundh Mfg. Div., a Div. of Asplundh Tree Expert Co. v. Benton Harbor Eng'g*, 57 F.3d 1190, 1196 (3d Cir. 1995)).[12]  Other examples of lay opinion testimony "'include identification of an individual, the speed of a vehicle, the mental state or responsibility of another, whether another was healthy, [and] the value of one's property.'"  *Id.* at 418 (quoting *Asplundh*, 57 F.3d at 1197–98).

Lay testimony "'results from a process of reasoning familiar in everyday life, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field.'"  *United States v. Christian*, 673 F.3d 702, 709 (7th Cir. 2012) (quoting Fed. R. Evid. 701 advisory committee's note (2000 amends.)).  As such, lay testimony is not admissible when the "witness's 'reasoning process [is] not that of an average person in everyday life'" but, rather, relies on the witness's "'considerable specialized training[,] . . . experience,'" and knowledge.  *United States v. Fenzl*, 670 F.3d 778, 782 (7th Cir. 2012) (quoting *United States v. Garcia*, 413 F.3d 201, 217 (2d Cir. 2005)).  Stated another way, lay testimony cannot "'make[] connections for the jury based on'" the witness's expertise.  *Christian*, 673 F.3d at 709 (quoting *Gaytan*, 649 F.3d at 581).  That means lay testimony is not admissible to "'provide specialized explanations or interpretations that an untrained layman could not make if perceiving the same acts or

---

[12] The Seventh Circuit has described *Asplundh* as providing a helpful explanation of "the difference between lay and expert testimony."  *Conn*, 297 F.3d at 553–54.

events.'"  *Conn*, 297 F.3d at 554 (quoting *United States v. Peoples*, 250 F.3d 630, 641 (8th Cir. 2001)).

When a lay witness with specialized knowledge is involved in the factual underpinnings of a case, it can be more difficult to distinguish between lay and expert testimony.  *Christian*, 673 F.3d at 709; *Tomkins*, 2012 WL 1357701, at *10.  In such situations, a witness's fact testimony may be influenced to some extent by her specialized knowledge because her observations may have been "guided by experience and training."  *Tomkins*, 2012 WL 1357701, at *10.  The mere fact that a witness has specialized training does not preclude her from offering a lay opinion "'limited to what he observed . . . or to other facts derived exclusively from [a] particular investigation.'"  *Christian*, 673 F.3d at 709 (quoting *Gaytan*, 649 F.3d at 581).  Even though this line may be hard to draw, the court still "must scrutinize" the witness's "testimony to ensure that all testimony based on scientific, technical or other specialized knowledge is subjected to the reliability standard of Rule 702."  *Conn*, 297 F.3d at 553.

Two examples are illustrative of how these principles apply to the facts of specific cases. In *United States v. Tomkins*, the United States filed a motion *in limine* seeking a ruling on the admissibility of a lay witness who, as a Senior Market Surveillance Specialist for the SEC, investigated the defendants' activity.  Government's Consolidated Motions *in Limine* at 1–2, *United States v. Tomkins*, No. 07-CR-227, (N.D. Ill.), [ECF No. 302].  The court recognized the mere fact that the witness had "particularized knowledge" did not make his testimony inadmissible.  *Tomkins*, 2012 WL 1357701, at *11.  The court found that, consistent with the principles discussed above, the Specialist could testify "about his personal knowledge and perceptions of the historical facts surrounding the relevant transactions."  *Id.*  This included testimony about summaries of data that he prepared and the contents of documents that he

reviewed. *Id.* But the court barred the witness from "provid[ing] testimony which requires him to make connections for the jury based on [his] specialized knowledge." *Id.* The court seemingly did not describe all of the testimony that would cross this line. But the court did state that the witness could not testify about whether the defendant "was successful or could have been successful in his scheme;" "how financial markets, stocks, and options work (in general)"; or "the jargon of economics and markets." *Id.* at \*10–11.

