## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | |
| Plaintiff, | ) ) | Case No. 09-cv-1775 |
| v. | ) ) | Jeffrey T. Gilbert |
| | ) | Magistrate Judge |
| RANDALL GOULDING; and DAVID GOULDING, | ) ) ) | |
| Defendants, | ) ) | |
| DAVID GOULDING, INC.; DAVID SAMUEL, LLC; FINANCIAL ALCHEMY, LLC; PHILLY FINANCIAL, LLC; ERIC IRRGANG; and SAM WAYNE | ) ) ) ) ) ) | |
| Relief Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Defendants David Goulding ("David"), David Goulding, Inc. ("DGI") and David Samuel,

LLC ("DSLLC") ("Relief Defendants") (David and the Relief Defendants are referred to together

as "Defendants") each consented to the entry of judgment in favor of Plaintiff Securities and

Exchange Commission ("SEC") in December 2017. [ECF Nos. 985-2, 985-4, 985-5]. The Court

entered consent judgments against these Defendants in early January 2018. [ECF Nos. 993, 994].

This case then proceeded to a 10-day bench trial in late January 2018 against David's father and

co-defendant, Randall Goulding ("Randall"). [ECF No. 1009]. Following extensive post-trial

briefing, the Court entered its findings of fact and conclusions of law in favor of the SEC and

against Randall in October 2019. [ECF No. 1085]. The Court ordered Randall to pay a civil

penalty of $642,222, entered an order of disgorgement of ill-gotten gains, including interest, in

the total amount of $1,225,652, and granted injunctive relief. [ECF No. 1094].

The consents entered into by, and the judgments entered against, David and the Relief Defendants each provide that Defendants "shall pay disgorgement and prejudgment interest thereon" as determined by the Court upon motion of the SEC. [ECF Nos. 985-2, 985-4, 985-5, 993, 994]. The consents and the judgments also provide that "the allegations of the Amended Complaint shall be accepted as and deemed to be true by the Court [except for certain allegations based on excluded expert opinions]" and David and the Relief Defendants are "precluded from arguing that [he/they] did not violate the federal securities laws as alleged in the Amended Complaint" in connection with the proceeding concerning disgorgement. *Id.* Defendants acknowledge the Court's previous grant of summary judgment against Nutmeg and Randall on certain of the SEC's non-scienter-based claims [ECF No. 795], and they waive entry of additional findings of fact and conclusions of law under Federal Rule of Civil Procedure 52. [ECF Nos. 985-2, 985-4, 985-5]. *SEC v. The Nutmeg Group LLC,* 162 F. Supp. 3d 754 (N.D. Ill. 2016).

The SEC has filed a Motion for Disgorgement Against David Goulding, David Goulding, Inc., and David Samuel, LLC ("Motion"). [ECF No. 1036]. That Motion is fully briefed. [ECF Nos. 1037, 1065, 1072]. The Court must now determine the amount of disgorgement, together with prejudgment interest, to be paid by David and the Relief Defendants consistent with those Defendants' prior consents and the judgments entered against them in favor of the SEC.

I.

The SEC alleges in Counts IV, V, VI, and VIII of its Amended Complaint against David [ECF No. 314] that he aided and abetted the primary violations of the Investment Advisers Act of 1940 ("the Act"), 15 U.S.C. §§ 80a-1, *et seq.*, committed by The Nutmeg Group, LLC ("Nutmeg"), an investment advisory firm Randall owned. Nutmeg managed millions of dollars entrusted to it by investors in funds it created (referred to generally herein as "the Funds"). The

judgments against Defendants, as described above, seem to be predicated on an implicit assumption or finding that David aided and abetted Nutmeg's violations of the federal securities laws. David agreed to the entry of injunctive relief that would seem to be predicated on such a finding and he is precluded in this proceeding from arguing that he did not violate the federal securities laws. [ECF Nos. 985-2, 993]. The judgment itself, however, does not contain an express finding that David violated the federal securities laws or, in particular, that he aided and abetted Nutmeg's violations of those laws.[1]

In their brief filed in opposition to the SEC's Motion, Defendants appear at times to say that David did not violate the securities laws as part of their overarching argument that David should not be required to disgorge any compensation he received from Nutmeg. Defendants tip-toe around the issue, presumably because of the consents and judgments, but the gist of their argument is that David did nothing wrong, violated no laws while he worked for Nutmeg, and none of the compensation he received from Nutmeg was causally connected to any violations of the securities laws. Response in Opposition to Plaintiff's Memorandum in Support of Motion for Disgorgement ("Defendants' Opposition") [ECF No. 1066].

Similarly, David filed a declaration in support of Defendants' Opposition in which he says he agreed to "this bifurcated settlement" because he "determined that the allegations [in the Amended Complaint] as written could not possibly translate into any rational basis for disgorgement in excess of zero dollars." David Declaration [ECF No. 1066-1] at ¶ 5. And while David recognizes the SEC alleges that he admitted certain information Nutmeg provided to the SEC from its own records "was probably flawed due to incomplete documentation and the

---

[1] The Relief Defendants are charged with receiving improper and illegal transfers of property from Nutmeg and accepting compensation from Nutmeg and/or the Funds for doing so. The SEC seeks to disgorge from the Relief Defendants the fees they received, plus interest, but it seeks no other relief against them and does not allege they independently violated the securities laws.

commingling of customer assets," David also says in the next breath that those "circumstances .

. . were corrected long before suit was filed" despite the SEC's allegations in the Amended

Complaint that those problems had not been corrected. Amended Complaint [ECF No. 314] at

¶¶ 72, 93-97; David Declaration [ECF No. 1066-1] at ¶ 7. In this way, and in others, David

directly challenges one of the premises of his consent and the judgment entered against him – that

the allegations in the Amended Complaint are to be taken as true for purposes of the SEC's

Motion.