In *United States v. Frantz*, the government wanted to call two IRS employees who conducted a civil tax audit of the transactions at issue in the case to provide lay testimony about "what they observed and what the found out during their audit." 2004 WL 5642909, at \*1 (C.D. Cal. Apr. 23, 2004). The government tried to argue the employees' testimony about their findings amounted simply to testimony about what they perceived but offered "no substantive" support for this proposition. *Id.* at \*10. The court discussed the Seventh Circuit's decision in *Conn* at some length. *Id.* at \*12. The court then found the witnesses could testify about: (1) their role as auditors, (2) how an audit generally is conducted, (3) documents and information they obtained, (4) research they conducted, (5) conversations they had, and (6) factual observations they made during their audit. *Id.* The court made clear, however, that, even in these areas, the witnesses could testify only to the extent that their testimony was "based on their rational perception of information and events, and [did] not rely on specialized or technical knowledge." *Id.* The court also barred the witnesses from testifying about their findings to the extent they were "based on their background and expertise as IRS auditors." *Id.*[13]

---

[13] *See also James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214–16 (10th Cir. 2011) (concluding testimony about the pre-fire value of a dilapidated, condemned, 39-year-old building constituted expert testimony in part because it was based on depreciation techniques that involved "more than applying basic mathematics"); *Ryan Dev. Co. L.C. v. Indian Lumbermens Mut. Ins. Co.*, 711 F.3d 1165, 1170–71 (10th Cir. 2013) (explaining that "accountants often testify as experts" but finding they can offer lay testimony based on "basic arithmetic, personal experience, and no expert reports"); *United*

Neither party in this case has parsed the Crowe Horwath reports and Reidy's proposed testimony to distinguish what constitutes lay testimony and what is expert testimony under the governing case law discussed above. Instead, the parties have staked out broad, categorical positions, with Defendants arguing everything amounts to expert testimony and the SEC claiming everything is lay testimony. Neither appears to be correct.

There can be no doubt that significant portions of Reidy's proposed testimony cross the line into expert testimony. Reidy indisputably used her expertise in forensic accounting while investigating Nutmeg and preparing the Crowe Horwath reports. *See* SEC's Response, [ECF No. 859], at 9 ("[Reidy] was qualified by her experience and specialized knowledge to offer expert opinion testimony on accounting matters."); *id.* at 11 ("[Reidy] is an expert in forensic accounting with prior expert testimony and relevant publications, and she is well-qualified to offer opinion testimony in this matter . . . ."). The SEC's Rule 706 argument concedes as much. The reports "address and explain complicated factual matters and accounting standards." *Id.* at 12–13. They do more than simply report personal observations and historical facts. The SEC explicitly says it wants Reidy to testify about the conclusions and findings that she made based on her expertise. *See* Plaintiff's Preliminary Witness List and Anticipated *Motions in Liminie*, [ECF No. 845], at 3 ("the *conclusions* which she drew *based upon her accounting expertise* and work on this matter") (emphasis added); SEC's Response, [ECF No. 859], at 11 (saying Reidy will testify "about Crowe Horwath's . . . finding on accounting issues), 13 (referring to "Reidy's

---

*States v. Williams*, 2016 WL 6635032, at *1–3 (E.D. La. Nov. 9, 2016) (drawing distinctions similar to those in *Frantz*); *Gallagher v. Holt*, 2012 WL 3205175, at *13–14 (E.D. Cal. Aug. 3, 2012) (barring entirely the testimony of a CPA who conducted a forensic accounting); *Commodities Futures Trading Comm'n v. Sentinel Mgmt. Grp., Inc.*, 2012 WL 1080166, at *1 (N.D. Ill. Mar. 30, 2012), *amended in part, adhered to in part sub nom. Commodity Futures Trading Comm'n v. Sentinel Mgmt. Grp., Inc.*, 2012 WL 3234277, at *1–3 (N.D. Ill. Aug. 6, 2012) (striking an affidavit submitted by a Supervisory Auditor for the SEC because it constituted undisclosed expert testimony).

opinions on forensic accounting matters). This type of testimony is not admissible under Federal Rule of Evidence 701.