The SEC argues in its reply that Defendants' approach is improper given Defendants'

concessions in the consents and judgments. Plaintiff's Reply in Support of Motion for

Disgorgement ("SEC's Reply ") [ECF No. 1072] at 4 ("David and the Relief Defendants should

not be permitted to repudiate a significant condition of their bifurcated settlements, by disputing

either the allegations of the Amended Complaint, or the Court's factual findings and conclusions

of law from its summary judgment order."). In its opening brief, the SEC also asked the Court

to find, in effect, that David aided and abetted Nutmeg's securities law violations: "the Court

should recognize that David acted, at the very least, with 'extreme recklessness,' and that his

actions substantially assisted Nutmeg's violations of the [Investment] Advisers Act."

Memorandum in Support of Motion for Disgorgement ("SEC's Opening Brief") [ECF No. 1037]

at 10. The SEC does not specify what form the Court's "recogni[tion]" of these facts or

conclusions should take, *i.e.*, whether it is asking the Court to make such findings or simply to

recognize that such findings are implicit in the judgments.

In light of the parties' respective arguments in favor of and in opposition to the SEC's

Motion, the Court believes it is prudent to proceed first with a discussion of aiding and abetting

4

liability before it turns to the amount of any disgorgement award to be entered against David or the Relief Defendants in accordance with the consents and judgments.

For the reasons discussed below, the Court finds that David aided and abetted Nutmeg's primary violations of the Act. Liability for aiding and abetting liability requires: (1) a primary violation of the Act by another person or entity; (2) that a person generally was aware or knew that his actions were part of an overall course of conduct that was improper or illegal; and (3) that the person substantially assisted the primary violation. *Monetta Financial Services, Inc. v. Securities and Exchange Commission,* 390 F.3d 952, 956 (7th Cir. 2004); *SEC v. The Nutmeg Group LLC,* 162 F. Supp. 3d at 782. The Court already has determined that Nutmeg violated the Act. Nutmeg's primary violations of the Act are chronicled in the Court's ruling on summary judgment motions earlier in this case. *SEC v. The Nutmeg Group LLC,* 162 F. Supp. 3d at 772–82. So, the first element of aiding and abetting liability is satisfied.

The Court will next address the third element of aiding and abetting liability (substantial assistance) because the discussion of whether David substantially assisted Nutmeg's primary violations is relevant to the Court's analysis of the second element of whether David generally was aware that his actions were part of an overall course of conduct that was improper or illegal. As discussed below, the allegations in the Amended Complaint, taken as true for purposes of this Motion, and other evidence in the record establishes that David substantially assisted Nutmeg's primary violations of the Act.[2]

---

[2] The judgment against David [ECF No. 993] states that "the Court may hold an evidentiary hearing or may determine the issues raised in the motion on the basis of affidavits, declarations, excerpts of sworn deposition or investigative testimony, and documentary evidence . . . ." David testified under oath during Randall's trial as a witness in the SEC's case in chief and in Randall's case. The Court sees no reason that it cannot consider David's sworn testimony at trial consistent with the clause in the judgment entered against him that permits the Court to consider "sworn deposition or investigative" testimony. There is no functional difference between sworn deposition or investigative testimony and trial testimony under oath for these

David began working for Nutmeg in at least June 2007. David Declaration [ECF No. 1066-1] at ¶ 14. Among other things, David prepared quarterly account statements that were sent to investors between 2007 and 2009. Amended Complaint [ECF No. 314] at ¶ 41. Those statements to investors were inaccurate for several reasons, which are outlined below. Amended Complaint [ECF No. 314] at ¶¶ 41-52, 71-75; 77-82; 91-92.

Nutmeg did not have complete records of the Funds' investments or their purchase and sale of entitled shares. Amended Complaint [ECF No. 314] at ¶ 44. It also lacked the books and records it was required to keep by law, as well as internal controls to prevent violations of the Act. Amended Complaint [ECF No. 314] at ¶ 44. Further, any books and records Nutmeg did keep were in disarray. Amended Complaint [ECF No. 314] at ¶ 45. Many of the notes and other documents reflecting the Funds' investments were not signed or were missing. Amended Complaint [ECF No. 314] at ¶ 46. Some investment documents were signed by Nutmeg but not in the name of a specific fund. *Id.* Nutmeg also held its fund and investor assets in commingled accounts with Nutmeg's own assets, and it held the Funds' investments in its own name. Amended Complaint [ECF No. 314] at ¶¶ 2, 37. The commingling of Fund assets and accounting shortcomings, among other things, made it impossible to know which specific dollars in an investors' held monies account came from which fund. Amended Complaint [ECF No. 314] at ¶ 95. Nutmeg was never able to determine which investor's money was used to purchase the securities held in the firm's name, and therefore, Nutmeg's investors could never receive an accurate record of their investments. *Id.*

The fact that Nutmeg failed to maintain complete and accurate financial records also made it extremely difficult to verify the performance and value of the Funds. Amended Complaint

purposes. The parties appear to agree. Both the SEC and Defendants cite excerpts from David's trial testimony in their briefs in support of and in opposition to the SEC's Motion.

[ECF No. 314] at ¶ 71. Randall and David admitted to the SEC that the holdings and valuations of certain funds reflected in Nutmeg's internal records probably was flawed due to incomplete documentation and the commingling of fund and investor assets. Amended Complaint [ECF No. 314] at ¶ 72. In addition, Randall and David recorded incorrect stock prices in Nutmeg's internal records for certain fund investments and overstated the proceeds from the sales of shares in at least three companies. Amended Complaint [ECF No. 314] at ¶ 73. Nutmeg also failed to allocate between $400,000 and $1 million in rolled-over assets to a particular fund making it impossible to accurately value its non-perpetual funds. Amended Complaint [ECF No. 314] at ¶¶ 89-90.