This is not to say that Reidy has no admissible testimony to offer in this case. She can testify about what she observed and the historical facts that she derived from her investigation. As long as Reidy does not offer specialized explanations or interpretations of her observations or the facts and does not testify about connections drawn based on her expertise, her testimony will not cross the line into the realm of an expert. Policing this line will require the Court to scrutinize closely Reidy's testimony. The three Crowe Horwath reports that seem to largely define the scope of Reidy's testimony are detailed and cover a variety of subjects. *See* SEC's Response, [ECF No. 859], at 6. The Court will not go through them line-by-line in this Memorandum Opinion and Order to identify what Reidy can and cannot say, particularly since the parties did not bother to do so. But the Court will address a couple of the areas that the parties focus on in their briefs.

Defendants are primarily focused on Reidy's ability to testify about Crowe Horwath's conclusion that Nutmeg significantly overstated the value of securities. The SEC disclaims any intent to elicit from Reidy testimony about valuation matters. *Id.* at 7, 11. But, as discussed below, the SEC intends to ask Reidy about her findings related to Nutmeg's fees that are based on Crowe Horwath's valuation work. So, it does intend to ask Reidy about valuation.

The basis for Crowe Horwath's conclusion that Nutmeg overvalued assets seems to be set forth in a memorandum prepared by two of Reidy's colleagues at Crowe Horwath. They conducted what they called "[p]reliminary work on the valuation of" seven securities held by the Mercury Fund and determined Nutmeg overvalued them. [ECF No. 860-7]. To reach these conclusions, they reviewed "voluminous" complex financial documents. *Id.* at 1. They assessed

whether the assets should be valued using the as-converted method and, if not, how much the assets should be discounted because of restrictions, illiquidity, and credit/default risk. *Id.* The pair's findings, as discussed in their memorandum, eventually made their way into the October 20, 2010 Crowe Horwath report, about which the SEC wants Reidy to testify. *See* Report Dated October 20, 2010, [ECF No. 860-4]. The report not only described the findings at length but even went so far as to extrapolate from the preliminary valuation to determine the value of all of the securities held by the Mercury Fund that Reidy's colleagues did not value. *Id.* at 31. The report did not provide any meaningful explanation of or justification for the extrapolation. The report then relied on the preliminary valuation to conclude that Nutmeg overvalued the Mercury Fund's assets and, thus, charged excessive fees. *Id.* at 6, 31.

A 2008 decision of the Seventh Circuit, *Compania Administradora de Recuperacion de Activos Administradora de Fondos de Inversion Sociedad Anonima v. Titan International, Incorporated*, 533 F.3d 555 (7th Cir. 2008), provides useful guidance in assessing the admissibility of Reidy's valuation testimony in this case. In *Compania*, the plaintiff sued an international tire manufacturer for breaching a guaranty contract. *Id.* at 556. At summary judgment, the tire manufacturer submitted the affidavit of its President and CEO in which he asserted, among other things, that the value of certain collateral exceeded $10 million. *Id.* at 558. The district court determined that this purportedly lay testimony actually constituted expert testimony and excluded it. *Id.* at 559. On appeal, the Seventh Circuit explained that the witness's "valuation was not based on any knowledge obtained through his special relationship with the items in question; instead, he simply looked at a list of items . . . and he estimated their value based on his extensive experience . . . ." *Id.* at 560. The court of appeals noted that this kind of testimony "traditionally [is] provided by an expert" and "'could have been offered by an

individual with specialized knowledge'" of the relevant market. *Id.* (quoting *Conn*, 297 F.3d at 555). The Seventh Circuit held that this type of testimony constituted expert testimony that was subject to Rule 702 and excluded it because the witness had not been disclosed as an expert. *Id.* at 561.