All of this affected the accuracy of Nutmeg's quarterly statements to investors both before and after David went to work for Nutmeg. Randall and David, for example, admitted that an investor's Current Cash Position as reported in regular account statements included investments in securities that had been commingled and not allocated to a specific fund. Amended Complaint [ECF No. 314] at ¶¶ 90- 91. Nutmeg also transferred control of more than $90,000 of fund assets to third parties, including the Relief Defendants, without disclosing to investors that it had done so. Amended Complaint [ECF No. 314] at ¶¶ 52-61. Nutmeg's statements to investors concerning assets owned by the Funds therefore also were inaccurate to the extent they failed to disclose these asset transfers and the failure to allocate assets to specific funds.

David also participated, through his wholly-owned Relief Defendants, in the transfer of fund assets to those Relief Defendants. Amended Complaint [ECF No. 314] at ¶¶ 52-61. Though he says he did not understand the nature of the transactions at the time, David signed documents prepared by Randall that effectuated the asset transfers. (Tr. 489:12-502:16). When David became Nutmeg's Chief Compliance Officer, he knew, at a minimum, that these undisclosed asset transfers were not the "the most appropriate way to do things and were part of what [David] hoped

to remedy." David's Declaration [ECF No. 1066-1] at ¶ 21. Nutmeg had not fully repatriated the transferred assets to the funds from which they came as of the time the SEC filed its Complaint in this case. Amended Complaint [ECF No. 314] at ¶ 97. *See also SEC v. The Nutmeg Group LLC,* 162 F. Supp. 3d at 767.

In opposition to the SEC's Motion, David emphasizes that he tried hard to bring Nutmeg into compliance with the law. Beginning in January 2008, David says he focused on retitling fund assets correctly in the name of the fund to which they belonged, as well as undoing the commingling of Nutmeg's and the Funds' assets in Nutmeg's accounts. David Declaration [ECF No. 1066-1] at ¶¶ 16-19. Although David insists that many of these problems were fixed by the time the SEC filed suit, the SEC's Amended Complaint, which must be taken as true for purposes of ruling on this Motion, alleges to the contrary. Amended Complaint [ECF No. 314] at ¶¶ 89-97. Moreover, David's work at Nutmeg, both before and after he became Chief Compliance Officer in March 2008, helped to keep Nutmeg afloat and perpetuated Nutmeg's improper or illegal conduct. It also likely delayed investors from learning the truth about what Nutmeg was doing with their money and prevented them from liquidating their investments at a time when they might have been able to recover more than they ultimately recovered. At the very least, it deprived them of information they could have used to address with Randall sooner than they ultimately were able to the serious and undisclosed issues that existed at Nutmeg. *SEC v. The Nutmeg Group LLC,* 2016 WL 3023291, at *3 (N.D. Ill. 2016) (citing *Abrahamson v. Fleschner,* 568 F.2d 862, 877 (2d Cir. 1977)).

In particular, in September 2008, David personally wrote and sent a letter to the investors in Nutmeg's Mercury Fund that contained misleading statements and served to further Nutmeg's improper activities. The September 9, 2008 letter (PX 288) purported to explain why the

8

investors' second quarter 2008 statements were late. David told investors in that letter that the delay in their statements was the result of Nutmeg switching over its tracking, valuation, and reporting software and that, in connection with that transition, Nutmeg also had revalued certain of the Mercury Fund investment holdings. David acknowledged that he "certainly wrote most of [the September 9 letter]." (Tr. at 561:3-4).

What David did not tell investors, however, was that Nutmeg undertook the valuation review process directly as a result of the SEC's examination that began in May 2008. That investigation uncovered serious problems with Nutmeg's operations. David acknowledged both during Randall's trial and in his own Declaration that the SEC's examination was the catalyst for the revaluation described in his September 9th letter. (Tr. 564:15-18); David's Declaration [ECF No. 1066-1] at ¶ 28 ("the aftermath of the SEC's examination *required* that we undertake a full review of every investment ever made and the status of each.") (emphasis added). While David also testified that, in his view, "all of this would have happened, anyway" – in other words, Nutmeg would have done the revaluation whether or not the SEC became involved – that does not excuse his failure to tell investors the real reason the revaluation was done at the time it was done, a material fact David clearly acknowledged and understood. (Tr. 562:25-563:3).

The September 9th letter also failed to mention that Nutmeg did not use liquidity discounts in its revaluations of fund investments before April 1, 2008, which David acknowledged could have resulted in lower reported values for those investments. (Tr. 566:1-568:7). David explained this omission on the ground that it was not necessary to use liquidity discounts in 2007 because Nutmeg did not pay itself a fee at the end of 2007 based on the value of funds under management. So, this argument goes, Nutmeg was not unjustly enriched by an artificially high fee even if the valuation of a fund was artificially inflated without a liquidity discount. *Id.* Whether or not

9

Nutmeg's fee was inflated, though, does not change the fact that the investors were being sent reports that artificially inflated the value of their investments without the application of a proper liquidity discount.

In its Findings of Fact and Conclusions of Law entered after trial of the SEC's claims against Randall, the Court found that Nutmeg's and Randall's failure to utilize a liquidity discount when valuing the securities Nutmeg purchased for the Funds was improper. At Randall's direction, Nutmeg wrongly valued those securities based on the market value of the stock into which the Fund investments were convertible, without considering numerous factors that would have reduced those values for, among other reasons, lack of liquidity. Findings of Fact and Conclusions of Law [ECF No. 1085] at Findings of Fact ¶¶ 240-267; Conclusions of Law at ¶¶ 19-23. David may not have created this flawed and improper system, but he adopted and applied it after he went to work for Nutmeg, including after he became Chief Compliance Officer. This is evident from his September 9th letter and cited trial testimony. David did so without any of the research, analysis, or critical thinking that his role as Chief Compliance Officer demanded. (Tr. 1582:18-20).

Even before he went to work for Nutmeg, David followed Randall's direction with respect to matters involving Nutmeg seemingly without question and in exchange for a promise from Randall of compensation for his cooperation and acquiescence. For example, David blindly signed paperwork prepared by Randall to create the Relief Defendants and to facilitate the transfer of fund assets to them. David says he did not fully understand what he was doing at that time or why he was being asked to do it. Some of the documents he signed contained blatantly false statements about David's supposed qualifications as a sophisticated investor (which he was not)

10

and the investigation or due diligence he did in connection with the transactions that Randall papered (he did none). (Tr. 489:12-502:16).