Testimony in this case about Crowe Horwath's valuation and extrapolation would be no different. Reidy's colleagues did not investigate Nutmeg to learn historical facts not known to others or make observations not made by others. The whole purpose of their involvement was not to recreate what happened as a factual matter, but, rather, to apply their expertise to determine the value of the Mercury Fund's holdings. What they did—applying complex valuation methods to value complex securities—is exactly what any other expert given the same documents could have done. The mere fact that Reidy repeated their findings and conclusions in the October 20 report does not allow her to smuggle in what clearly would be expert testimony. Reidy likewise cannot testify about the extrapolation because that also amounts to expert testimony. *See C.W. v. Textron, Inc.*, 2014 WL 1047940, at *8 (N.D. Ind. Mar. 17, 2014), *aff'd sub nom. C.W. ex rel. Wood v. Textron, Inc.*, 807 F.3d 827 (7th Cir. 2015) ("However, under *Daubert*, experts have to connect the dots for the court and explain *how* they extrapolated the data . . . ."). Therefore, Reidy cannot testify regarding findings and conclusions about Nutmeg's valuation to the extent they are based on Crowe Horwath's preliminary valuation and/or extrapolation.

Even if testimony from Reidy in this vein constituted lay opinion, the Court is not convinced it would be admissible. Reidy's colleagues conducted only a preliminary valuation of the assets. The extrapolation seems to have been conducted without any reasonable basis for believing that it would lead to an accurate calculation as to the value of the other holdings. The

SEC has not offered any substantive explanation of how Crowe Horwath conducted its valuation and extrapolation. Instead, the agency acts as if the preliminary valuation and extrapolation were not mentioned in and did not impact the conclusions set forth in the Crowe Horwath reports. This ostrich impersonation leaves much to be desired. Even if testimony about this valuation work were not subject to Federal Rule of Evidence 702, it still would have to pass muster under Rules 401 and 403. If Crowe Horwath's valuation or extrapolation were not calculated in the manner prescribed by the Advisers Act, then testimony about either may be irrelevant to this case and unfairly prejudicial to Defendants.[14]

The next area of Reidy's testimony that the parties focus on is her determination that Nutmeg charged excessive fees. Section 2.6 of the October 20, 2010 Crowe Horwath report contains the most lengthy discussion of this issue.[15] The report describes the fee structure for the Mercury Fund under the relevant governing documents. [ECF No. 860-4], at 25–27. Reidy can testify about the provisions of those documents, but she cannot use her expertise to, for instance, define terms or offer specialized explanations and interpretations of the various provisions and how they operate together. *See Tomkins*, 2012 WL 1357701, at *11. The report then lays out how Nutmeg actually calculated fees. [ECF No. 860-4], at 28–30. It is unclear exactly what reasoning process went into this analysis. It may be that the calculations are based on historical facts learned during the investigation and on a reasoning process that is within the ken of a lay witness. After this, though, the report takes a quick turn.

---

[14] The Court's concerns about the discussion in the October 20 report regarding valuation—particularly the unjustified extrapolation—also make the Court skeptical that the SEC could satisfy *Daubert* with respect to this testimony even if Reidy were a properly disclosed expert.

[15] This topic also is discussed in Crowe Horwath's November 16, 2010 report. [ECF No. 860-5], at 17–19. The Court's discussion of the earlier report should provide the parties with enough guidance about the admissibility of testimony regarding the November report.

In section 2.63, Reidy assesses whether Nutmeg's management and incentive fees are reasonable, relying on the valuation and extrapolation discussed above. *Id.* at 31–33. Testimony about this complex analysis and whether Nutmeg's fees were reasonable are beyond the ken of Rule 701. *See LG Elecs. v. Whirlpool Corp.*, 2010 WL 3781264, at *2 (N.D. Ill. Sept. 22, 2010) (prohibiting an employee of Whirpool from providing lay opinion testimony about statistical analyses he conducted because "[a]n untrained lay person could not make the observations or conclusions made by [him]"); *see also In re Perry H. Koplik & Sons, Inc.*, 382 B.R. 599, 602 (Bankr. S.D.N.Y. 2008) (explaining that a skilled accounting professional cannot offer lay testimony about whether a practice was wrongful or should have been done differently).