For all these reasons and in these ways, David substantially assisted Nutmeg's primary violations of the Act.

As evidenced by the allegations in the Amended Complaint and the averments in David's Declaration, David generally was aware that his actions were part of an overall course of conduct that was improper or illegal at least as of the time he became Chief Compliance Officer in or about March 2008. David was aware of much of what the Court outlined above when he became Nutmeg's Chief Compliance Officer, if not before, and he certainly became more informed of those issues after he assumed his new role. David's Declaration [ECF No. 1066-1] at ¶ 22. For example, David knew it was likely there were errors in the complicated internal spreadsheets that Nutmeg used to prepare reports sent to investors. David's Declaration [ECF No. 1066-1] at ¶¶ 14-15. In David's own words, "by the time I got involved, I was opening up something like 300 spreadsheets at one time just to get all of the links to update. That was, to me, an absurdly unwieldy system and something that – before I even knew that there were errors, it seemed like – it seemed to lend itself towards a problem happening." (Tr. 1571:17-22.)

Further, throughout David's tenure with Nutmeg, including his time as its Chief Compliance Officer, David was aware of the problems caused by Nutmeg's commingling of its own assets with assets of the funds and their investors. Although David says he attempted to address these problems, they continued to exist, at least to some extent, until the SEC filed its Complaint in this case as discussed above. Amended Complaint [ECF No. 314] at ¶ 97.

David admits that when he was thinking about becoming Nutmeg's Chief Compliance Officer, he "expressed concern that were I to become the CCO, I would get painted with a broad

11

brush by the SEC and be held responsible for things that did not happen during my tenure." David's Declaration [ECF No. 1066-1] at ¶ 21. This is a frank acknowledgement that David knew Nutmeg was doing things that were improper when he became its Chief Compliance Officer. David specifically mentions the asset transfers to the Relief Defendants and unspecified issues with Nutmeg's books and records as being issues he was concerned about. *Id.* David says he consulted a lawyer, Carl Duncan ("Duncan"), who knew Randall and was familiar with Nutmeg's operations (and who David characterizes as Nutmeg's general counsel), about his concerns. According to David, Duncan's "view was that this should certainly not be an issue so long as the record was clear as to the date I became CCO and everything that I accomplished going forward to bring the company's books and records into compliance." *Id.*

Whatever tea leaves Duncan was reading to render the advice David says Duncan gave him, there is nothing in the record from Duncan. Nor does David cite any authority to support the "view" Duncan purportedly expressed. But David's problem is not only Nutmeg's improper conduct before he became Chief Compliance Officer, which the Amended Complaint alleges continued to exist until the SEC filed this lawsuit in early 2009, but also the conduct that he allowed to continue, and that he learned about and participated in, after he assumed that role. David was largely dependent on Randall when David succeeded him as Nutmeg's Chief Compliance Officer given David's lack of training, knowledge, and experience for that position, and Randall had operated Nutmeg in a way that David (as evidenced in part by his discussion with Duncan) knew was improper before he joined the company. Moreover, as discussed above, David continued Nutmeg's practice of sending misleading and inaccurate information to investors and accepted the self-serving explanations that Randall had used to justify that practice in the past

which means he adopted to some extent Nutmeg's improper business practices that were in place before he arrived.

For all of these reasons, the Court finds that the allegations in the Amended Complaint, taken as true for purposes of this proceeding, David's trial testimony and various trial exhibits, and David's own Declaration filed in opposition to the SEC's Motion, more than establish David generally was aware that his actions were part of an overall course of conduct that was improper or illegal and that he substantially assisted Nutmeg in furtherance of its improper activities after he became Chief Compliance Officer in March 2008.

Finally, David was extremely reckless in taking on responsibility for Nutmeg's compliance with federal securities laws given his complete lack of qualifications for that job. The Court addressed the state of mind required for aiding and abetting liability in its summary judgment ruling. *SEC v. The Nutmeg Group LLC,* 162 F. Supp. 3d 754, 782–85. As discussed there, reckless, or at a minimum extremely reckless, conduct satisfies the SEC's burden of proof as to the state of mind required for aiding and abetting liability. *Id.* The SEC has met its burden here by showing that David acted in an extremely reckless way when he became Nutmeg's Chief Compliance Officer and thereafter.

David had absolutely no training in, experience with, or knowledge of the securities industry when he agreed to become the Chief Compliance Officer of an investment advisory firm that had roughly $30 million in investor funds under management.[3] He had never worked for a broker/dealer, investment company, or investment fund. (Tr. 487:14-488:17). He had no experience communicating with investors, performing or assisting in the valuation of investment

---

[3] The SEC alleges in the Amended Complaint that Nutmeg claimed to have approximately $32.3 million under management. Amended Complaint [ECF No. 314] at ¶¶ 32, 49. David says in his declaration that Nutmeg had "more than $25 million under management." David Declaration [ECF No. 314] at ¶ 14.

funds, or with the compliance responsibilities of an investment adviser. *Id.* David had an undergraduate degree in philosophy and economics with a minor in political science and no graduate work or degree. He had worked as a personal trainer and in marketing for a health club and for Borders Books and Music before joining Nutmeg. (Tr. 486:3-18). David was 35 years old when he went to work for Nutmeg in 2007. (Tr. 487:3-4). His goal in going to work for Nutmeg was to make money. (Tr. 472:17-19).

To be blunt, the evidence suggests David literally had no idea what he was doing or what he was getting himself into when he decided to go to work for Nutmeg. In April 2007, as he was transitioning to working for Nutmeg on a more regular basis, he wrote a memo to his then-employer, the Harbor Athletic Club, about what he would be doing at Nutmeg and why it represented a good opportunity for him. David conceded during Randall's trial that everything he said in that memo was based on a "complete misunderstanding." (PX 213); Tr. 474:19-475:6) ("Yeah, this was based on a very complete misunderstanding of what I would actually be doing with the Nutmeg Group and what anybody had envisioned. As I look back on this, I'm not really sure what I was thinking about, but it was clearly a misunderstanding that I had.").