In section 2.64, Reidy identifies two different alternative methods of calculating fees that "remove uncertainties associated with" Nutmeg's valuation. [ECF No. 860-4], at 33–34. They supposedly are based on the terms of two different sets of offering documents for the Mercury Fund. *Id.* at 33. Then Reidy selects one of the methods to be used in calculating the amount due to the Mercury Fund from Nutmeg. *Id.* at 34. In the Court's view, the calculations involved in the two proposals potentially may have been conducted using a reasoning process within the ability of a lay person.[16] But the reasoning process involved in proposing alternative methods of calculating fees and choosing one to use in determining whether Nutmeg overcharged fees clearly is beyond the capabilities of a person without expertise in accounting and finance. Drawing these conclusions requires making connections that are substantively different from those necessary to describe either what fees were provided for in offering memoranda or what fees Nutmeg actually charged.

---

[16] Whether a lay person could figure out the method for calculating fees provided for in the offering memoranda is another issue. That may create a further problem for Reidy's proposed testimony.

The above discussion leaves a couple of areas of Reidy's proposed testimony unaddressed. Of particular note, the Court has not discussed her conclusions that Defendants did not invest all of the investors' money and that there are amounts due from Defendants to Nutmeg's funds. As explained above, however, neither party has addressed in any meaningful detail the lay/expert divide with respect to these areas. The Court thus will not strike out further on its own. These areas can be discussed at the pretrial conference after the parties have had the opportunity to consider the guidance provided in this Memorandum Opinion and Order.

Another topic merits brief mention. At Crowe Horwath, Reidy led a team of people who worked on the Nutmeg matter. Presumably these people developed personal knowledge about many of the facts contained in the Crowe Horwath reports. It is possible that Reidy may not have developed the same knowledge herself, but, rather, may have relied in certain instances on what members of her team told her. Under Federal Rule of Evidence 602, Reidy's testimony must be based on personal knowledge and she must lay a proper foundation for any testimony based on that knowledge. Under Federal Rule of Evidence 802, Reidy must not offer inadmissible hearsay testimony. Because the parties do not address these issues in their briefs, the Court will not delve into them at this time.

Before leaving Reidy's testimony, the Court wants to emphasize one point that should be eminently obvious from the discussion above. Reidy is precluded from offering testimony about findings and conclusions based on her expertise because the SEC did not disclose her as an expert. If the SEC had done so, then Reidy's testimony would not have to fit within the parameters for lay testimony set by the Federal Rules of Evidence. Although some of Reidy's proposed testimony may have been excluded even if she were disclosed as an expert, most of the limitations on her testimony stem from the fact that she only can provide lay testimony. In other

words, it is the SEC's decision not to disclose Reidy as an expert, not some failing in her qualifications or analysis, that undermines the admissibility of certain testimony.

For all of these reasons, Defendants' Motion, to the extent it seeks to bar Reidy's testimony, is granted in part and denied in part. The parties should be prepared at the pretrial conference to address in more detail what admissible testimony, if any, Reidy may give.

### 2. Peter Hickey

Peter Hickey has prepared two expert reports in this case. In the first, he assesses Nutmeg's valuation of the Mercury Fund and the Stealth Fund. Expert Report of Peter C. Hickey, ("Hickey's Report"), [ECF No. 860-1]. Hickey does not calculate a specific value for the funds' holdings; instead, he opines on the methodologies that Defendants used when valuing the holdings. In his second report, Hickey analyzes Garvy's report. Rebuttal Report of Peter C. Hickey ("Hickey's Rebuttal"), [ECF No. 849-15]. The SEC intends to call Hickey to testify about the contents of both of his reports. Plaintiff's Preliminary Witness List and Anticipated *Motions in Liminie*, [ECF No. 845], at 3. Defendants are seeking to preclude him from offering any testimony in this case.[17] Defendants argue that Hickey is unqualified and that his opinions are unreliable and irrelevant.