Moreover, as discussed above, David admits he was wary about taking on more responsibility and becoming Nutmeg's Chief Compliance Officer in March 2008 given what he already knew about Nutmeg's improper activities. David Declaration [ECF No. 1066-1] at ¶ 21. David says he needed "a crash course on all pertinent securities regulations" when he took on the compliance role. David Declaration [ECF No. 1066-1] at ¶ 21. It is unclear what this crash course entailed. When he became Chief Compliance Officer, David either learned or already knew that Nutmeg lacked any internal policies, procedures, or control mechanisms. David Declaration [ECF No. 1066-1] at ¶ 22. David admits he plunged into the process of valuing the securities

Nutmeg had purchased for the Funds without looking at any literature, guidance, or academic material concerning the valuation process. (Tr. 1582:18-20). It was extremely reckless for David to become Nutmeg's Chief Compliance Officer under these circumstances and to continue in that role once additional issues and problems came to light.

David also knew of the serious problems with Nutmeg's spreadsheet system for valuing and accounting for Fund assets even before he became Nutmeg's Chief Compliance Officer, and he says he intended to change that system beginning as early as January 2008. (Tr. at 1595:11-1598:7). Although David says he had begun to speak with outside consultants about ways to address these problems, he had not made progress by the time the SEC began its examination in May 2008. *Id.* Moreover, David says that when he ultimately determined no commercially available software existed that would help Nutmeg to account properly for the convertible debentures that were the primary instruments Nutmeg purchased for the funds, he turned to his brother Brandon – who had created the unwieldy system Nutmeg was using in the first place – to fix it. (Tr. at 1600:3-13). There was no reason to believe Brandon had the ability to fix the fundamentally flawed system he had himself created, especially without outside help or expert guidance.

David was in way over his head as the Chief Compliance Officer for an investment advisory firm, and he knew it. He was unqualified and unable to fix the problems he knew existed when he started the job, and the problems the SEC identified after it began its examination in May 2008 just exasperated the situation. He accepted without research or analysis the valuation methodology Randall had been using to report to investors Nutmeg's performance in managing their investments which misrepresented that information to investors. This was reckless and even extremely reckless conduct under all the circumstances.

For all these reasons, the Court finds, and agrees with, the implicit assumption underlying the judgments that David aided and abetted Nutmeg's primary violations of the Investment Adviser's Act.

II.

Under these circumstances, disgorgement of ill-gotten gains can be an appropriate equitable remedy. The SEC here is seeking disgorgement from David in the full amount of his compensation from Nutmeg and disgorgement from the Relief Defendants in the amount of fees they earned on the sale of certain fund assets that were transferred to them by Nutmeg. "Disgorgement is an equitable remedy that takes ill-gotten gains from a wrongdoer so that he does not profit from his misconduct." *SEC v. Rooney*, 2014 WL 3500301, at *2 (N.D. Ill. 2014) (citing *SEC v. Lipson*, 278 F.3d 656, 662-63 (7th Cir. 2002)). "The simple question is whether the profits, fees and other compensation derived from wrongdoing." *Id.* at *2 (quoting *SEC v. Capital Solutions Monthly Income Fund, LP*, 2014 WL 2922644 (D. Minn. 2014)). To obtain disgorgement, the SEC need only demonstrate that its disgorgement figure is "a reasonable approximation of profits causally connected to the violation." *SEC v. Michel*, 521 F. Supp. 2d 795, 830-31 (N.D. Ill. 2007) (quoting *SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230 (D.C. Cir. 1989)); *see also SEC v. Black*, 2009 WL 1181480, at *2-3 (N.D. Ill. 2009); *SEC v. DeMaria*, 2013 WL 4506867, at *1 (N.D. Ill. 2013); *SEC v. Benger*, 2015 WL 6859168, at *4 (N.D. Ill. 2015); *SEC v. Randy*, 38 F. Supp. 2d 657, 674 (N.D. Ill. 1999).

Disgorgement calculations do not have to be exact. *Koenig*, 532 F. Supp. 2d at 994. Once the SEC offers a reasonable disgorgement calculation, the burden then shifts to the defendant to show that this approximation is inaccurate. *Black*, 2009 WL 1181480, at *2; *Randy*, 38 F. Supp. 2d at 674. Any "ambiguity in the calculation should be resolved against the defrauding party."

*Black*, 2009 WL 1181480, at *2; *see also Koenig*, 532 F. Supp. 2d at 994. "Disgorgement of salaries and other forms of compensation may be an appropriate remedy." *Black*, 2009 WL 1181480, at *7. *See also* Order in *SEC v. Resources Planning Group, Inc.*, Case No. 1:12-cv-9509 (N.D. Ill. 2014). Disgorgement is targeted at the wrongdoer's gains, not tied to or limited by the amount of losses suffered by investors. *SEC v. Toure*, 4 F. Supp.3d 579, 589 (S.D. N.Y. 2014); *SEC v. Huff*, 758 F. Supp.2d 1288, 1359 (S.D. Fla. 2010). The Court has broad discretion to order disgorgement under these circumstances. *SEC v. Murray*, 2013 WL 839840, *1 (E.D.N.Y. 2013) (citations omitted).