### i. Qualifications

Defendants launch two challenges to Hickey's qualifications. The first is that he is not familiar with either the Uniform Standards of Professional Appraisal Practice ("USPAP") or the Statement on Standards for Valuation Standards ("SSVS"). Defendants do not cite case law or evidence showing that familiarity with these standards is required for an expert to be qualified to value securities. Moreover, this argument is fundamentally misguided. "The notion that

---

[17] The SEC claims Defendants' arguments do not attack testimony about the rebuttal report. SEC's Response, [ECF No. 859], at 4 n.2. The Court disagrees.

*Daubert* . . . requires particular credentials for an expert witness is radically unsound." *Tuf Racing Prod., Inc. v. Am. Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000). Under *Daubert*, "[a]nyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." *Id.*

Defendants' unyielding focus on the USPAP and the SSVS causes them to ignore all of Hickey's other qualifications. Hickey has a BA in Economics from Georgetown University and a MBA, with concentrations in Accounting and Finance, from The University of Chicago's Booth School of Business. Hickey's Report, [ECF No. 860-1], ¶ 4. After more than a decade of experience conducting analysis in cases involving valuation and accounting, Hickey co-founded his own consulting firm (which later became Global Economics Group). *Id.* ¶ 5. As a Vice President at Global Economics Group, Hickey has worked as a valuation expert both within and outside the litigation context. *Id.* Hickey has developed experience valuing various assets, including restricted stocks. *Id.* ¶ 6. This training and experience is sufficient to qualify Hickey to render the opinions he gave in this case.

Defendants also attack Hickey's qualifications because he supposedly "admitted to a total lack of familiarity with SEC Rule 144," making him unqualified to determine how long a restriction would limit one's ability to sell an asset. Defendants' Motion, [ECF No. 852], at 9. This argument is inconsistent with Hickey's report and his deposition testimony. In his report, Hickey explains that Rule 144 "governs securities that are deemed to be exempt from registration requirements . . . and allows for public resale of some restricted securities and control securities if certain conditions are met." Hickey's Report, [ECF No. 860-1], ¶ 23 n.24. Hickey also says the restriction period under Rule 144 was decreased from 2 years to 1 year in 1997. *Id.* ¶ 23 n.25. During his deposition, Hickey offered the same explanation of Rule 144. Deposition of

Peter C. Hickey ("Hickey's Dep."), [ECF No. 860-2], at 94–96.[18]  Nothing that Hickey says or does not say about Rule 144 goes to his qualifications to opine on Nutmeg's and Garvy's assessments of the value of the restricted securities that Hickey assessed for this case.[19]  Hickey is qualified to do so.

### ii.     Reliability

Defendants attack the reliability of Hickey's opinion on a few grounds.  Defendants' most developed argument is that Hickey's failure to comply with the USPAP and the SSVS renders his opinions unreliable.  Defendants have not cited any authority holding that a valuation that does not comply with those standards must be barred under *Daubert*.  The Court has not found any such case law during its own research.  Hickey's opinions are admissible as long as they demonstrate "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Lapsley*, 689 F.3d at 805.  Nothing in the record now before the Court indicates that the USPAP and the SSVS define the level of intellectual rigor for valuation experts.

Defendants also contend that, in his rebuttal report, Hickey incorrectly determined the Mercury Fund's convertible note in GoIP Global, Inc. ("GoIP") could be converted to common stock only at a 30% premium.[20]  Defendants say that Hickey misread the terms of the note and

---

[18] Hickey testified during his deposition that he did not rely heavily on Rule 144 in rendering his opinion for this case because he thought the rule's effect on restriction periods did not significantly impact the value of the securities that he analyzed.  Hickey's Dep., [ECF No. 860-2], at 94–96

[19] The Court also does not believe that Hickey's one sentence answer at his deposition stating he is not familiar with the operations of a conversion notice of a restricted security justifies excluding his testimony.  *See* Hickey's Dep., [ECF No. 860-2], at 225.  The Court is not convinced knowledge of that operation is necessary for Hickey to testify about the opinions he actually rendered in this case.