The judgments provide that Defendants "shall pay disgorgement and prejudgment interest thereon" as determined by the Court upon motion of the SEC. [ECF Nos. 993, 994]. Defendants argue, as noted above, there are no ill-gotten gains to disgorge either by David or the Relief Defendants. The SEC, as also noted above, says most of Defendants' arguments contravene the consents because Defendants effectively argue there were no securities law violations that would give rise to a disgorgement award. To some extent, the Court agrees that is what Defendants are arguing, but it will deal with Defendants' arguments anyway.[4]

Defendants say the SEC has not shown a causal connection between any compensation or income earned by Defendants and a violation of the securities laws. It is hard to credit that

---

[4] David also argues that the SEC has waived any objection it might have to the Court considering David's Declaration filed in opposition to the SEC's Motion or his trial testimony for purposes of deciding the Motion. The Court does not understand this argument or the basis for it. In any event, the Court has considered David's Declaration and his trial testimony in deciding the Motion, so it appears David's waiver argument is moot. The Court will not, however, address directly the arguments in Randall's 31-page declaration ostensibly filed in support of David's position in this proceeding. Randall Declaration [ECF No. 1066-2]. The Court agrees with the SEC that Randall's Declaration is replete with unsupported opinions and essentially reargues whether Randall or Nutmeg violated the securities laws. Those arguments, to the extent they are relevant to the SEC's claims against David, largely are barred by the consent and judgment that David entered into with the SEC. [ECF Nos. 985-2, 983]. For the reasons discussed above, the Court has found that Nutmeg violated the securities laws and that David aided and abetted Nutmeg's violations as alleged in the Amended Complaint [ECF No. 314]. Nothing in Randall's Declaration changes the Court's findings or conclusions in that regard.

argument, however, since the only reason David or the Relief Defendants received any compensation or fees is because Nutmeg was violating the Act. The Relief Defendants received fees because of the improper transfers to them of money from certain funds. David was paid a salary by Nutmeg. Neither David nor the Relief Defendants would have received a dime but for Nutmeg's improper conduct and its violations of the securities laws that infected its operations from top to bottom as alleged in the Amended Complaint and as detailed in the Court's prior rulings on summary judgment. *See, e.g., SEC v. Church Extension of Church of the Church of God, Inc.,* 429 F. Supp. 2d 1045, 1050 (S.D. Ind. 2005) (Hamilton, J.) ("But for the securities violations, CEG would have collapsed earlier, so the violations enabled the defendants to continue their employment.")

Defendants also say investors suffered no losses because of anything Defendants did. As noted above, however, this also is not a winning argument because disgorgement need not be tied to investor losses. *SEC v. Toure,* 4 F. Supp.3d 579, 589 (S.D. N.Y. 2014); *SEC v. Huff,* 758 F. Supp.2d 1288, 1359 (S.D. Fla. 2010). Related to this argument, Defendants argue David was not paid with investor money but with Nutmeg's own funds. Given the pervasive commingling of Nutmeg's and investors' money, it is impossible for Defendants to win this argument. And, again, the SEC need not show that David was paid with investor funds. It is sufficient for the SEC to show that the money paid to David is "a reasonable approximation of profits causally connected to [Nutmeg's] violation" of the securities laws. *SEC v. Michel*, 521 F. Supp. 2d at 830-31, and cases cited for this point above. If Nutmeg was violating the law, as the Court has found it was doing in so many ways, then the money Nutmeg paid to David is connected to Nutmeg's violations of the securities laws. Moreover, if David aided and abetted Nutmeg's securities

violations, as the Court has found he did, then his compensation for those activities from Nutmeg is causally connected to Nutmeg's and David's violations of the securities laws.

Defendants also say David's compensation was reasonable for what he did and no more than what he was entitled to receive for his efforts. The SEC argued in another context, and the Court found, that Nutmeg would have had to pay someone who actually was qualified to be its Chief Compliance Officer more than it paid David who was not qualified for that position. Findings of Fact and Conclusions of Law [ECF No. 1085], Findings of Fact at ¶¶ 49, 50, 54. The Court agrees that it can take into consideration in determining an appropriate disgorgement award the extent to which a defendant provided real and valuable services for the payments he received and sufficiently shows the value of the services he provided. *SEC v. Black,* 2009 WL 1181480, at *4. The SEC argues, however, that David has not quantified or monetized the value of the services he provided to Nutmeg and it is his burden under the law to do so. The SEC also argues that it is impossible to differentiate what David was paid for his wrongful activities and what he was paid for his efforts to bring Nutmeg into compliance with the law, citing *SEC v. Capital Solutions Monthly Income Fund, LP,* 28 F. Supp.3d 887, 899 (D. Minn. 2014). In the Court's view, both sides have a point here and the Court has factored these arguments into its decision as to the amount David should be required to disgorge under all the circumstances of this case.

Finally, Defendants argue that any disgorgement award under these circumstances would be akin to an unlawful penalty to which the SEC is not entitled and which, if allowed, would be contrary to Supreme Court precedent. For this point, Defendants cite the Supreme Court's 2017 decision in *Kokesh v. SEC,* 137 S.Ct. 1635 (2017). It appears Defendants are arguing that any disgorgement award here as to David would amount to a penalty because the SEC has not shown that "the amount of compensation received by David was attributable to the wrongdoing."

Defendants' Opposition [ECF No. 1066] at 16. As discussed above, however, the Court disagrees with Defendants' premise for this argument. The money Nutmeg paid to David came from commingled funds and/or it was paid to compensate David for work he did that helped to keep Nutmeg in business and prevent disclosure of the multiple ways in which Nutmeg was violating the law. David's compensation was attributable to both his and Nutmeg's wrongdoing.

In any event, the Supreme Court did not hold in *Kokesh* that a disgorgement award under the circumstances of this case would be an unlawful penalty. In fact, in *Kokesh*, the Supreme Court said, "[n]othing in this opinion should be interpreted as an opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings or on whether courts have properly applied disgorgement principles in this context. The sole question presented in this case is whether disgorgement, as applied in SEC enforcement actions, is subject to § 2462's limitations period." *SEC v. Kokesh,* 137 S.Ct. at 1642, n.3. Other courts since have taken the Supreme Court at its word and reaffirmed that disgorgement can be an appropriate remedy in a securities case particularly when the amount ordered disgorged is equal to or less than the amount received by a defendant as a result of a securities violation. *See SEC v. Jammin' Java Corp.,* 2017 WL 4286180 at \*\*2-4 (C.D. Cal. 2017); *SEC v. Sample,* 2017 WL 5569873 at \*2 (N.D. Tex. 2017).