[20] Defendants infer from this one error that Hickey "apparently" misread all of the other debentures that have similarly worded provisions.  Defendants' Motion, [ECF No. 864], at 7.  Defendants, however, do not actually identify any other similar error.  Therefore, the Court will focus solely on the GoIP debenture.

that, if he read them correctly, he would have realized that the Mercury Fund could convert the note to common stock at a 30% discount. Defendants' argument is of no avail. As an initial matter, the Court notes that Hickey's opinion about the GoIP note is not merely *ipse dixit*. He explained at length at his deposition why he reached the conclusion that he did. Hickey's Dep., [ECF No. 860-2], at 235–46. The alleged error identified by Defendants does not show Hickey's opinion is unreliable; at most it would indicate that he made a factual error. Factual inaccuracies "go toward the weight and credibility of the evidence not admissibility." *Traharne*, 156 F. Supp. 2d at 723. The only problem that supposedly resulted from this error is that Hickey reached the wrong conclusion as to the value of an asset. It is the jury's job to assess the correctness of an expert's opinion. *Sys. Dev. Integration*, 886 F. Supp. 2d at 882. Therefore, regardless of whether Hickey actually erred in the way Defendants say he did, he will not be excluded because of his assessment of the GoIP note.

Defendants' last argument is that Hickey's discounting of assets was inappropriate. Defendants quote at length the provisions of FAS 157, say FAS 157 prohibits blockage discounts, and claim Hickey's discounts amount to not very well disguised ways to discount for a blockage factor.[21] Again, this contention largely misses the mark. The question under *Daubert* is not whether Hickey's opinion is right or wrong. As the Court explained with respect to the SEC's challenge to Garvy's discounting, it is the jury's role to decide which expert's opinion, if any, is correct.

Defendants offer one meritorious objection to Hickey's opinion. Defendants contend Hickey should not be allowed to testify about Crowe Horwath's preliminary valuation or its

---

[21] This argument also could be interpreted as challenging the relevance of Hickey's opinions, rather than their reliability. The Court believes it is better understood as contending Hickey applied FAS 157 in an unreliable manner. Regardless of whether the argument is characterized as challenging the reliability or the relevance of Hickey's testimony, the outcome would be the same.

extrapolation. It seems the SEC may hold a contrary view, as it says Hickey should be allowed to testify about Crowe Horwath's valuation work "[t]o the extent it is necessary or appropriate." SEC's Response, [ECF No. 859], at 11 n.5. This at least implies that some testimony on this matter may be necessary or appropriate in the SEC's view. Moreover, in his report, Hickey purports to adopt or approve of Crowe Horwath's valuation. In several instances, Hickey explicitly says he reviewed Crowe Horwath's valuation report and agrees with its method and approach to valuation. *See*, *e.g.*, Hickey's Report, [ECF No. 860-1], ¶¶ 41, 46, 84. Hickey does not provide any explanation as to what method and approach he understands Crowe Horwath to have used or why he agrees with them.

As explained above, Crowe Horwath's preliminary valuation and extrapolation both are the work of experts. One expert "cannot simply adopt wholesale the ideas of another expert without any independent analysis." *Fluidmaster*, 2017 WL 1196990, at *24. Such undeveloped bolstering is both unreliable and irrelevant. *Id.* That is why a disclosed expert cannot merely serve as the "mouthpiece" of an undisclosed expert. *See Burkybile v. Mitsubishi Motors Corp.*, 2006 WL 3191542, at *7 (N.D. Ill. Oct. 18, 2006); *see also Whirlpool*, 2010 WL 3613814, at *5. "If an expert intends to rely upon the expert report of another, he or she must evaluate the methods used by the earlier expert and demonstrate familiarity with the methods and reasoning used by the earlier expert." *Estate of Cape v. United States*, 2013 WL 4522933, at *3 (E.D. Wis. Aug. 27, 2013).