The Court notes that the Supreme Court has agreed to hear in its current term a case, *SEC v. Liu, et al.,* 754 Fed. Appx. 505 (9th Cir. 2018), that may require it to decide whether disgorgement is an appropriate remedy in a securities fraud case and, if so, under what circumstances that is permissible. As of this writing, however, in this Court's view, the law permits a disgorgement award in this case.

For all these reasons, the Court agrees with the SEC that disgorgement is appropriate here and that David's salary is the appropriate starting point for the analysis. The SEC alleges in its Amended Complaint that David's was paid $95,480 in salary between 2007 and 2009. Amended Complaint [ECF No. 314] at ¶ 68. In support of the instant Motion, the SEC submitted a declaration from an SEC accountant that pegs David's salary during the same time period as $97,639. Tushaus Declaration [ECF No. 1038-1] at ¶ 5. The SEC asks for disgorgement of the entire $97,639 from David plus interest, ignoring the $95,480 figure in the Amended Complaint even though the allegations in the Amended Complaint are deemed to be true for purposes of this Motion.

As an initial matter, David should not have to disgorge any salary he received before he became Nutmeg's Chief Compliance Officer in March 2008. His activities in 2007 were predominantly ministerial and administrative. He worked mostly from home and he apparently was still working as a personal trainer and in marketing for an athletic club for at least half of that year. *See* PX 213; David's Declaration [ECF No. 1066-1] at ¶ 14 ("I had been an outside consultant at the time, assisting with some mundane things like entering the daily sales."). Although David became "internal operations manager" in January 2008, his responsibilities in that role are unclear; he still apparently was working part time, and he appears to have been focused primarily on internal bookkeeping functions. *Id.* at ¶¶ 16-19. As discussed above, however, David made an affirmative decision to get more involved with Nutmeg in March 2008 when he became Chief Compliance Officer, knowing that Nutmeg had engaged in improper conduct in the past, and knowing that he did not have the background, training, or experience to step into such a role for a company with tens of millions of investor money under management.

That decision and the conduct that flowed from it raised his profile, responsibility, and exposure. *Id.* at ¶¶ 20-21.

According to the SEC's Tushaus Declaration, from March 11, 2008 through March 20, 2009, David was paid the net amount of $36,660 in salary as Chief Compliance Officer and he received $974 in expense reimbursements. [ECF No. 1038-1] at Exhibit 1.[5] *See also* David Declaration [ECF No. 1066-1] at ¶¶ 35, 36, 38. David does not dispute the line items in Exhibit 1 to the Tushaus Declaration that support the $36,660 number.[6] That includes two payments to David from David Samuel, LLC, of $1,000 each in May and June 2008. Tushaus Declaration [ECF No. 1038-1] at Exhibit A. David says these payments to him through David Samuel, LLC were made pursuant to Nutmeg's "undefined fee arrangement with me as I continued to get more involved with Nutmeg." David Declaration [ECF No. 1066-1] at ¶ 36. Including these payments to David, therefore, is consistent with "a reasonable approximation of profits causally connected to the violation." *Michel,* 521 F. Supp. 2d at 830-31; *Black,* 2009 WL 1181480, at *2-3.[7]

David argues that he provided valuable services to Nutmeg because he was trying to correct the problems at Nutmeg during this time period, and he did correct some of the problems, so his compensation was not ill-gotten. But David ignores the fact that whatever his efforts to bring

---

[5] David says he was paid $3,466.07 per month net of taxes. David Declaration [ECF No. 1066-1] at ¶ 38. The chart in the Tushaus Declaration itemizes 10 payments in this amount so it appears the SEC is seeking to disgorge from David only his net compensation. Tushaus Declaration [ECF No. 1028-1] at Exhibit A.

[6] The Court recognizes that these payments to David do not comport with the annual compensation the SEC alleges he was paid. Amended Complaint [ECF No. 324] at ¶68; Tushaus Declaration [ECF No. 1038-1] at ¶5. Nevertheless, this is what the evidence shows.

[7] David might argue that disgorgement of these two $1,000 payments from David Samuel, LLC, amounts to a double recovery if those amounts also are part of a disgorgement award against that Relief Defendant. David Declaration [ECF No. 1066-1] at ¶ 36. But David has not met his burden of showing that is the case as discussed more fully below in the next section of this Opinion. Based on both the Tushaus and the David Declarations [ECF Nos. 1038-1, 1066-1], the record supports including these two payments in the category of compensation paid to David during the time he was Nutmeg's Chief Compliance Officer.

Nutmeg into compliance with the securities laws, he also was actively working to keep Nutmeg in business during a time that it was flagrantly violating those laws and, as shown by his September 9th letter to investors, he bought into Nutmeg's practice of concealing material facts from investors so they would not discover the full extent of the serious problems at Nutmeg or challenge Randall about what Nutmeg was doing and about the reported value of their investments.

Under these circumstances, the Court concludes it is fair, reasonable, and equitable to require David to disgorge one-half of his salary as Nutmeg's Chief Compliance Officer and one-half of the expense reimbursements he received during that time, plus interest, as proceeds directly attributable to Nutmeg's and his violations of the federal securities laws. The principal disgorgement amount using this formula, before prejudgment interest, is $18,817. As then-District Judge David Hamilton put it in *Church of Extension*, "[t]here is no magic to the fraction of one-half, but it is intended to reflect in an equitable way the fact that [David] also provided real and valuable services to [Nutmeg], as well as other mitigating factors." *Church of Extension*, 429 F. Supp. 2d at 1050. Here, another mitigating factor is David's apparently sincere belief when he became Nutmeg's Chief Compliance Officer that he could remedy the compliance issues at Nutmeg even if that belief was naïve and ill-advised.