Hickey's deposition testimony in this case shows he has no reliable basis to opine on Crowe Horwath's extrapolation. Hickey stated during his deposition that he did not and would not offer any opinion on the extrapolation. Hickey's Dep., [ECF No. 860-2], at 62–64; *see also id.* at 57. He also admitted he did not analyze the extrapolation. *Id.* at 64, 90; *see also id.* at 53.

40

Therefore, if Hickey were to testify about that extrapolation, he would be no more than a mouthpiece.

Hickey did more with respect to Crowe Horwath's preliminary valuation work. In his report, Hickey states he reviewed the September 2009 memorandum summarizing the conclusions of Reidy's two colleagues. Hickey's Report, [ECF No. 860-1], ¶ 2(iii). It seems his understanding of the preliminary valuation came solely from his reading of the memorandum. *See* Hickey's Dep., [ECF No. 860-2], at 49, 52, 70, 73. During his deposition, Hickey said he did not independently value any of the securities. Hickey's Dep., [ECF No. 860-2], at 35. He testified, though, that he thought the Crowe Horwath's discounting was consistent with his understanding of the type of valuation analysis that should have been conducted. *Id.* at 59–60, 63. As Hickey put it, he never determined whether Crowe Horwath's valuations were too low or too high, he "just felt that they consistently applied the guidelines that [he] . . . laid out" in his report. *Id.* at 73; *see also id.* at 88–90.

Even in light of this explanation, the Court is not convinced Hickey can offer reliable testimony about Crowe Horwath's preliminary valuations. It seems clear Hickey has not conducted any meaningful independent analysis that would allow him to testify about the specific valuations (*i.e.*, the dollar amounts) that Crowe Horwath calculated. Hickey's deposition testimony indicates that he may have conducted meaningful independent analysis regarding whether Crowe Horwath's method and approach complied with what Hickey determined to be the relevant guidelines. But there is no such analysis disclosed in Hickey's report. The report discusses at length whether Nutmeg complied with the guidelines. But the discussion (if it can be called that) of Crowe Horwath is contained in several single sentences simply stating that Hickey agrees with its approach and method. These isolated and undeveloped

sentences appear to amount to no more than a series of bottom-line conclusions and to constitute inappropriate bolster. As such, the report leaves the Court with little basis to determine whether Hickey's opinions about Crowe Horwath's preliminary valuation are reliable. Therefore, testimony along these lines will be excluded.

### iii. Relevance

Defendants contend Hickey's report and rebuttal report are irrelevant to this case because they do nothing more than prop up Crowe Horwath's valuation and extrapolation. This is true of only a small part of Hickey's report and not true at all of his rebuttal report. As discussed above, Hickey's report does affirm his agreement with Crowe Horwath's preliminary valuation work. The SEC has not shown that evidence of what Crowe Horwath did and found during its preliminary valuation will be admissible. In light of that fact, the Court does not see how Hickey's opinions about whether that work complied with relevant guidelines are relevant to this case. Therefore, testimony in that vein is irrelevant and will not be admitted.[22]

The rest of Hickey's report and rebuttal report, however, are entirely independent of Crowe Horwath's valuation and extrapolation. Outside of the stray references to Crowe Horwath, Hickey's report is devoted to assessing how Nutmeg valued securities and explaining why Hickey believes Nutmeg did not discount the value of those assets enough. Hickey's rebuttal report does not discuss Crowe Horwath's work at all. Instead, Hickey explains in the report why, in his view, Garvy's report is deficient. Defendants have not offered any sound objection to the relevance of these portions of Hickey's reports.

---

[22] The same logic would preclude Garvy's opinions about Crowe Horwath's preliminary valuation and extrapolation.

## IV.    CONCLUSION

For all of the reasons stated above, the SEC's Motion [ECF No. 847] is granted in part and denied in part, and Defendants' Motion [ECF No. 852] is granted in part and denied in part.


_____
Jeffrey T. Gilbert
United States Magistrate Judge


Dated: April 28, 2017