This case is distinguishable from others cited by the SEC in which the defendant ordered to disgorge ill-gotten gains or profits also was deeply involved in and an architect of the fraudulent or improper conduct from the beginning. David joined Nutmeg well-after it was up and running under Randall's watch. He did not participate directly in raising new money from investors. He appears to have gone to work for the company with the intent to fix problems he knew existed when he arrived but those problems grew astronomically when the SEC began its

23

compliance examination within months of David becoming Nutmeg's Chief Compliance Officer. In addition, during much of the time he was Chief Compliance Officer, David also was responding to the SEC's requests for information and attempting to address the slew of issues the SEC had identified. It seems a bit odd to require David to disgorge money he was paid, at least in some part, for work he did at the SEC's instance.

Still, for all the reasons discussed above, David's conduct as Nutmeg's Chief Compliance Officer, including his dissemination of the misleading September 9th letter, is not beyond reproach. Under all these circumstances, and in the exercise of its discretion, the Court believes the balance it has struck here with respect to the amount of money David should be required to disgorge is fair, reasonable, and equitable. Accordingly, for these reasons, the Court will order David to disgorge $18,817 in compensation he received as Nutmeg's Chief Compliance Officer plus pre-judgment interest on that amount, calculated quarterly, at the interest rate used by the Internal Revenue Service when it computes interest due on back taxes.

IV.

The SEC is seeking a total of $13,086 by way of disgorgement from the Relief Defendants plus prejudgment interest on that amount. That is the total amount the SEC alleges the Relief Defendants received in fees for selling securities purchased with Nutmeg client money. The total breaks down to $3,317 from David Goulding, Inc., in fees that entity received from selling securities purchased with Nutmeg client money and $9,769 in fees that David Samuel, LLC, received from selling securities on behalf of certain Nutmeg funds in 2007 and 2008. Tushaus Declaration [ECF No. 1038-1] at ¶ 6 and Exhibits 5, 6.

Defendants do not dispute the SEC's math as to the fees received by the Relief Defendants. But they claim the SEC also is seeking these same amounts from David directly on the ground

that he received the proceeds of the fee payments made to the Relief Defendants. David Declaration [ECF No. 1066-1] at ¶ 32; Defendants' Opposition [ECF No. 1066] at 16. The SEC does not seem to disagree that David ultimately received from the Relief Defendants the fees it is seeking to disgorge from them. The SEC says it is not interested in a double recovery, and the Court should reduce any disgorgement award as to the Relief Defendants by the corresponding amount they paid to David for the fees they received for selling securities purchased with investor money. SEC's Reply [ECF No. 1072] at 9. This makes some sense, as the SEC acknowledges that the Relief Defendants have been dissolved and have no assets. *Id.*

Neither Defendants nor the SEC, however, do the math with respect to a potential reduction of the amount the SEC is seeking to disgorge from the Relief Defendants to account for any payment by the Relief Defendants to David. The SEC lays out what it says Defendants must disgorge in the Tushaus Declaration [ECF No. 1038-1]. In that Declaration, the SEC sets out the "salary and other compensation" Nutmeg paid to David in Exhibit 1 and the fees received by the Relief Defendants in Exhibits 3 and 4. Tushaus Declaration [ECF No. 1038-1] at ¶¶ 4, 6. It is impossible to figure out from the Tushaus Declaration, or the attached Exhibits, what the Relief Defendants may have remitted to David from the fees they received from selling securities transferred to them by Nutmeg..

The SEC closes its reply brief with a prayer for disgorgement of the ill-gotten fees paid to the Relief Defendants plus interest, ignoring its own previous suggestion that the Court could reduce any disgorgement award against the Relief Defendants and instead add that amount to the disgorgement award against David. SEC's Reply [ECF No. 1072] at 12. Perhaps the SEC takes this approach because it realizes it is impossible to determine from the materials it has submitted in support of its Motion the amount of fees the Relief Defendants remitted to David. There simply

is no evidence in the record from which the Court can tie out the disgorgement award the SEC is seeking from the Relief Defendants with amounts paid to David by those Defendants.

On this record, therefore, the Court concludes that a disgorgement award against the Relief Defendants in the amounts requested by the SEC is fair, reasonable, and equitable. The Court already has found the asset transfers occurred, they were not disclosed to investors, and the Relief Defendants received payments they should not have received as a result of the transfers and sales of those assets, all in violation of the Act. *SEC v. The Nutmeg Group, LLC,* 162 F. Supp. 3d at 766–67. In the context of a disgorgement award, where precision is not required, provided the SEC makes a prima facie case showing that disgorgement is appropriate, it is up to the defendant to show that the SEC's disgorgement calculation is wrong. *Black,* 2009 WL 1181480, at *2. No more is required to order disgorgement of the fees received by the Relief Defendants here. The Court acknowledges that the Relief Defendants may have no assets, SEC's Reply [ECF No. 1072] at 9, but that goes to whether the Relief Defendants are collectable, not to the propriety of the award.

Accordingly, for these reasons, the Court will order David Goulding, Inc., to disgorge the principal amount of $3,317 in fees it received and David Samuel, LLC, to disgorge the principal amount of $9,769 in fees it received, as supported by the Tushaus Declaration. Both Relief Defendants shall also pay pre-judgment interest on those amounts, calculated quarterly, at the interest rate used by the Internal Revenue Service when it computes interest due on back taxes.

## V.

Accordingly, for all the reasons discussed above, Plaintiff SEC's Motion for Disgorgement Against David Goulding, David Goulding, Inc., and David Samuel, LLC ("Motion"). [ECF No. 1036] is granted. David and the Relief Defendants each shall disgorge the amounts set forth in

the body of this Memorandum Opinion and Order together with prejudgment interest on those amounts calculated at the stated rates. The parties shall meet and confer and submit by January 29, 2020, proposed orders that include the disgorgement awards and a calculation of pre-judgment interest through and including the date the orders are submitted.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge

Dated:   January 21, 2020